UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

SHELLEY L. STANGLER, P.C.
155 MORRIS AVENUE, 2ND FLOOR
SPRINGFIELD, NJ 07081
PHONE (973) 379-2500 FAX (973) 379-0031
Attorney for Plaintiffs
Attorney ID: 023191987

| | |
|---|---|
| KIRSTEN SEIDLE, as Administratrix of the Estate of TAMARA WILSON-SEIDLE, TERESA SEIDLE, minor by her guardian KIRSTEN SEIDLE, and KIRSTEN SEIDLE, PHILIP SEIDLE, JR., JOHN SEIDLE, CHRISTOPHER SEIDLE, MONICA SEIDLE, DOROTHY SEIDLE, MARIA SEIDLE, minor and STEPHEN SEIDLE minor, by their guardian, KIRSTEN SEIDLE, individually, <br><br> Plaintiffs, <br> vs. <br><br> NEPTUNE TOWNSHIP, NEPTUNE TOWNSHIP POLICE DEPARTMENT, POLICE CHIEF JAMES M. HUNT, JR., in his official and individual capacities, POLICE DIRECTOR MICHAEL BASCOM, in his official and individual capacities, former POLICE CHIEF ROBERT ADAMS, in his official and individual capacities, former POLICE CHIEF HOWARD O'NEIL, in his official and individual capacities, CITY OF ASBURY PARK, ASBURY PARK POLICE DEPARTMENT, ACTING POLICE CHIEF ANTHONY SALERNO, in his official and individual capacities (retired); ASBURY PARK POLICE DEPARTMENT DEPUTY CHIEF DAVID KELSO, in his official and individual capacities, MONMOUTH COUNTY, THE MONMOUTH COUNTY PROSECUTOR'S OFFICE, PROSECUTOR CHRISTOPHER GRAMICCIONI, in his official and individual capacities, PHILIP SEIDLE in his official and individual capacity, OFFICER AHMED LAWSON, in his official and individual capacities, OFFICER CARL CHRISTIE, in his official and individual capacities, OFFICER TIMOTHY GRISWOLD, SLEO, II., in his official and individual capacities, JAMES CRAWFORD, SLEO, II., in his official and individual capacities, SGT. MARSHAWN LOVE, in his official and individual capacities; APPOs # 6-10 (as yet unidentified | CIVIL ACTION <br><br> Civ. No. 3:17-cv-04428-MAS-LHG <br><br> THIRD AMENDED COMPLAINT AND JURY DEMAND, AND DEMAND TO IDENTIFY DEFENDANTS |

Asbury Park police officers/state actors on the scene, dispatched to the scene, or having any police or law enforcement duties or responsibilities at, near or after the subject incident forming the basis for this Complaint, identities known to the Prosecutor), MCPOs #1-10 (as yet unidentified detectives, officers, employees or representatives of the MONMOUTH COUNTY PROSECUTORS OFFICE on the scene, dispatched to the scene, or having any police or law enforcement duties or responsibilities at, near or after the incident forming the basis for this Complaint, identities known to the Prosecutor), FORMER ASSISTANT PROSECUTOR GREGORY J. SCHWEERS, in his official and individual capacities, FORMER ASSISTANT PROSECUTOR JACQUELYNN F. SEELY, in her official and individual capacities, FORMER DEPUTY ASSISTANT PROSECUTOR RICHARD E. INCREMONA, in his official and individual capacities, MCPOs #14-20 (as yet unidentified detectives, Asst. Prosecutors, members, employees, agents of the Monmouth County Prosecutor or Sheriff's Office who had authority, control and supervision over Phillip Seidle and/or decisions and control over the seizure and return of weapons and reinstatement of Seidle and determination over conditions involving Seidle's use and control over weapons, including service weapons, identities known to the Prosecutor), PST KAREN CLAYTON, in her official and individual capacities, PST KRISTIN ARAS, in her official and individual capacities, PST STEPHANIE MIGLIACCIO, in her official and individual capacities, PST KURT GIBSON, in his official and individual capacities, JOHN DOES 5-10 (as yet unidentified detectives, officers, employees or representatives of any law enforcement agency or public entity including Neptune Township or other responding entities, on the scene, dispatched to the scene, or having any police dispatch or law enforcement duties or responsibilities at, near or after the incident forming the basis for this Complaint, identities known to the Prosecutor), JANE DOES 1-10 (as yet unidentified medical responders, EMTS, BLS, paramedics, or law enforcement officers charged with providing medical care or with the responsibility to provide medical care and assistance to TAMARA SEIDLE, identities known to the Prosecutor) and NPO 1-10 (as yet unidentified officers, employees, agents, representatives, internal affairs officials from the NEPTUNE POLICE DEPARTMENT/NEPTUNE

TOWNSHIP, charged with supervision, training, discipline of law enforcement officers, internal affairs investigations, and domestic violence investigations); (all unidentified defendants are sued in their official and individual capacities),

Defendants.

Plaintiffs **KIRSTEN SEIDLE, as Administratrix of the Estate of TAMARA WILSON-SEIDLE, TERESA SEIDLE,** minor by her guardian **KIRSTEN SEIDLE,** and **KIRSTEN SEIDLE, PHILIP SEIDLE, JR., JOHN SEIDLE, CHRISTOPHER SEIDLE, MONICA SEIDLE, DOROTHY SEIDLE** and **MARIA SEIDLE,** minor and **STEVEN SEIDLE,** minor by their guardian **KIRSTEN SEIDLE, individually** (together the **"ESTATE"**), as and for their Complaint against Defendants, say:

## PARTIES

1. At all relevant times herein plaintiff **KIRSTEN SEIDLE, as Administratrix of the Estate of TAMARA WILSON-SEIDLE, ("KIRSTEN")** was and is a resident of the County of Monmouth and State of New Jersey.

2. At all relevant times herein plaintiff **TERESA SEIDLE,** a minor and daughter of **TAMARA WILSON-SEIDLE** by her guardian **KIRSTEN SEIDLE** was and is a resident of the County of Monmouth and State of New Jersey and the daughter of **TAMARA WILSON-SEIDLE ("TAMARA," or Plaintiff).**

3. At all relevant times herein plaintiffs **PHILIP SEIDLE, JR. JOHN SEIDLE, CHRISTOPHER SEIDLE, MONICA SEIDLE, DOROTHY SEIDLE, MARIA SEIDLE,** minor and **STEPHEN SEIDLE,** minor were and are residents of the County of Monmouth and State of New Jersey and the children of **TAMARA WILSON-SEIDLE** (hereinafter, except where specifically designated, all the individually **named children** will be collectively referred

3

to as the "PLAINTIFF CHILDREN"). PHILIP SEIDLE will be referred to as "PHILIP SEIDLE, JR." to distinguish him from his father, PHILIP SEIDLE ("SEIDLE"), a defendant.

4. At all relevant times herein defendant NEPTUNE TOWNSHIP was and is a municipal entity organized and existing pursuant to the laws of the State of New Jersey, engaged in the operation, management, supervision and control over law enforcement with a subdivision known as the NEPTUNE TOWNSHIP POLICE DEPARTMENT (collectively, "NEPTUNE"), and the employer of defendant PHILIP SEIDLE, a police officer, with a place of business at 25 Neptune Blvd., Neptune, New Jersey 07753.

5. At all relevant times herein defendant POLICE CHIEF JAMES HUNT, JR. ("CHIEF HUNT"), sued in his official and individual capacities, was the Chief of Police of NEPTUNE, responsible for the supervision, training, hiring, operations and oversight of the police department upon information and belief between 2014 through and including the events described in this Complaint, including the development, promulgation, and implementation of policies, procedures and standards for the department and more specifically policies, procedures and standards relating to, the handling of domestic violence and use of force incidents and reporting involving members of law enforcement, employment, supervision, monitoring, internal affairs investigations, discipline and the overall conduct of police officers and law enforcement, acting under color of law and within the scope of his employment.

6. At all relevant times herein defendant former POLICE CHIEF HOWARD O'NEIL ("CHIEF O'NEIL"), sued in his official and individual capacities, was the Chief of Police of NEPTUNE, upon information and belief prior to 2012 and responsible for the supervision, training, hiring, operations and oversight of the police department, including the development, promulgation, and implementation of policies, procedures and standards for the

4

department and more specifically policies, procedures and standards relating to the handling of domestic violence and use of force incidents and reporting involving members of law enforcement, employment, supervision, monitoring, internal affairs investigations, discipline and the overall conduct of police officers and law enforcement, acting under color of law and within the scope of his employment.

7.    At all relevant times herein defendant **POLICE DIRECTOR MICHAEL BASCOM,** (hereinafter **"DIRECTOR BASCOM"**), sued in his official and individual capacities, was the Police Director of **NEPTUNE** upon information and belief from 2013 to 2017, responsible for the supervision, training, hiring, operation and oversight of the police department, including the development, promulgation, and implementation of policies, procedures and standards for the department and more specifically policies, procedures and standards relating to the handling of domestic violence, use of force incidents and reporting involving members of law enforcement, employment, supervision, monitoring, internal affairs investigations, discipline and the overall conduct of police officers and law enforcement, acting under color of law and within the scope of his employment.

8.    At all relevant times herein defendant  former **POLICE CHIEF ROBERT ADAMS ("CHIEF ADAMS")**, sued in his official and individual capacities, was the Chief of Police of **NEPTUNE** upon information and belief  between 2012 and 2014, responsible for the supervision, training, hiring, operations and oversight of the police department, including the development, promulgation, and implementation of policies, procedures and standards for the department and more specifically policies, procedures and standards relating to the handling of domestic violence, use of force incidents and reporting involving members of law enforcement, employment, supervision, monitoring, internal affairs investigations, discipline and the overall

conduct of police officers and law enforcement, acting under color of law and within the scope of his employment.

9. At all relevant times herein defendant **ASBURY PARK** was and is a municipal entity organized and existing pursuant to the laws of the State of New Jersey, engaged in the operation, management, supervision and control over law enforcement with a subdivision known as the **ASBURY PARK POLICE DEPARTMENT**, with a place of business at 1 Municipal Plaza, Asbury Park, New Jersey 07712 (collectively, "**ASBURY PARK**").

10. At all relevant times herein defendant **ACTING POLICE CHIEF ANTHONY SALERNO, sued in his official and individual capacities (retired) (hereinafter "CHIEF SALERNO")**, sued in his official and individual capacities, was the Police Director of **ASBURY PARK** during the events described in this Complaint, responsible for the supervision, training, hiring, operation and oversight of the police department, including the development, promulgation, and implementation of policies, procedures and standards for the department and more specifically policies, procedures and standards relating to the handling of active shooting situation, rapid response, use of force, handling of crimes in the field including shooting, medical attention, hostage taking, field training, purchase and use of equipment such as bulletproof vests and shields, and all supervision and monitoring over members of law enforcement, employment, internal affairs investigations, discipline and the overall conduct of police officers and law enforcement, acting under color of law and within the scope of his employment.

11. At all relevant times herein defendant **DEPUTY POLICE CHIEF DAVID KELSO,** sued in his official and individual capacities (hereinafter "**DEPUTY CHIEF KELSO**"), sued in his official and individual capacities, was the Police Director of **ASBURY**

6

**PARK during the events described in this Complaint,** responsible for the supervision, training, hiring, operation and oversight of the police department, including the development, promulgation, and implementation of policies, procedures and standards for the department and more specifically policies, procedures and standards relating to the handling of active shooting situation, use of force, handling of crimes in the field including shooting, medical attention, hostage taking, field training, purchase and use of equipment such as bulletproof vests and shields, and all supervision and monitoring over  members of law enforcement, employment, internal affairs investigations, discipline and the overall conduct of police officers and law enforcement, acting under color of law and within the scope of his employment.

12.    At all relevant times herein defendant **MONMOUTH COUNTY** was and is a county and public entity organized and existing pursuant to the laws of the State of New Jersey, engaged in the operation, management, supervision, training and control over law enforcement as well as having responsibility for the supervision, oversight, management, control, training and operation over the 911 and dispatch operations for law enforcement entities throughout the County, including **NEPTUNE** and **ASBURY PARK**, as well as having supervision, oversight, management, control and training obligations over the **MONMOUTH COUNTY PROSECUTOR** and his office (**"the MCPO"**), with a place of business at 33 Mechanic Street (Market Yard), Freehold, New Jersey 07728.

13.    At all relevant times herein the **MONMOUTH COUNTY PROSECUTOR'S OFFICE,** was and is the agency responsible for the operation, management, supervision and control over the investigation, prosecution and presentation of criminal matters brought by the State against persons charged with crimes, but who also has responsibility over investigative and non-judicial or advocacy functions including but not limited to the review of weapons seizures

and issues involving domestic violence involving or relating to law enforcement officers and the handling of domestic violence incidents as well as determining the conditions under which weapons may be seized or returned and oversight over the reinstatement of weapons to an officer and/or termination of officers and/or conditions of employment with respect to the use of service and personal weapons, among other duties and obligations, supervision and monitoring over law enforcement.

14. At all relevant times herein defendant **PROSECUTOR CHRISTOPHER GRAMICCIONI ("GRAMICCIONI"),** sued in his official and individual capacities, was and is the official responsible for the operation, management, supervision and control over the **MCPO,** including the investigation, prosecution and presentation of criminal matters brought by the State against persons charged with crimes, but who also has responsibility over investigative and non-judicial or advocacy functions including but not limited to the review of weapons seizures and issues involving domestic violence and use of force involving or relating to law enforcement officers and the handling of domestic violence incidents as well as determining the conditions under which weapons may be seized or returned and oversight over the reinstatement of weapons to an officer and/or termination of officers and/or conditions of employment with respect to the use of service and personal weapons, among other duties and obligations, supervision and monitoring over law enforcement.

15. At all relevant times herein defendant **PHILIP SEIDLE ("SEIDLE")** was and is the former husband of Plaintiff's decedent **TAMARA WILSON-SEIDLE,** sued in his official and unofficial capacity, who is currently serving a 30 year sentence for aggravated manslaughter for the shooting and death of **TAMARA WILSON-SEIDLE ("TAMARA")** and is currently incarcerated at New Jersey State Prison, with an address of 600 Cass St, Trenton, NJ 08608.

16.     At all relevant times herein defendants **OFFICER AHMED LAWSON ("LAWSON"), OFFICER CARL CHRISTIE ("CHRISTIE"), OFFICER TIMOTHY GRISWOLD SLEO, II. ("GRISWOLD")**, and **JAMES CRAWFORD, SLEO, II. ("CRAWFORD")** are law enforcement officers, sued in their official and individual capacities, employed by or under the control of **ASBURY PARK** as police officers, first responders, responders or already at the location of the shooting which is the subject of this Complaint with the responsibility and duty to both protect **TAMARA WILSON-SEIDLE** from harm being caused by a state actor, **PHILIP SEIDLE,** as well as to attend to their ministerial duties of following policies, procedures, and standards in their duties as law enforcement officers in handling the subject active shooter event including the neutralization of the threat posed by **SEIDLE** and in the provision of medical care to **TAMARA-WILSON SEIDLE.**

17.     At all relevant times herein defendant **MARSHAWN LOVE ("LOVE"),** sued in his official and individual capacity,  was and is a law enforcement officer employed by or under the control of **ASBURY PARK** as a Sergeant and commanding officer responding to the scene of the active shooting incident which is the subject of this Complaint, with the responsibility and duty to both protect **TAMARA WILSON-SEIDLE** from harm being caused by a state actor, **PHILIP SEIDLE,** as well as to attend to his ministerial duties of following policies, procedures, and standards including taking command of the situation and taking action to disarm or neutralize **SEIDLE** and to provide immediate medical care to **TAMARA WILSON-SEIDLE,** remain at the scene and direct collaboration of law enforcement response regarding the handling the subject event.

18.     At all relevant times herein defendants **APPO #6-10** are law enforcement officers employed by or under the control of **ASBURY PARK,** sued in their official and individual

capacities, as yet unidentified first responders, responders or already at the location of the shooting which is the subject of this Complaint with the responsibility and duty to both protect **TAMARA WILSON-SEIDLE** from harm being caused by a state actor, **PHILIP SEIDLE,** as well as to attend to their ministerial duties of following policies, procedures, and standards in their duties as law enforcement officers in handling the subject event in an active shooter or as presented situation. The Prosecutor has not yet released his file on this matter and has sole and exclusive knowledge and possession of the identities of any unidentified defendants.

19.    At all relevant times herein defendants **MCPOs #1-10** were and are as yet unidentified detectives, officers, employees or representatives of either **MONMOUTH COUNTY, the MONMOUTH COUNTY PROSECUTOR'S OFFICE** or the Monmouth County Sheriff's Department, sued in their official and individual capacities, on the scene, dispatched to the scene or having any police or law enforcement duties or responsibilities at, near or after the incident forming the basis for this Complaint. The Prosecutor has not yet released his file on this matter and has sole and exclusive knowledge and possession of the identities of any unidentified defendants.

20.    At all relevant times herein defendants **FORMER ASSISTANT PROSECUTOR GREGORY J. SCHWEERS ("SCHWEERS"), FORMER ASSISTANT PROSECUTOR JACQUELYNN F. SEELY ("SEELY"), FORMER DEPUTY ASSISTANT PROSECUTOR RICHARD E. INCREMONA ("INCREMONA")** were and are as yet unidentified detectives, Asst. Prosecutors, members, employees, agents of the **MONMOUTH COUNTY PROSECUTOR** or Sheriff's Office, sued in their official and individual capacities, who made decisions regarding the seizure and return of weapons to **SEIDLE** as well as determining conditions involving **SEIDLE'S** use and control over the weapon used to kill **TAMARA**. The

Prosecutor has not yet released his file on this matter and has sole and exclusive knowledge possession of any unidentified defendants.

21.    At all relevant times herein defendants **MCPOs #15-20** were and are as yet unidentified detectives, Asst. Prosecutors, members, employees, agents of the **MONMOUTH COUNTY PROSECUTOR** or Sheriff's Office, sued in their official and individual capacities, who had decision making authority over whether and under what terms **SEIDLE** could regain use and possession of the weapon he used to kill **TAMARA**. The Prosecutor has not yet released his file on this matter and has sole and exclusive knowledge and possession of any unidentified defendants.

22.    At all relevant times herein defendants **PST KAREN CLAYTON** (**"CLAYTON"**), **PST KRISTIN ARAS** (**"ARAS"**), **PST STEPHANIE MIGLIACCIO** (**"MIGLIACCIO"**) and **PST KURT GIBSON** (**"GIBSON"**) were and are employees of the County of Monmouth with responsibilities regarding the handling of all phone calls and dispatch between the public, **TAMARA** the **PLAINTIFF CHILDREN** and law enforcement relating to the subject incident.

23.    At all relevant times herein defendants **JOHN DOES 5-10** were and are as yet unidentified detectives, officers, employees or representatives of any law enforcement agency or public entity including **NEPTUNE TOWNSHIP** or other responding entities, sued in their official and individual capacities, on the scene, dispatched to the scene, or having any police or law enforcement duties or responsibilities at, near or after the incident forming the basis for this Complaint. The Prosecutor has not yet released his file on this matter and has sole and exclusive knowledge and possession of any unidentified defendants.

24.    At all relevant times herein defendants **JANE DOES 1-10** were and are as yet

11

unidentified medical responders, **EMTS, BLS**, paramedics, or law enforcement officers charged with providing medical care or with the responsibility to provide medical care and assistance to **TAMARA WILSON-SEIDLE**, sued their official and individual capacities. The Prosecutor has not yet released his file on this matter and has sole and exclusive possession of the identities of these defendants; demand is made to immediately identify these defendants and to notify them and **NEPTUNE** of the pendency of this lawsuit pursuant to F.R.C.P. 15(c).

25.    At all relevant times herein defendants **NPO 1-10** are as yet unidentified officers, employees, agents, representatives, internal affairs officials from the **NEPTUNE POLICE DEPARTMENT/NEPTUNE TOWNSHIP**, sued in their official and individual capacities, charged with supervision, training and discipline of law enforcement officers, internal affairs investigations, domestic violence, and use of force investigations. **NEPTUNE** has sole and exclusive possession of the identities of these defendants; demand is made to immediately identify these defendants and to notify them of the pendency of this lawsuit pursuant to F.R.C.P. 15(c).

26.    At all relevant times herein defendants **ABC ENTITIES 1-10** were and are as yet unidentified public entities, or their agencies or departments, which employed any of the defendants and/or unidentified defendants having responsibility, control and authority over defendant **PHILIP SEIDLE**.

## II. NATURE OF ACTION

27.    This action arises out of the wrongful death of **TAMARA WILSON-SEIDLE** on June 16, 2015, mother to the Plaintiff Children **KIRSTEN SEIDLE,  PHILIP SEIDLE, JR, JOHN SEIDLE, CHRISTOPHER SEIDLE, MONICA SEIDLE, DOROTHY SEIDLE, MARIA SEIDLE, minor, STEPHEN SEIDLE, minor** and **TERESA SEIDLE** by her former

husband and father to the Plaintiff Children, then **SGT. PHILIP SEIDLE** of the **NEPTUNE TOWNSHIP POLICE DEPARTMENT** who shot her after chasing her with his motor vehicle and running her vehicle off the road in broad daylight before members of the **ASBURY POLICE DEPARTMENT** and other law enforcement officers on the scene, including **OFFICER LAWSON, OFFICER CHRISTIE, OFFICER GRISWOLD, OFFICER CRAWFORD** and **MARSHAWN LOVE, APPOs # 6-10, MCPOs #1-10** and **JOHN DOES 5-10.**

28.   **The following defendants, all acting under color of law and/or by the authority of state law, violated and deprived TAMARA SEIDLE of** her constitutional rights under both federal and state law of liberty, due process both substantive and procedural and equal protection by the following actions and/or omissions:

**a)  Neptune Township**

29.   **NEPTUNE acts through its officials, employees and agents including individually named CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT and DIRECTOR BASCOM in their official capacities.  NEPTUNE was the employer of PHILIP SEIDLE. NEPTUNE** failed to properly supervise, monitor, train, retain and discipline **SEIDLE** despite repeated and persistent evidence of domestic violence and/or domestic **violence** incidents involving the chronic harassment and abuse **of TAMARA WILSON-SEIDLE** and her children; **NEPTUNE permitted and allowed SEIDLE** to remain on the force and possess a service weapon, or any weapon despite a known and documented history of mental instability, fitness for duty problems, temperament, emotional and psychological problems requiring anger management and other related psychological care and counselling;  **NEPTUNE failed and refused** to keep **SEIDLE** disarmed despite knowledge that there was a substantial likelihood of

serious physical injury or death to **TAMARA WILSON-SEIDLE**; **permitted** him to be reinstated after being found unfit for duty with use of a weapon; **failed** to abide by progressive discipline standards requiring termination prior to the subject incident; **failed** to follow the Attorney General and other standards and guidelines for the handling of Domestic Violence complaints and incidents involving members of law enforcement;  **and failed** to follow applicable domestic violence guidelines **requiring that PHILIP SEIDLE be disciplined.** **NEPTUNE** failed to terminate **PHILIP SEIDLE, discriminated against TAMARA-WILSON SEIDLE by** failing to assist her in the filing of a restraining order or assisting to file such papers and/or advising her to take such action in accordance with the guidelines, as mandated and nondiscretionary, **failed** to protect **TAMARA WILSON-SEIDLE** as a state created danger by failing to protect against the foreseeable and substantially likely death or serious physical harm by **SEIDLE,** whether acting as a state actor or not;  and, by affirmatively reinstating **SEIDLE** to full duty and returning his service weapon despite being found unfit for duty or psychologically unstable in 2012,  2013, 2014 and 2015 up to and including the date of the shooting **increased the risk of harm.** **NEPTUNE failed** to monitor evidence of stalking,  failed to train and discipline its officers in the police department regarding the use of force and the use of excessive force, including domestic violence;  permitted, allowed and maintained a pattern, practice, custom and policy of discriminating against women as described in the "Turner Report," a report commissioned by **NEPTUNE** involving claims of harassment and discrimination against women on and off the force prior to 2014;  and allowed and permitted a custom, practice and policy condoning and accepting the use of excessive force and domestic violence, among other acts and omissions, proximately causing the death of **TAMARA WILSON-SEIDLE.**

b).  Chief O'Neil, Chief Adams, Chief Hunt and Director Bascom

14

30.    These individuals violated TAMARA'S constitutional rights by having personal involvement and knowledge of the history of domestic violence outlined in this complaint during the periods of time each individual was in charge of the police force for NEPTUNE, knowing that SEIDLE was a ticking time bomb in terms of temperament and psychological fitness and stability and that he would with substantial certainty cause serious physical harm or death to TAMARA and failed to take action.

31.    These individuals violated TAMARA's constitutional rights by allowing and permitting SEIDLE to maintain and carry a gun, including carrying a gun without any conditions or restrictions knowing that he was unfit to do so and that that he would with substantial certainty cause serious physical harm or death to TAMARA.

32.    These individuals violated TAMARA's constitutional rights by failing to train, monitor, supervise and discipline SEIDLE with personal knowledge that he had a lengthy internal affairs history involving the use of excessive force and other misconduct, that he had been found unfit for duty on more than one occasion within the immediate years leading up to the shooting death of TAMARA and/or imposing discipline that was insufficient and ineffective.

33.    The actions and inactions of these individual defendants were done with deliberate indifference to the right of TAMARA to be free of bodily harm as they knew, based on their own personal knowledge that she would likely suffer serious injury or death at the hands of SEIDLE.

34.    These individuals violated TAMARA's constitutional rights by failing to abide by multiple guidelines, standards and protocols issued by the Attorney General

("AG") relating to the handling of domestic violence incidents and assuring that their subordinates did so, including the failure to provide TAMARA with the direct assistance required of the AG Guidelines.

35.    These individuals discriminated against TAMARA on the basis of her sex in that they did not affirmatively take action to prevent domestic violence and had a history of permitting and tolerating abuse of women based on the Turner Report.

36.    These individuals discriminated against TAMARA on the basis of her sex in disciplining SEIDLE in 2014 for yelling profanities at other officers instead of disciplining him for the domestic incident that led to the profanities.

37.    All of the actions and misfeasance attributable to NEPTUNE as set forth above were done by and through these individual supervisory defendants in their respective roles as the chief policymaking official for law enforcement during their tenure at the police department.

c).  <u>Asbury Park</u>

38.    ASBURY PARK acts through its officials, employees and agents including individually named defendants CHIEF SALERNO, DEPUTY CHIEF KELSO, LAWSON, LOVE, CHRISTIE, GRISWOLD and CRAWFORD acting in their official capacities. ASBURY PARK was at all relevant times the employer of these individually named defendants.

39.    LAWSON, LOVE, CHRISTIE, GRISWOLD and CRAWFORD responded to the scene of the active shooting or were already on the scene. LOVE was the highest ranking officer responsible for command, coordination and control. These officers knew SEIDLE as

16

a Sgt. from NEPTUNE and treated him as an officer acting under color of law instead of a person committing murder. They failed in several critical aspects to attend to their duties.

40.    These defendants failed to intervene to prevent the shooting; protected SEIDLE at the expense of the victim and failed to intervene after putting TAMARA in a position of greater danger than had these officers not undertook rescue and assistance at the scene.

41.    These defendant officers' actions, affirmative acts and omissions are attributable to ASBURY PARK as they lacked basic training in the handling of an active shooter/rapid responder/hostage taking situation which was a direct and proximate cause of the shooting and death. ASBURY PARK knew and was deliberately indifferent to the lack of training, supervision, promulgation and enforcement of basic policy regarding active shooter situations, including the need for special equipment, one leader in command and control, the need to neutralize by death or otherwise the shooter upon contact and how to de-escalate and take action to get the victim out of danger's way.

42.    The ASBURY PARK supervisory defendants CHIEF SALERNO and DEPUTY CHIEF KELSO failed to have any policies, procedures or standards in place regarding an active shooting/rapid responder/hostage situation, and failed to properly supervise, monitor, train, retain and discipline its officers in the handling, include command and coordination responsibilities, of an active shooting/hostage/violent criminal situation in the field.

d) the Individual Defendants Chief Salerno, Deputy Chief Kelso, Love, Lawson, Griswold, Christie and Crawford

43.    These individuals all had personal knowledge and involvement in the actions and omissions set forth above and violated TAMARA's constitutional rights in the failures and affirmative actions made with deliberate indifference as set forth above. The actions of

17

the individuals at the scene placed TAMARA in greater danger than she would have been in had they not arrived on the scene and mismanaged the entire situation; these individuals failed to intervene in the face of the use of deadly force by a person who they believed to be acting under color of law and further failed to conduct themselves in accordance with mandated and ministerial procedures.

44.    The individual supervisory officials SALERNO and KELSO knew with substantial certainty that their training and policymaking was so defective and inadequate that it would be substantially certain that serious physical injury or death would result.

e) <u>Monmouth County</u>

45.    **MONMOUTH COUNTY acts through its officials, employees and agents including individually named defendants PROSECUTOR GRAMICCIONI, SCHWEERS, SEELY and its dispatchers CLAYTON, ARAS, MIGLIACCIO and GIBSON in their official capacities. MONMOUTH COUNTY was at all relevant times the employer of these individually named defendants.**

46.    **MONMOUTH COUNTY ("The COUNTY") is responsible for the administrative decisions and actions of employees and agents who take official action in connection with discipline or weapons forfeiture or reinstatement of weapons.**

47.    At all relevant times **PROSECUTOR GRAMICCIONI, SCHWEERS, SEELEY and INCREMONA** were acting in an administrative capacity as opposed to a law enforcement or investigatory function and subject to the supervision and control of the County as opposed to the State.

48.    Despite knowledge of the history of domestic violence and excessive use of force incidents of **SEIDLE**, as well as a known and documented history of mental instability, fitness

18

for duty problems, temperament, emotional and psychological problems requiring anger management and other related psychological care and counselling; **PROSECUTOR GRAMICCIONI, SCHWEERS, SEELEY** and **INCREMONA** permitted and allowed **SEIDLE to possess and use a weapon, and reinstated his weapon to him without conditions. These defendants on behalf of the COUNTY** refused to keep **SEIDLE** disarmed despite knowledge that there was a substantial likelihood of serious physical injury or death to **TAMARA WILSON-SEIDLE. These defendants on behalf of the COUNTY permitted SEIDLE to retain his gun** after at least two suspensions and known fitness for duty findings which were questionable despite being unfit for duty and failed to follow the Attorney General and other standards and guidelines for the handling of Domestic Violence complaints and incidents involving members of law enforcement as mandated and nondiscretionary, failed to protect **TAMARA WILSON-SEIDLE from bodily harm by SEIDLE,** acting as a police officer during all events involving discipline and reinstatement; and, by returning his service weapon despite being found unfit for duty or psychologically unstable in 2012, 2013, 2014, 2015 and up to the date of the subject incident, increasing the risk of harm.

49.    The **COUNTY** also allowed and permitted a custom, practice and policy condoning and accepting the use of excessive force and domestic violence, based upon their knowledge of use of force and domestic violence incidents without appropriate discipline occurring throughout their jurisdiction, among other acts and omissions, proximately causing the death of **TAMARA WILSON-SEIDLE. These defendants knew that SEIDLE has a lengthy internal affairs file of over 600 pages involving numerous incidents of excessive force.**

50.    **GRAMICCIONI, acting also on behalf of the COUNTY failed to properly supervise, monitor and train the individually named Asst. Prosecutors SCHWEERS,**

SEELY and **INCREMONA** in the handling of domestic violence and use of force incidents by law enforcement officers within their jurisdiction, including **SEIDLE, a direct and proximate cause of the shooting and death of TAMARA.**

51.    Dispatchers **CLAYTON, ARAS, MIGLIACCIO** and **GIBSON** were **dispatchers acting on behalf of the COUNTY. The EMT providers as yet unidentified were also acting on behalf of the COUNTY.**

52.    **These individuals** failed to handle mandated and non-discretionary dispatch duties properly by purposely failing to dispatch, by refusing to advise in radio communications that **SEIDLE** was shooting his former wife and the cars involved as advised by the victim's daughter; and/or provide medical assistance in a timely manner, which ministerial and/or intentional failures were the proximate cause of **TAMARA WILSON-SEIDLE'S** death.

**f) The individuals Prosecutor Gramiccioni, Asst. Prosecutors Schweers, Seely and Incremona.**

53.    **These individuals all had personal knowledge and involvement in the actions and omissions set forth above and violated TAMARA's constitutional rights in the failures and affirmative actions made with deliberate indifference as set forth above.**

**g) The individual dispatchers Clayton, Aras, Migliaccio and Gibson**

54.    **These individuals all had personal knowledge and involvement in the actions and omissions set forth above and violated TAMARA's constitutional rights in the failures and affirmative actions made with deliberate indifference as set forth above.**

**h) PHILIP SEIDLE as the shooter.**

55.    This action is instituted for compensatory and punitive damages arising out of the unlawful actions and conduct of all of the defendants, who, acting under color of state and federal law and under authority, custom and usage of their offices violated the civil rights of

Plaintiff's decedent protected by and secured under the provisions of the Fourth and Fourteenth Amendments to the United States Constitution and under the laws of the United States, particularly under the Civil Rights Act, Title 42 of the United States Code, § 1983, *et seq.*

56.    Plaintiff also institutes this action pursuant to the common law and statutory laws of the State of New Jersey for damages arising by reason of assault, battery, pain and suffering, negligence, wrongful death, failure to timely render medical treatment, negligent retention, emotional distress, the failure to properly hire, train and supervise and failure to intervene.

57.    Plaintiffs further alleges a cause of action for the minor child who witnessed the shooting as a "*Portee*" claim for **TERESA SEIDLE**, and meeting all the requirements for such claim under the Tort Claims Act.

58.    Plaintiffs also seeks relief for violation of constitutional rights under the New Jersey Civil Rights Act, 10 N.J.S.A. 6-1, *et seq.*

### III.    JURISDICTION AND VENUE

59.    This Court has jurisdiction pursuant to Title 28 of the United States Code, Sections 1331, 1332, 1343 (2), 1343 (3), 1343 (4), and Title 42 of the United States Code, Section 1983, as well as pendent jurisdiction to adjudicate plaintiffs' causes of action on the state and common law claims.

60.    Venue is properly laid in the United States District Court of the District of New Jersey pursuant to Title 28 United States Code Section 1391 (b) in that all of the acts complained of herein occurred in the district and that the defendants are citizens of, reside in or are public entities of the State of New Jersey and domiciled within this district.

61.    The matter in controversy herein involves, exclusive of interest, an amount in excess of $75,000.

21

## IV.   NOTICES OF CLAIMS

62.    On or about September 11, 2015, Plaintiffs served Notice of Claims for damages in the form prescribed by New Jersey Statutes, Title 59:8-4, and signed by Plaintiff's representative upon the public entity defendants and their known employees within the statutorily prescribed period.

63.    More than six (6) months have elapsed since service of Plaintiff's Notices of Claim and the claims remain unresolved.

64    This action is commenced within two (2) years from the date of the occurrence.

65.    The **PUBLIC ENTITY DEFENDANTS** have had ample opportunity and time to fully investigate and attempt a resolution of the claims.

## V.   FACTUAL ALLEGATIONS

66.    Defendant **SEIDLE** and Plaintiff's decedent **TAMARA WILSON-SEIDLE** (**"TAMARA or TAMARA SEIDLE"**) were married on August 25, 1990 in Asbury Park,  at St. Peter Claver Church, New Jersey.  Over the course of 27 years they together had nine (9) children, all identified as the **PLAINTIFF CHILDREN** herein.  Their marital residence was in Neptune Township, County of Monmouth and State of New Jersey.

67.    Defendant **SEIDLE** was employed by **NEPTUNE** as a law enforcement officer, first as a police officer and then Sergeant, for about 21 years as of June 16, 2015.

68.    During the course of the marriage defendant **SEIDLE** became violent, seriously abusive, and engaged in assaults, harassment, intimidation and other acts of domestic violence against his wife, **TAMARA SEIDLE**.  These actions included, but are not limited to, violent assaults which left holes in the walls of the marital bedroom and other property damage,  heard and known to the **PLAINTIFF CHILDREN**, occurring on a regular basis over the years

requiring repair  (In or about the 2013 time frame decedent's church, Our Mother of Mercy hired a contractor to repair and repaint damage caused by violent assaults against decedent by **SEIDLE**); kicking decedent in the stomach during pregnancy, putting a gun to decedent's head, giving her a black eye on her birthday and repeatedly hitting her and verbally abusing her.  These actions of domestic violence were chronic, repeated,  known to **PLAINTIFF CHILDREN, and as described herein this history was also known to SEIDLE's employer, NEPTUNE, including defendants CHIEF O'NEIL, and later CHIEF ADAMS, CHIEF HUNT and DIRECTOR BASCOM.**

69.    As of 2012 **SEIDLE** left the family residence after **TAMARA SEIDLE** filed for divorce, moving in with a girlfriend in Monmouth County, New Jersey.

70.    The divorce was finalized on May 27, 2015.

**Neptune Township**

71.    There were numerous reported incidents and complaints regarding domestic violence both in the marital household and after the couple separated.  The couple had a well-known history of domestic violence which was severe and life-threatening.

72.    The separation and divorce proceedings and the reasons for them were well-known to **NEPTUNE by and through its employees and agents,** including then **CHIEF ADAMS, CHIEF HUNT and DEPUTY CHIEF BASCOM,** all of whom were acting as supervisory officials between 2012 and 2015. The history of known abuse predated the 2012 time frame and covered incidents through the date of the shooting.  **CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT and DEPUTY CHIEF BASCOM** were all intimately involved in the discipline and fitness for duty problems exhibited by **SEIDLE.**  In particular, **CHIEF O'NEIL** was the Chief for many years prior to 2012; his position was taken over by **CHIEF ADAMS** in 2012; **CHIEF**

23

HUNT became the chief supervisory official in 2014. **DIRECTOR BASCOM** was the second in command and a supervisory and policy-making official from 2013 to 2017.

73. The allegations in the divorce papers filed in the 2012 time frame were a matter of public record, and included affidavits from both **TAMARA SEIDLE** and **PHILIP SEIDLE**. **TAMARA SEIDLE** noted in an affidavit that she was the victim of horrific abuse; **PHILIP SEIDLE** wrote in an affidavit that **TAMARA SEIDLE** advised the police department of the gross domestic abuse and violence and that he was being taken to task for it by **NEPTUNE**. Accordingly there is direct evidence from **SEIDLE** himself that **NEPTUNE** was on notice of the allegations of domestic violence at least as of 2012, **covering the period when CHIEF O'NEILL and CHIEF ADAMS were in charge of the police department.**

74. A police officer employed by **NEPTUNE** affirmed that **TAMARA** had advised the **NEPTUNE POLICE DEPARTMENT** of her complaints in the 2014 time frame, **covering the period when CHIEF HUNT and DIRECTOR BASCOM were in charge of the police department.**

75. **TAMARA** continued to suffer abuse by **SEIDLE** after he left the marital home **in 2012.** Between 2012 and June 16, 2015 **SEIDLE** threatened **TAMARA** by screaming and intimidating her over custody disputes and arrangements to take the children on visitation; threatening to commit serious bodily harm and to assault her, threatening that he would hurt her if she would complain and create problems for him on the job, threatening her safety over perceived problems with the **PLAINTIFF CHILDREN** and their lack of interest in seeing him, calling and threatening and harassing her over the phone; such threats and harassment being known to one or more of the **PLAINTIFF CHILDREN** as well as **SEIDLE'S** employer, **NEPTUNE. SEIDLE** also stalked **TAMARA** by following her and sitting by or near her home,

24

which were known to or should have been known to the **NEPTUNE** defendants from a review of **SEIDLE'S** GPS system on his patrol car.

76.     The police were regular visitors to the **SEIDLE** marital residence both before 2012 and after, up to the date of the shooting on June 16, 2015.  Some of these visits were documented by dispatch/911 and/or the police department; many were not.  There were at least **twelve (12)** documented domestic violence or incidents calls placed to **NEPTUNE** by either **TAMARA** or **SEIDLE**, which involved fights over times for visitation, showing up when unanticipated or permitted; **SEIDLE'S** attempts to enter the marital premises in violation of a separation/custody agreement, all with threats, harassment and intimidation against **TAMARA.**

77.     There were numerous occasions known to the **PLAINTIFF CHILDREN** when the police would show up as an "escort" to **SEIDLE** during which he would complain that the children refused to see him or that he wanted to come into the house.  These visits varied with frequency between 2012 and June 17, 2015; but became more frequent and volatile after 2014.

78.     **This period covered the times when CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT and DIRECTOR BASCOM were in charge of the police department.**

79.     The children recall the police coming to the house on several occasions.  There was one (1) incident where the police came and a younger child had to wait in **SEIDLE**'s car.  The child saw **SEIDLE** arguing with **TAMARA** with the police coming down the street and to the house.  **SEIDLE** was screaming and yelling and the officers had to hold him back.  On another occasion **SEIDLE** showed up at the house for hair clippers and **TAMARA** didn't want him in the house, but **SEIDLE** attempted to come in anyway and the police were called to intervene.  On yet another occasion several of the **PLAINTIFF CHILDREN** were home.  The police were called to intervene when **SEIDLE** demanded to come into the house for "some

papers for work" and TAMARA was not home. SEIDLE called TAMARA yelling at her and came into the house and into the basement without authority; TAMARA arrived and there was a screaming argument; police officers arrived and told SEIDLE he wasn't supposed to be at the house.

80.    On another occasion, SEIDLE was demanding that the children visit and come with him but they did not want to go with him. The police arrived and asked the children why they didn't want to go with SEIDLE and were told that SEIDLE was always yelling and always violent and that they didn't want to go with him. SEIDLE was screaming and the police had to calm him down; upon information and belief a neighbor also heard the screaming.

81.    On yet another occasion SEIDLE came to the school of one of the children and demanded she get into his car. TAMARA works at the school and SEIDLE was yelling and threatening TAMARA requiring police intervention; the teacher told the children to go back into the school despite that SEIDLE was demanding that they be released to him.

82.    Sometimes SEIDLE would call his fellow officers as "backup" when he came to the marital house to pick up any of the children or take them back home.

83.    SEIDLE would be able to use the police force at his whim, to create an intimidating and threatening environment for TAMARA every time he came to pick up the children. The police were accordingly well aware of problems involving domestic violence as defined by statute and in the attorney general and police guidelines for the handling of domestic dispute incidents involving law enforcement officers.

84.    NEPTUNE maintained several complaint and investigation files relating or referring to domestic violence incidents involving SEIDLE against TAMARA, between 1994 and June 16, 2017, and knew or should have known of SEIDLE'S propensity and desire to

assault and physically harm **TAMARA.**

85.    These domestic violence calls involved **TAMARA** allegedly throwing a chair, a call by one of the children regarding an explosive fight with screaming and pushing, another verbal dispute and, in 2012 a call from **TAMARA** with a police response in which she reported that she had been subjected to past incidents of physical abuse, resulting in administrative discipline consisting of a two (2) day suspension.

86.    There is a history known and documented by **NEPTUNE** involving fitness for duty, psychological counselling, anger management, mental instability and psychological problems suffered by **SEIDLE** which affected his work performance and ability to carry a weapon; a history which should have and would have put **NEPTUNE, through its agents and employees** on actual and constructive notice that **SEIDLE** presented a physical and psychological threat to **TAMARA** as well as the **PLAINTIFF CHILDREN** with a substantial or strong likelihood that such harm would in fact occur if he was permitted to keep and use weapons, both service and personal.

87.    In the 2012 time frame **SEIDLE** was disciplined for cancelling a dispatch call from **TAMARA** relating to domestic violence and was suspended. His firearm was taken away from him by **NEPTUNE.** Upon information and belief he was found unfit for duty and required to undergo psychological counselling including anger management.

88.    In an affidavit evidencing notice to **NEPTUNE, SEIDLE** wrote: "This suspension came as the result of plaintiff [**TAMARA WILSON-SEIDLE**] calling police to involve them in our custody dispute causing me a tremendous amount of stress. This impacted my job performance and ultimately I was suspended." Further, the affidavit says: "I was later told by two sergeants that Tamara told them I went at her in a menacing manner and that she feared for

her safety. She also accused me of abusing her, and putting a gun to her head and pulling the trigger in the past. She told them that several police officers had knowledge of what occurred and had done nothing. I was suspended pending an investigation and would be on leave for four months. During that time, I was sent to a police psychologist and declared unfit for duty, not because I was violent, but because the divorce and Tamara's behavior had taken such a toll on me, I couldn't stay focused at work."

89.    At some time, upon information and belief about eleven (11) months later, in 2013, **NEPTUNE,** despite actual or constructive knowledge that **SEIDLE** remained unfit for duty, in that there were known and continued threats to **TAMARA** and continued mental and emotional instability by **SEIDLE** evidenced by medical reports and records and fitness for duty evaluations that indicated a substantial likelihood of continued harm to **TAMARA** and others, determined improperly, with reckless and deliberate disregard to the substantial likelihood of serious bodily harm to **TAMARA** to take affirmative action to reinstate **SEIDLE** to full duty with full resources including the ability to maintain and possess service and personal weapons. **Ultimately no conditions or restrictions were placed on SEIDLE's ability to use his weapon, required under the circumstances to prevent harm to TAMARA, including having to turn in his gun at the end of the day and not being allowed to carry it when not in uniform or off duty.**

90.    **Nor did NEPTUNE seek to terminate SEIDLE from the force, despite his longstanding history of domestic violence and mental instability.**

91.    **NEPTUNE knew that certain fitness for duty examinations between 2012 and 2015 were deficient, and that they were prepared without proper documentation, investigation, communication with all interested parties including TAMARA WILSON-**

**SEIDLE, and prior to completion of administrative proceedings.**

92.    **NEPTUNE knew that SEIDLE** remained unfit for duty and should not have the use of a service weapon or at a minimum have a service weapon without conditions in that he continued to exhibit poor judgment, lack of focus, anger and emotional instability. **NEPTUNE knew that SEIDLE** was also the subject of longstanding chronic internal affairs complaints with a 682 page internal affairs history including prior excessive force complaints. These excessive force complaints, starting in 2004, allege upon information and belief that **SEIDLE** threw a man on top of a police cruiser and then punched him in the jaw and kicked him in the ribs. Another claims he hit a man on a bicycle with his police car and then kneed and kicked him. Upon information and belief there is another complaint of excessive force in connection with an arrest in 2015, prior to the subject shooting, **among other complaints.**

93.    The determination to reinstate **SEIDLE to full duty** with knowledge of his anger problems and psychological instability, along with known and continuing complaints of the use of excessive force and threats to **TAMARA** known by many law enforcement officers and officials at **NEPTUNE**, including but not limited to **POLICE CHIEF O'NEIL, CHIEF ADAMS, DIRECTOR BASCOM and CHIEF HUNT, JR.**, was reckless and evidenced deliberate difference to the right of **TAMARA-SEIDLE WILSON** to be free from excessive force and maintain her interest in bodily integrity and liberty.

94.    **The knowledge to NEPTUNE** evidenced by the internal affairs complaints and investigations, the affidavit of **SEIDLE** himself in his divorce proceedings and the calls by **SEIDLE** for assistance from other police officers with domestic calls to the house relating to child custody and visitation with threats to **TAMARA**, shows a shocking lack of regard for the safety of **TAMARA** by **NEPTUNE.**

29

95.     In the 2012 time frame **TAMARA** filed a domestic violence civil complaint and restraining order, a matter of public record.  She alleged that **SEIDLE** put a gun to her cheek, gave her a black eye and kicked her stomach while pregnant.  These allegations are supported and confirmed by the children, who witnessed the violence on a regular basis in the house. Without the assistance of the police the request was denied, upon information and belief.

96.     A lieutenant on the **NEPTUNE** police force became aware of ongoing domestic incidents also in the 2012 time frame as they were discussed during a confrontation between **SEIDLE** and **TAMARA**, and notified then **CHIEF ADAMS** and **DIRECTOR BASCOM**.

97.     Upon information and belief **SEIDLE** was again disciplined for problems related to his performance as an officer and psychological readiness to continue as an officer in 2013, yet he was permitted to retain and carry a service weapon and personal weapons.

98.     In or about March 2014 **SEIDLE** was yet again disciplined, reprimanded and received a short suspension for his involvement in a domestic violence incident involving harassment and threats to **TAMARA** when he failed to arrive as scheduled or in violation of visitation and **NEPTUNE was** put yet again on notice of still more threats of physical harm, emotional outbursts, menacing and harassing behavior by **SEIDLE** against **TAMARA**.

99.     **NEPTUNE** permitted **SEIDLE** full use of his service weapon despite another domestic violence incident and a 30 day suspension.  **SEIDLE** was again called to task upon information and belief in 2013 after his gun was returned for yet another incident of misconduct.

100.    In particular, **SEIDLE** would harass **TAMARA** that he would use physical force and assault her if she complained or took any action to create problems for him at the job, that she would suffer grievous harm as a result including financial ruin.  **SEIDLE** also complained and threatened her with physical harm when the **PLAINTIFF CHILDREN** refused to see him or did

not want to see him, or refused to be taken by him. **SEIDLE** blamed **TAMARA** for his problems with the children. **NEPTUNE** had actual or constructive notice of these domestic violence issues, from having certain officers witnessing the problems from being dispatched to the marital home, from the investigations in 2012, 2013 and 2014 subjecting **SEIDLE** to discipline, but still permitted and allowed him to work and possess a weapon, and from their own conversations with **SEIDLE**, as discussed in his affidavit and as set forth in the incident detailed by **KIRSTEN SEIDLE**, below, as well as personal complaints made by **TAMARA** herself to **CHIEF O'NEIL** and/or **CHIEF ADAMS** and/or **CHIEF HUNT, JR.** as well as set forth below.

101.    **SEIDLE** was not properly disciplined, monitored or supervised after the 2012, 2013 and 2014 incidents, evidencing a reckless and shocking lack of regard for the safety of **TAMARA** by **NEPTUNE.**

102.    Less than a year before the shooting, **SEIDLE** offered to retire from the force over the problems with **TAMARA** and attempted to hand in his badge and gun.  But instead of accepting his resignation, knowing of the explosive nature of the couples' confrontations and the history of domestic violence and prior discipline, **NEPTUNE, through CHIEF HUNT,** gave **SEIDLE** a free pass and asked him to stay, in gross contempt for the civil rights of **TAMARA.**

103.    **SEIDLE** then filed his own civil complaint seeking a restraining order against **TAMARA**, claiming that she had threatened him in the past.  That order was denied. **TAMARA'S** efforts to obtain a restraining order were also denied as she did not have the assistance from the police as was required under the Attorney General guidelines discussed herein.

104.    In particular, **NEPTUNE** had the ability to and should have monitored the GPS on **SEIDLE**'s patrol car, which would have alerted the defendant to continued stalking and staking

31

out of the marital residence by **SEIDLE**, which would have and should have provided additional notice of domestic disputes and potential violence.

105. In the summer of 2014 there was an incident involving **SEIDLE** children **KIRSTEN** and **MONICA SEIDLE**. The girls were working at a beach food stand in Ocean Grove when they were approached by **SEIDLE**. **SEIDLE** was angry that the girls did not want to see him or interact with him and threatened the girls with "consequences" if they failed to answer his phone calls and texts. **KIRSTEN SEIDLE** told **SEIDLE** he had to leave. The **NEPTUNE** police were called and arrived to investigate. **KIRSTEN** refused to give any statements to the officer identified as Jay Hunter Ellison, on the ground that he was a friend of her father. Instead, she gave a statement to an internal affairs officer, Officer Gallerio, who advised her that the police knew what was "going on," that her father was a "known problem" and that the police department was concerned "for the children's safety."

106. Further, **SEIDLE**'s friends officers Mike Allen and Jay Hunter Ellison knew about the domestic violence and the family problems.

107. No action, or minimal and inappropriate action was taken in response to this July 2014 incident by **NEPTUNE**, evidencing a reckless and shocking lack of regard for both the safety of **TAMARA** and the **PLAINTIFF CHILDREN**.

108. **TAMARA** herself went to complain about the mistreatment, abuse, threats and behavior of **SEIDLE** to representatives of **NEPTUNE**, including **JAMES HUNT JR.** in the late 2014 time frame. The basis for this knowledge is from **KIRSTEN SEIDLE**, who recalls her mother telling her that she was first, going to see, and then advising that she had seen, the Chief of Police regarding the harassment and violent propensities of **SEIDLE** and concern for her and her children's safety. Upon information and belief, **TAMARA** had also been in contact with

32

former **CHIEF O'NEIL** and **CHIEF ADAMS** about physical abuse by **SEIDLE**, and **DIRECTOR BASCOM** also had knowledge of the problems. No action was taken.

109.    After the 2014 incident the problems with **SEIDLE** appearing at the marital residence and harassing **TAMARA** continued unabated. There is one recorded and documented dispatch from April 2015 involving yet another dispute between **SEIDLE** and **TAMARA** about 45 days prior to the shooting and upon information and belief yet another reported incident in or about May 21 2015. No action was taken.

110.    The lack of action to permanently remove **SEIDLE's** service and personal weapons, and to terminate him from the force and/or to keep him in a desk job with continuing psychological counselling, as well as the affirmative act of reinstating **SEIDLE** to full duty after finding him unfit and then returning his service and/or personal weapons to him and **failing to file further administrative charges and control or restrict the use of his weapon** evidenced a reckless, deliberate and shocking disregard for the substantial likelihood that physical harm would be inflicted upon **TAMARA** by **SEIDLE,** which ultimately led to the shooting and death of **TAMARA SEIDLE** at the hands of **SEIDLE.**

111.    During all relevant times regarding discipline, reinstatement, fitness for duty and internal affairs investigations and removal and return of the service weapon used to shoot **TAMARA, SEIDLE** was a law enforcement officer acting under color of state law. Under all these periods, involving actions or inactions of the **NEPTUNE** , which actions or inactions are alleged to have been the proximate cause of the shooting incident, **SEIDLE** was a law enforcement officer acting under color or state law.

112.    Policy and protocol regarding progressive discipline should have resulted in the termination of **SEIDLE** from the police force by **NEPTUNE** without the ability to obtain **or use**

33

a weapon of any kind.    The lack of standard progressive discipline, removal and then reinstatement of **SEIDLE** to active duty with use of a weapon in 2012, 2013, and 2014 were a direct and proximate cause of the shooting and **TAMARA's** death.

113.    In addition to the notification of the likelihood of harm, **NEPTUNE** failed to enforce and implement policies, procedures and standards designed to prevent the subject occurrence.  **NEPTUNE** failed and refused to abide by the specific Attorney General guidelines applicable to domestic violence incidents where a law enforcement officer is involved.

114.    The Attorney General "Departmental Policy for the Handling of Domestic Violence Incidents Involving Law Enforcement Officers" prescribe mandated conduct, policy, and directives for the handling of Domestic Violence incidents.

115.    Under mandated policy **NEPTUNE, through its officials CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT, DEPUTY CHIEF BASCOM** and their subordinates and employees were mandated to take action in response to observed warning signs of domestic violence behavior and to provide assistance to both the officers and the partners involved.  No such assistance was provided to **TAMARA SEIDLE.**

116.    The definition of domestic violence is that found in statute N.J.S.A. 2C 25-19.

117.    Under mandated policy the above defendants were mandated to conduct proper investigations and take action with respect to reports of domestic violence by either family members or other officers and failed to do so properly so as to avoid the subject occurrences, death and damages.

118.    **CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT** and **DEPUTY CHIEF BASCOM were required to train their subordinates in the applicable domestic violence policies, including the mandate to document all information** potentially indicative of

domestic violence which included but was not limited to inappropriate surveillance activities, unusually high incidents of either physical altercations or verbal disputes, and unwarranted aggression, none of which occurred.

119.    **CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT** and **DEPUTY CHIEF BASCOM** were mandated by policy to review and address all such behaviors and conduct and document their review with a written report to the Chief of Police, which did not occur in this case, or did not occur with the frequency and action required to prevent the subject occurrences, death and damages.

120.    **CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT** and **DEPUTY CHIEF BASCOM** were required to report all information regarding potential or known domestic violence to the **MONMOUTH COUNTY PROSECUTOR** but failed to do so or did not do so with the frequency and action required to prevent the subject occurrences, death and damages.

121.    Under mandated policy, once domestic violence is assessed to have occurred **CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT, DEPUTY CHIEF BASCOM and their subordinates** must attempt to contact the victim and provide a report which is to be forwarded to the **MONMOUTH COUNTY PROSECUTOR.** The report must be documented. Such contact or report did not occur, which was a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent.

122.    Under mandated policy, a detailed criminal investigation report is to be completed by an officer responding to a domestic violence incident regardless of whether any arrest is made and such report is to be forwarded to the Chief of Police and Internal Affairs officer. Such reports or follow up did not occur, which was a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent.

35

123. Under mandated policy, assistance is to be provided to the victim of the domestic violence, including providing the victim with the name and contact number for the point person on domestic violence within the Prosecutor's office and referrals made to local domestic violence programs. Such assistance was not provided, which was a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent.

124. Under mandated policy, upon arrival at the scene of a domestic violence incident involving law enforcement, dispatch is to be notified and a supervisor or shift commander is to report to the scene; the supervisor or shift commander is to notify the police department of any domestic violence incident regardless of whether there is an arrest, charges filed or a restraining order issued. Such policy was not followed with respect to **TAMARA WILSON-SEIDLE,** such failure being a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent.

125. The on-scene supervisor is to ensure that the victim is informed of her rights, with forms being provided and procedures for obtaining a restraining order as well as the availability of a domestic violence response team or a domestic violence advocate, among other assistance to be provided. Such policy was not followed with respect to **TAMARA WILSON-SEIDLE,** such failure being a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent.

126. Under mandated policy **NEPTUNE, through its agents and employees CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT, DEPUTY CHIEF BASCOM** and their **subordinates** were obligated to undertake and make "all reasonable efforts to provide law enforcement protection and other safety measures to a victim" of domestic violence, including directed patrol initiatives including drive-bys, patrols and checks; further that these defendants

are to ensure that the victim is contacted and trained by advocates in dealing with domestic violence. Such policy was not followed with respect to **TAMARA WILSON-SEIDLE,** such failure being a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent.

127.    Administrative investigations by the police were to be conducted of any alleged incident of domestic violence. Such policy was not followed with respect to **TAMARA WILSON-SEIDLE,** such failure being a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent.

128.    Further, policy requires that whenever an act of domestic violence as defined in the statute to include harassment and stalking occurs and known to law enforcement, all weapons shall be seized by the officer responding to the domestic violence call if the officer reasonably believes that the presence of weapons would expose the victim to a risk of serious injury. This policy is in place regardless of the failure to arrest, charge or obtain a restraining order. Such policy was not followed with respect to **TAMARA WILSON-SEIDLE,** such failure being a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent. It was not objectively reasonable based on the circumstances including numerous and known domestic violence incidents and problems with anger and emotional lability of **SEIDLE** not to have removed and disarmed him during the various calls to the family home and not to have removed and disarmed **SEIDLE** permanently.

129.    In addition, policy mandates that the Chief of Police and/or the Prosecutor shall conduct an investigation and shall recommend whether an officer subject to a domestic violence incident should be permitted to carry weapons and what conditions should be imposed for the return of weapons. The failure to take aggressive and serious action by **NEPTUNE, through its**

37

**agents and employees CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT, DEPUTY CHIEF BASCOM** and their **subordinates** in the face of repeated domestic violence incidents and the failure to keep weapons away from **SEIDLE** permanently or to terminate him was the result of reckless and deliberate indifference to the high risk of harm to **TAMARA SEIDLE**, such failures being a direct and proximate cause of the subject occurrences, death and damages to Plaintiffs and Plaintiff's decedent.

130.    The subject policy, "Departmental Policy for Handling of Domestic Violence Incidents involving Law Enforcement Officers applies regardless of whether there is an arrest or restraining order in effect.

131.    Under AG Guidelines "Directive Implementing Procedures for the Seizure of Weapons from Municipal and County Law Enforcement Officers involved in Domestic Violence Incidents, No. 2000-3, "where an act of domestic violence as defined in N.J.S.A. 2C:25-19 has been alleged to have been committed by a law enforcement officer all weapons, department issued and personal, possessed by that officer shall immediately be seized by the law enforcement officer responding to the domestic violence call if the responding officer reasonably believes that the presence of weapons would expose the victim to a risk of serious bodily injury...' and the seized weapon is to be returned to the custody and control of the department issuing the weapon.

132.    The various incidents and threats reported to **NEPTUNE** should have alerted the agency that by the April 2015 incident there was more than sufficient cause to remove the weapons in the possession of **SEIDLE** and the failure to so instruct their subordinates amounted to reckless indifference to the constitutional rights of **TAMARA.**

133.    In addition to the failure to follow prescribed policies regarding domestic

38

violence, at all relevant times herein the **NEPTUNE, through its agents and employees CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT, DEPUTY CHIEF BASCOM and their subordinates** ratified and maintained a practice, official or unofficial custom and/or policy of failing to train, discipline and/or supervise defendant police and law enforcement officers in conformity with clearly established constitutional principles which govern their conduct, including proscriptions against the use of excessive force including domestic violence. **This dereliction is shown from the Internal Affairs complaints against SEIDLE, known by Neptune. The failure to train, discipline and supervise is shown by the inaction taken in the face of countless domestic violence incidents involving SEIDLE and TAMARA known to NEPTUNE.**

134. **NEPTUNE,** through its agents and employees **CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT, DEPUTY CHIEF BASCOM and their subordinates** acted with deliberate and conscious indifference to **TAMARA'S** constitutional rights which violations arose out of a pattern or custom, policy and practice by and of defendants in allowing the use of excessive force and domestic violence to occur, permitting and condoning the use of excessive force and domestic violence by failing to implement and enforce police procedures and protocols as well as the failure to properly hire, train and supervise police officers in the proper conduct of their duties and in the use of force, failing to conduct proper and complete internal affairs investigations which permitted, allowed and acquiesced in the unlawful use of force including domestic violence among law enforcement personnel and police officers and in failing to render medical aid. These faulty internal affairs investigations include those against the entire force as well as the investigations into the use of force by defendant **SEIDLE.**

<u>Monmouth County</u>

135. The **COUNTY** is responsible for the administration of the **MONMOUTH COUNTY PROSECUTOR'S OFFICE** which covers all non-law enforcement related functions, including but not limited to the non-advocacy functions of handling personnel matters internally and in conjunction with a local police department regarding joint oversight of issues relating to the use, operation and control over a gun by a police officer.

136. **The COUNTY's responsibilities in connection with its administrative role is applied through its agents and employees acting in their official capacity, here PROSECUTOR GRAMICCIONI and the ASST. PROSECUTORS SCHWEERS, SEELY and INCREMONA.**

137. **The COUNTY, by PROSECUTOR GRAMICCIONI and the ASST. PROSECUTORS SCHWEERS, SEELY and INCREMONA were on notice of all the problems between SEIDLE and TAMARA, as the COUNTY through the PROSECUTOR'S OFFICE collects annual summary reports showing all complaints against law enforcement and internal affairs investigations into complaints regarding use of force and domestic violence.**

138. **The COUNTY, through the PROSECUTOR'S OFFICE was aware of the abuse as it was advised of same by employees of NEPTUNE and was called in to investigate the domestic violence allegations and complaints against SEIDLE.**

139. **The COUNTY, through the PROSECUTOR'S OFFICE and by the personal involvement of GRAMICCIONI, SCHWEERS, SEELY and INCREMONA was aware of the documented history of SEIDLE'S fitness for duty problems, anger management, mental instability and need for psychological counselling which impacted his performance and his**

40

ability to carry a weapon safely.

140.    The COUNTY, through the PROSECUTOR'S OFFICE, and by the personal involvement of GRAMICCIONI, SCHWEERS, SEELY and INCREMONA was on actual notice that SEIDLE presented a physical threat to TAMARA with a substantial likelihood that such harm would in fact occur if SEIDLE was permitted to keep and use a gun.

141.    The COUNTY, through the PROSECUTOR's OFFICE and by the personal involvement of GRAMICCIONI, SCHWEERS, SEELY and INCREMONA knew that SEIDLE was disciplined almost every year for three (3) years prior to the shooting, that he had been suspended and had on multiple occasions been found unfit for duty.

142.    The COUNTY, through the PROSECUTOR's OFFICE and by the personal involvement of GRAMICCIONI, SCHWEERS, SEELY and INCREMONA was aware of affidavits by SEIDLE regarding his suspension in the 2012 time frame establishing that TAMARA had in fact called the police and told them that she feared for her safety, noting physical abuse.

143.    The COUNTY, through the PROSECUTOR's OFFICE and by the personal involvement of GRAMICCIONI, SCHWEERS, SEELY and INCREMONA was aware of the need to discipline SEIDLE as these individuals were personally involved in the removal and reinstatement of a gun to SEIDLE after periods of discipline.

144.    Upon information and belief in or about 2013 GRAMICCIONI, SCHWEERS, SEELY and INCREMONA were personally involved in the decision to allow SEIDLE to again use his gun, and again in 2014 and 2015 were involved in determining how and under what circumstances SEIDLE would again be disciplined.

145. The discipline imposed by these individuals in conjunction with NEPTUNE was

insufficient, inadequate and ineffective.  In particular, GRAMICCIONI, SCHWEERS, SEELY and INCREMONA  knew that there were fitness for duty findings that were of questionable value as the persons most affected by SEIDLE, namely his wife and children, were never consulted about his performance, temperament, anger and problems of abuse at home.

146.    In particular, the COUNTY, through GRAMICCIONI, SCHWEERS, SEELY and INCREMONA knew that the fitness for duty examinations between 2012 and 2015 were deficient, and that they were prepared without proper documentation, investigation and communication with all affected parties.

147. The COUNTY, through GRAMICCIONI, SCHWEERS, SEELY and INCREMONA knew that SEIDLE remained unfit for duty, that he was a threat to the wellbeing of TAMARA and should not have the use of a weapon or at a minimum have conditions placed on the use of the weapon in that SEIDLE continued after 2012 and 2013 to exhibit poor judgment, lack of focus, anger and emotional instability.

148.    Further, The COUNTY, through GRAMICCIONI, SCHWEERS, SEELY and INCREMONA knew of the history of domestic violence disputes and problems at the marital household, as they were advised that discipline needed to be imposed.

149.    The COUNTY, through GRAMICCIONI, SCHWEERS, SEELY and INCREMONA  knew that SEIDLE was the subject of longstanding chronic internal affairs complaints with a 682 page file including prior excessive force complaints starting in 2004 through 2015.

150. The determination by the COUNTY, through GRAMICCIONI, SCHWEERS, SEELY and INCREMONA  to reinstate and allow SEIDLE to use a gun was reckless and

evidenced deliberate indifference to the right of TAMARA to be free from excessive force and maintain her interest in bodily integrity and liberty.

151. The COUNTY, through GRAMICCIONI, SCHWEERS, SEELY and INCREMONA acted with deliberate and conscious indifference to TAMARA'S constitutional rights by personally failing to follow mandated procedure and protocol in the handling of discipline pertaining to the removal and reinstatement of SEIDLE'S service weapon, and in permitting and allowing reinstatement to full duty and use of the service weapon used to kill TAMARA which affirmatively put TAMARA in a position of danger resulting in her death.

152. The COUNTY, through GRAMICCIONI, SCHWEERS, SEELY and INCREMONA failed and refused to abide by the AG guidelines applicable to domestic incidents applicable to the PROSECUTOR's OFFICE.

153. In particular, the COUNTY, through the PROSECUTOR's OFFICE, failed to respond appropriately to reports of domestic violence regarding SEIDLE and others, failed to assure that all law enforcement agencies properly reported such incidents as required, assure that all victims obtain the assistance mandated by policy, assure that complete criminal investigation reports were filed and that proper internal affairs investigations were conducted regarding domestic violence and use of force throughout the COUNTY. In particular, none of these mandates were carried out as to TAMARA prior to her shooting and death, which failures were a direct and proximate cause of the shooting and death.

154. The COUNTY, through the PROSECUTOR'S OFFICE, is mandated by the AG policy to conduct an investigation and recommend whether an officer should be permitted to carry weapons and under what conditions. The failure to take aggressive and

43

more serious action by the COUNTY in the face of repeated domestic violence incidents and the failure to keep weapons away from SEIDLE permanently was the result of reckless indifference to the high risk of harm to TAMARA, such failures being a direct and proximate cause of the subject occurrences, death and damages to TAMARA.

155.    Finally, GRAMICCIONI himself stated that the domestic violence policies and procedures were lacking in that officers [such as SEIDLE] who are the subject of numerous internal affairs complaints are not tagged for proper discipline and that an early warning system was necessary to assure that officers like SEIDLE would be the subject of proper monitoring, supervision and discipline, including possession of and use of a weapon.

156.    In addition to the failures to follow prescribed policies, the COUNTY, by GRAMICCIONI, SCHWEERS, SEELY and INCREMONA ratified and maintained a practice, policy or custom of failing to train, supervise, monitor and discipline officers committing excessive force including domestic violence. This dereliction is established from the Internal Affairs complaints against SEIDLE and the inaction in the face of the complaints.

157.    The County, through GRAMICCIONI, SCHWEERS, SEELY and INCREMONA and their subordinates, acted with deliberate and conscious indifference to TAMARA's constitutional rights by personally failing to follow procedure and protocol in the handling of discipline pertaining to the removal and reinstatement of SEIDLE's gun, and in permitting and allowing reinstatement to full duty and continued use of a gun in the face of repeated incidents in 2014 and 2015 just prior to the subject event, affirmatively putting TAMARA in a position of danger being a direct and proximate cause of the shooting and death.

44

### Dispatch

158. **With respect to the dispatch, the COUNTY failed to properly train and supervise their dispatchers causing them to provide inconsistent, false or improper instructions and communications contributing to the chaos at the scene and prohibiting law enforcement from recognizing the nature of the situation and responding to an active shooter/rapid response/hostage event.**

159. The persons responsible for dispatch operations at the County, Defendants **CLAYTON, ARAS, MIGLIACCIO** and **GIBSON** failed and refused to relay adequate information regarding the call received from **KIRSTEN SEIDLE**, failed to notify the officers at the scene that the **SEIDLE** car was chasing **TAMARA**, and failed to notify the officers and responders that there was an active shooting of a person by a police officer, thus denying and delaying a rapid response to take place in violation of ministerial policies and procedures. As a direct consequence and proximate cause thereof, **TAMARA SEIDLE** was killed.

160. The actions of the dispatchers, each one individually, were made intentionally in that they willfully refused to provide appropriate detail to the effect that it was a police officer engaged in a shooting and chasing another vehicle.

### Asbury Park

161. **ASBURY PARK** acts through its agents and employees in their official capacities.

162. On June 16, 2015 **TAMARA** received a call from **SEIDLE** that he was extremely angry and threatening and she was concerned that he would actually kill her. **TAMARA** notified her daughter **KIRSTEN SEIDLE** that she believed that **SEIDLE** was in fact going to assault her and/or take some severe action against her.

163. **TAMARA** told **KIRSTEN** that **SEIDLE** was in fact chasing her and that she had

45

left work with **SEIDLE** following her in his private vehicle.

164.    **KIRSTEN SEIDLE** called the 911 dispatch and spoke to alternatively Defendants **CLAYTON, ARAS, MIGLIACCIO** and **GIBSON** or others to advise that there were threats against her mother, providing the models and colors of the cars, the persons involved and the location of the chase.

165.    After turning onto Sewell Avenue in Asbury Park by its intersection with Ridge Road, **SEIDLE** rammed his vehicle into the one driven by **TAMARA** and forced her off the road into a parked car. After that, **SEIDLE** got out of his car and began to shoot several shots into the driver's side window of the **TAMARA** vehicle at **TAMARA**.

166.    At the time of the initial shooting there was an **ASBURY PARK** officer already at the scene dealing with an unrelated motor vehicle stop. Upon information and belief this officer was **OFFICER LAWSON**.   In a gross disregard of police procedure and policy, and evidencing a shocking lack of training, this officer ran in the opposite direction from the shooting while acknowledging in police communications his awareness that the shooter was **PHILIP SEIDLE**.

167.    In a gross disregard of police procedure and policy and evidencing a shocking lack of training, **OFFICER LAWSON** not only ran away from an active shooting and crime scene but yelled "shots fired" to dispatch instead of indicating that there was an active shooter and rapid responder situation evolving before him, and that the shooter was a police officer known to **LAWSON, PHILIP SEIDLE**.

168.    **OFFICER LAWSON** failed to notify dispatch or communicate to other responding officers that **SEIDLE** was engaged in shooting someone in a motor vehicle.

169.    This officer failed to relay appropriate orders to dispatch, resulting in delay and inability to perceive and dispatch appropriate response from other officers, including the need to

arrive with protective gear in an active shooter situation, including shields and appropriate equipment necessary to deal with the situation as well as having a trained response with officers prepared to shoot the suspect to neutralize the immediate threat.

170.    The words 'shots fired" is a meaningless phrase devoid of any intelligent communication that would alert other responders and dispatch of the situation to be addressed, creating havoc, confusion and chaos resulting in placing **TAMARA** in greater danger as **SEIDLE** set himself up in a standoff with police and engage with the police, creating the circumstances that led to a second round of shots being fired 2.3 minutes after the first round.

171.    In a gross disregard of police procedure and policy evidencing a shocking lack of training, **OFFICER LAWSON** affirmatively positioned himself in violation of procedure by failing to take available cover with a direct line of fire to **SEIDLE,** who was in the process of shooting a civilian.

172.    In a gross disregard of police procedure and policy and evidencing a shocking lack of training, this officer failed to take **SEIDLE** down by the use of lethal force as mandated under the use of force guidelines and as expected in any situation where there is an active shooting; the evidence by video footage shows that the officer had the ability to both protect himself and take action to shoot **SEIDLE** but failed to do so because **SEIDLE** was a fellow officer.

173.    There was sufficient time to perceive and react to the shooting of **TAMARA** under standard engineering principles of perception/reaction time, that would have allowed **LAWSON** to use deadly force against **SEIDLE,** as required in an active shooter situation. The use of deadly force would have either prevented any of the first round of shots or some **of them,** which would have either saved **TAMARA'S** life or given her a much greater chance of survival.

174.    Officers are supposed to be trained to recognize the priority of life in an active shooter situation as follows: (1) the victim; (2) the officer and (3) the suspect.  Surrounding civilian activity is also critical; however, a review of the camera footage indicates that if **LAWSON** had remained at close range, moving toward **SEIDLE** as he was trained or should have been trained to do, deadly force could have and should have been immediately employed.

175.    The Attorney General guidelines state that an officer may use deadly force when there is a reasonable belief that such action is immediately necessary to protect the officer or another person from imminent danger of death or serious bodily harm.

176.    The Police Training Commission guidelines, which are used to train all new police recruits,  lists as a "Performance Objective" for active shootings in a school that the priority of law enforcement is to "Stop shooter- as soon as possible," which means to neutralize the threat immediately by shooting the suspect.

177.    In a 2017 directive by the Bergen County Prosecutor Gurbir S. Grewal, now the Attorney General, mandatory active shooter training requires that the first priority be to "stop the active shooter."  "Officers responding to an active shooter situation should: (a) use only aimed-directed fire at targets which can be identified as posing an imminent threat of death or serious bodily injury..."

178.    The Attorney General has not issued any specific guidelines on active shooter situations; accordingly other state, national and local training standards apply to determine the objectively reasonable behavior of an officer presented with an active shooter situation **which shows that** the response of **OFFICER LAWSON** was **unreasonable and made** with reckless disregard to the civil rights of plaintiff's decedent **TAMARA.**

179.    **LAWSON** failed to act or took affirmative acts which resulted in placing

48

TAMARA in greater danger, by reason of confusion, panic, and improperly distracting and disorienting the shooter, **SEIDLE**, causing him to continue shooting.

180.    In addition to a lack of training, **LAWSON** failed to act and/or acted unreasonably as he perceived that **SEIDLE** was a law enforcement officer acting under color of law. **LAWSON** did not know who **SEIDLE** was shooting, and therefore believed that he was on police business and that **SEIDLE** was acting in his official capacity.. **LAWSON** did not know if **SEIDLE** was on or off duty. Accordingly, **SEIDLE** was perceived as acting under color of law during the shooting incident and was therefore legally acting under color of law.

181.    By the time **LAWSON** managed to convey to dispatch that the shooter was a "sergeant from Neptune," **SEIDLE** had already started his standoff by pretending to have his finger on the trigger of his gun which he put to his head, with a bluetooth attachment in his ear. **LAWSON** failed to convey in police communications that **SEIDLE** had been shooting into a car, thus prohibiting an immediate and appropriate response to an active shooting situation. This failure made the situation worse, as now **SEIDLE** was engaging with various responding officers in a disorienting and panicked mode which resulted in another round of shots being fired into **TAMARA**.

182.    Within a minute after the first shots were fired, **SEIDLE'S** 7 year old daughter, **TERESA**, who had been in his car, ran out to **LAWSON**, who took the child and ultimately left the scene **or left and returned. The child was given to Defendant MARSHAWN LOVE ("LOVE"), the commanding officer who also left the scene during the course of the homicide.**

183.    **LOVE was ultimately disciplined for his derelictions with respect to the subject incident.**

49

184. No action was taken by **LAWSON** to disarm or engage with **SEIDLE** appropriately in order to extricate **TAMARA** from her vehicle and provide immediate medical attention during the minute after the first round of shots had stopped.

185. At no time was **SEIDLE** attempting to commit suicide or threatening to do so. His hand was not on the trigger which should have been readily observable to any trained officer, including **LAWSON**. Further, the Attorney General guideline stating that "deadly force shall not be used against persons whose conduct is injurious only to themselves" did not apply to **SEIDLE** as his conduct was not injurious "only to himself;" **SEIDLE** was both suicidal *and* homicidal.

186. **LAWSON,** as a trained officer, had a duty to protect **TAMARA** first; **accordingly** he had a duty to advise **SEIDLE** that he was going to extricate **TAMARA** from the car and/or get medical providers to attend to her and that in the event **SEIDLE** made any attempt to move or use his gun **LAWSON** would shoot him. This constitutes the proper course of action for a trained police officer.

187. **LAWSON** had a duty to intervene to protect **TAMARA** from the excessive use of force by another officer; and/or **LAWSON** had a duty to intervene to protect **TAMARA** where his affirmative actions created a substantial danger to her.

188. **LAWSON,** by his actions and inactions, breached that duty which was a proximate cause of the death and damages suffered by plaintiff's decedent, **TAMARA WILSON- SEIDLE.**

189. In a further affirmative act of misfeasance, **the** supervisory officer responsible for command and coordination, **LOVE,** responded to the scene and failed to take command of operations as required. **LOVE** had a duty to organize and take command as the highest ranking

50

officer at the scene. Instead, he took the child Teresa into his patrol car and left the scene while the crime was still in progress, resulting in no police coordination or orders as to how to effectively handle the situation, evidencing gross lack of tactical training and handling of an active shooter or rapid responder crime scene, including the failure to take action to permit and allow medical teams and responders to provide medical care, proximately causing **TAMARA's** death including any last chance of saving her.

190.    In particular, commanding officer **LOVE** left inexperienced and rookie officers to attempt to deal with the unfolding event, designated "Special Class II" officers," upon information and belief sworn in on or about January 2, 2015, officers **GRISWOLD, CHRISTIE** and **CRAWFORD.** This was in gross disregard of police procedure and policy and evidenced a shocking lack of training and supervision, proximately causing the death of **TAMARA** or precluding a last chance to save her.

191.    During the course of the unfolding event **LOVE** failed to provide any potential rescue attempts to **TAMARA.**

192.    **LOVE** was a neighbor of the Seidle's and knew that the car into which **SEIDLE** was shooting was **TAMARA'S.**

193.    Demonstrating a gross lack of training and reckless disregard for the safety and protection of **TAMARA, LOVE** failed to communicate that the victim was **TAMARA** and that the car **SEIDLE had engaged with was TAMARA'S.**

194.    Demonstrating a gross lack of training and reckless disregard for the safety and protection of **TAMARA, LOVE** failed to see to it that only one (1) officer  would engage **SEIDLE,** reducing the confusion, chaos and panic that was the hallmark of the event and thus calming **SEIDLE** down;  immediately attend to **TAMARA** by advising **SEIDLE** that the police

were going to get her and that he would be shot immediately if he attempted any intervention; failed to deduce that **SEIDLE'S** finger was not on the trigger; failed to take a proper stance and tactical position as against **SEIDLE**; failed to supervise **CHRISTIE, CRAWFORD** and **GRISWOLD** as to what tactical positions to take to move on **SEIDLE**; failed to provide a trained response with the other officers with a goal to neutralize the threat and take down **SEIDLE** if necessary; failed to assess the situation and prioritize the goals, the first of which was to extricate **TAMARA** and provide medical attention; allowing and permitting **SEIDLE** to stand for **over** 2 minutes without taking any action to save **TAMARA** or provide medical attention; treating the shooter as the victim and considering **SEIDLE's** needs and interests before **TAMARA'S**; and failed to follow any accepted guidelines on how to handle an active shooter/rapid response situation.

195.    **LOVE** had a duty to intervene to protect **TAMARA** from the excessive use of force by another officer; and/or **LOVE** had a duty to intervene to protect **TAMARA** where his affirmative actions created a substantial danger to her.

196.    **LOVE**, by his actions and inactions, breached that duty which was a proximate cause of the death and damages suffered by plaintiff's decedent, **TAMARA WILSON-SEIDLE.**

197.    After over 2 minutes and 30 seconds during which time **SEIDLE** was standing in the street with a police presence consisting of the **ASBURY PARK** officers defendants **LAWSON, CHRISTIE, GRISWOLD, CRAWFORD and LOVE** as well as other unidentified responding officers from either **ASBURY PARK**, the **PROSECUTOR's OFFICE**, Sheriff's Department or other public entity, **SEIDLE** shot multiple rounds of fire again into the **TAMARA** vehicle without any intervention on the part of any of the responding officers to take

52

action to prevent it, as required under mandated use of force policy and local and nationwide police standards for the handling of the situation.

198.    Defendants **CHRISTIE, GRISWOLD** and **CRAWFORD** individually showed a shocking lack of training and gross disregard for the safety of **TAMARA** by failing to take tactical positions in the direct line of fire to **SEIDLE,** as each of them were required to immediately neutralize any threat of harm to **TAMARA** regardless of whether there was any commanding officer controlling and supervising the active shooter situation.

199.    Defendants **CHRISTIE, GRISWOLD** and **CRAWFORD** showed a shocking lack of training and gross disregard for the safety of **TAMARA** by allowing **SEIDLE** to shoot several more rounds of gunfire into **TAMARA** despite 2.3 minutes during which **SEIDLE** was standing at the scene without using lethal action to take him down, as required under the AG use of force guidelines and all active shooter guidelines, both state, national and local.

200.    Defendants **CHRISTIE, GRISWOLD** and **CRAWFORD** showed a shocking lack of training and gross disregard for the safety of **TAMARA** in failing to recognize that **SEIDLE** did not have his finger on the trigger of the gun, that he was using the standoff as a means of venting and raging and that **SEIDLE** was not "suicidal," further that he was in the process of murdering someone.

201.    Defendants **CHRISTIE, GRISWOLD** and **CRAWFORD** showed a shocking lack of training and gross disregard for the safety of **TAMARA** in failing to split up operations and activities by removing all civilians from the area to the extent there were any in the direct line of fire or potential line of fire to **SEIDLE** while taking and remaining in tactical position to take **SEIDLE** down and remove **TAMARA** from her vehicle; and to have medical personnel immediately enter the vehicle while directly positioning themselves to fire upon **SEIDLE** as

necessary.

202. It took 13 minutes of the "standoff" artificially created by **SEIDLE** who was employing it to engage the multiple police defendants at the scene in an ongoing emotionally labile outburst until the defendant officers made any effort to extricate **TAMARA** and offer medical assistance, by which point it was too late.

203. In addition to a lack of training, **CHRISTIE**, **CRAWFORD** and **GRISWOLD** failed to act and/or acted unreasonably as they perceived that **SEIDLE** was a law enforcement officer acting under color of law. These defendants did not know who **SEIDLE** was shooting, and therefore believed that he was on police business and that **SEIDLE** was acting in his official capacity **CHRISTIE**, **CRAWFORD** and **GRISWOLD** did not know if **SEIDLE** was on or off duty. Accordingly, **SEIDLE** was perceived as acting under color of law during the shooting incident and was therefore legally acting under color of law.

204. **CHRISTIE**, **CRAWFORD** and **GRISWOLD** had a duty to intervene to protect **TAMARA** from the excessive use of force by another officer; and/or **CHRISTIE**, **CRAWFORD** and **GRISWOLD** had a duty to intervene to protect **TAMARA** where their affirmative actions created a substantial danger to her.

205. **CHRISTIE**, **CRAWFORD** and **GRISWOLD** by their actions and inactions, breached that duty which was a proximate cause of the death and damages suffered by plaintiff's decedent, **TAMARA WILSON- SEIDLE**.

206. In failing to advise the responding officers that **SEIDLE** was an active shooter, defendant **LAWSON** failed in his ministerial duties and failed to act in a reasonably objective manner, such failure directly leading to the lack of perception by the responding officers that **SEIDLE** was an active shooter and homicidal, and the inability to properly respond and intervene

54

and was a direct and proximate cause of the death and damages to **TAMARA WILSON-SEIDLE.**

207.    All the Asbury Park responders at the scene, **LAWSON, LOVE, CHRISTIE, CRAWFORD** and **GRISWOLD,** in allowing and permitting the situation to escalate as opposed to taking immediate action against **SEIDLE** and in the failure to extricate **TAMARA** after the first round of shots, and in their various affirmative acts in the handling of the matter made the situation worse in that **SEIDLE** had stopped shooting and would likely not have continued shooting but for the intervention of the police and the inappropriate methods used to attempt to engage **SEIDLE.**

208.    The perception and assumption that **SEIDLE** was acting under color of law and involved in official police business prohibited immediate and proper response and delayed appropriate intervention directly resulting in the death and damages to plaintiff **TAMARA-WILSON SEIDLE.**

209.    In an interview with a newspaper reporter, **SEIDLE** acknowledged that he killed while "a police officer," and that he did not remember the incident, further supporting his belief that he was acting under color of law during the shooting.

210.    A review of the available footage to the public reveals that the defendant **ASBURY PARK** officers at the scene treated **SEIDLE** differently because he was a police officer as opposed to a third party in the same position, and treated him as one acting under color of law and entitled to special deference.

211.    **The lack of training and supervision was so grossly deficient in the handling of the event and the failure to intervene so shocking as to evidence a depraved, reckless and deliberate indifference to the safety and welfare of TAMARA SEIDLE.**

212.    Ineffective communications and control between the responding officers and the supervisors created chaos and the inability to contain and stop SEIDLE from shooting TAMARA and killing her. **In particular, there were no communications between the lead commander, LOVE and his subordinates GRISWOLD, CHRISTIE, CRAWFORD and LAWSON as to where to position themselves, how to approach SEIDLE, who should directly engage him or distract him while others deployed to get her out of the car and how to handle civilians, among other command responsibilities.**

213.    Although SEIDLE at certain points had a gun to his head, any experienced officer would know that his finger was not on the trigger and that he was not planning on committing self-harm, permitting additional action in the use of force, further that there were several means to disarm SEIDLE from various positions as there were to save TAMARA or at a minimum permit a chance to save TAMARA and attend to her.

214.    None of the officers had received active shooter or rapid response training, which was so deficient by applicable standards involving police training as to rise to the level of a constitutional violation.

215.    By taking the affirmative action of running away from the scene, calling out wrong and dangerously inaccurate dispatch information and leaving the scene of the accident, and in various actions taking by the responding officers which did not comport with policy and procedure, the ASBURY PARK police officers and other at the scene as yet unidentified state actors, acted and used their authority to create a danger to TAMARA and make her more vulnerable to danger and serious harm then if they failed to act.

216.    **TAMARA was made more vulnerable to danger as the responding officers, LOVE, LAWSON, GRISWOLD, CHRISTIE and CRAWFORD by their individual actions**

56

escalated the situation, providing the opportunity for SEIDLE, who became increasingly psychologically and emotionally impaired due to the presence and confusion created by the police responders to shoot a second round of multiple shots into the car.

217.    CHIEF SALERNO and DEPUTY CHIEF KELSO failed to establish, consider and enact any policies or protocols for the handling of an active shooter/rapid responder/hostage event, thus setting the stage for a deprivation of constitutional rights. The failure to enact any such policies was so obviously deficient that CHIEF SALERNO and DEPUTY CHIEF KELSO know with substantial certainty that serious injury or death would result by the failure to do so. Further, these defendants individually, in conjunction with the failure to enact, propound and enforce such critical policies, failed to train their subordinates in the handling of such an event, such lack of training and policy a direst and proximate cause of the shooting and death of TAMAR WILSON-SEIDLE.

218.    Such failures amount to a policy, custom and practice in failing to have appropriate policies and train in the handling of what is now a national standard for police training in active shooter situations.

219.    CHIEF SALERNO and DEPUTY CHIEF KELSO acted with deliberate and conscious indifference to TAMARA'S constitutional rights by the failure to enact and enforce polices and standards regarding an active shooter/rapid responder/hostage event and in their failure to supervise and train as to same, including proper tactical command and response, equipment and de-escalation tactics.

220.    LOVE also bears responsibility for the failure to train and supervise in addition to his individual actions of dereliction at the scene.

221.    In addition to the omissions and affirmative acts detailed herein, TAMARA failed

to receive adequate and appropriate medical care in that if there had been proper training, supervision and handling of the entire event, medical providers could have gotten to **TAMARA** within seconds of being shot and she would have had an opportunity to be saved.

**Philip Seidle**

222.    **SEIDLE** shot **TAMARA**, being a proximate cause of her death.

## COUNT I
### (Section 1983- Neptune Township-Monell)

223.    Plaintiffs repeat and reallege each and every paragraph contained in this Complaint and incorporate same by reference.

224.    **TAMARA had a right, under the substantive due process clause of the 14th Amendment and the 4th Amendment to the United States constitution, to be free from arbitrary state action that deprived her of her life and liberty.**

225.    **NEPTUNE knew of SEIDLE's extensive history of domestic violence against TAMARA and did nothing about it.**

226.    **NEPTUNE failed repeatedly to follow proper domestic violence policies and procedures with respect to SEIDLE'S conduct and abuse of TAMARA. In particular, NEPTUNE continued to permit SEIDLE to carry a gun without any conditions or restrictions after its return by MONMOUTH COUNTY in the 2013 time frame and thereafter.**

227.    **NEPTUNE failed to properly take action to discipline SEIDLE in the face of multiple deficient fitness for duty evaluations, known emotional and psychological instability and anger management problems.**

228.    **NEPTUNE failed to terminate SEIDLE from the force and/or take other actions including putting limitations and restrictions on the use of a gun or taking the gun**

58

away from SEIDLE permanently; and failed to discipline him adequately in the face of multiple internal affairs complaints regarding the use of force and domestic violence problems between 2012 and the date of the shooting in June 2015, which would have prevented the shooting and death of TAMARA.

229.    NEPTUNE failed and refused to provide TAMARA with the assistance mandated under the AG guidelines necessary to obtain a restraining order; failed to have SEIDLE'S gun removed after officers responded to complaints at the family home where altercations were occurring with increasing frequency between 2012 and the date of the shooting in accordance with AG guidelines.

230.    NEPTUNE failed to take action in the face of specific complaints by TAMARA to each Chief and Deputy in charge of the police department.

231.    NEPTUNE ignored the complaints of TAMARA.

232.    NEPTUNE failed to interview or take appropriate steps to assure that those conducting fitness for duty evaluations or evaluating SEIDLE for emotional and psychological problems had all significant information presented to them, including from TAMARA and the PLAINTIFF CHILDREN.

233.    NEPTUNE failed to supervise, train and discipline not only SEIDLE but all members of the police department regarding the use of excessive force, such lack of training and discipline shown by the lack of response to the lengthy internal affairs files of SEIDLE as well as a history of complaints brought by civilians against NEPTUNE which did not result in appropriate internal affairs review or discipline.

234.    In particular a recent evaluation by the Star Ledger found 658 documented use of force incidents in NEPTUNE between 2012 and 2016, including 177 involving the use

59

of hands and fists, 43 pepper spray incidents and 15 leg swipes. Although certain techniques for the use of force are considered acceptable under national and state standards, such as a compliance hold, leg swipes, the inordinate use of pepper spray and punching and hitting are not acceptable techniques. Leg swipes are extremely hazardous to employ as they result in tripping the person so that they fall hard to the ground, and are generally to be avoided.

235.    These events including use of force were not properly or adequately investigated and those responsible for hitting and punching using hands and firsts were not disciplined, establishing an anemic and inadequate response by the policy makes to the use of excessive and unnecessary force.

236.    These incidents and analysis show a pattern, practice, custom or policy to ignore civilian complaints, fail to take action regarding the use of excessive force including domestic violence, tolerate and acquiesce in misconduct. The pattern and practice is also evident from the lack of adequate response to the internal affairs and domestic violence complaints of SEIDLE pre-dating the shooting and death of TAMARA.

237.    NEPTUNE failed to supervise, train and discipline its officers with respect to following the AG policies on domestic violence involving law enforcement, such lack of training and discipline shown by the lack of response to abuse of TAMARA by the police who either were sent to the home on a complaint, or acted as "escorts" to SEIDLE when he wanted to enter the former family home or was involved in an altercation with TAMARA or the PLAINTIFF CHILDREN.  No internal affairs investigations were ever conducted into the conduct of the many officers who went to the marital home unannounced and who dealt with various confrontations between TAMARA, SEIDLE and the PLAINTIFF

CHILDREN without official documentation as described in this complaint.

238. All of the NEPTUNE officials in policy-making positions were aware of these circumstances and took no steps to correct or remediate the problem.

239. At all relevant times herein all agents and employees of NEPTUNE were acting under color of state law and within the scope of their authority.

240. NEPTUNE's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S rights under the substantive due process clauses of the federal constitution.

241. As a direct and proximate result of NEPTUNE'S policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendments to the United States constitution.

242. As a direct and proximate result of NEPTUNE'S policy of deliberate indifference, Plaintiff's decedent was deprived of her rights, privileges and immunities secured by the Constitution and laws of the United States under the **Fourth** and Fourteenth Amendments, and **NEPTUNE** is liable to Plaintiffs pursuant to Title 42, Section 1983 of the United Stated Code.

243. As a direct and proximate result of defendants constitutional violations, Plaintiff's decedent **TAMARA WILSON-SEIDLE** suffered serious and severe injuries which resulted in her death.

244. The decedent left her surviving her nine children.

245. As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

246.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

247.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have been damaged.

248.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

249.    By reason of the foregoing pain and suffering and wrongful death plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

250.    **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

251.    **WHEREFORE, the Estate demands judgment against NEPTUNE TOWNSHIP and the NEPTUNE POLICE DEPARTMENT for compensatory damages, funeral bills and costs of suit, together with interest and attorney's fees.**

**COUNT II**
**(1983 - Neptune - equal protection)**

252.    Plaintiffs repeat and reallege each and every allegation contained in this Complaint and incorporates same by reference.

253.    Plaintiff repeat and reallege each and every allegation contained in this Complaint and incorporates same by reference.

254.    **TAMARA had a right, under the equal protection clause of the 14ᵗʰ Amendment to be free of discrimination or differential treatment because of her sex.**

255.    **NEPTUNE had a history of disregarding or ignoring women's concerns and of allowing discriminatory and adverse treatment of women by the police department, both internally and externally.**

256.    The Neptune Defendants, in treating women in a disparate and discriminatory manner, failed and refused to properly deal with the domestic violence and use of force issues presented by **SEIDLE.**

257.    Several lawsuits and complaints have been filed against **NEPTUNE and** its police department with respect to hostile work environment based on sex, retaliatory actions towards women, the failure to promote, unwarranted reprimands, vulgar and unabated sexual and unwanted comments, and in general complaints evidencing a negative and dismissive attitude toward women.

258.    Because of their known disparate and discriminatory treatment toward women, **NEPTUNE** commissioned an outside investigative company to look into the complaints, culminating in the "Turner Report" of January 29, 2014.  This report was released in April 2018, after lawsuits and OPRA requests by the public and the press.

259.    The Turner Report relates a series of complaints, lawsuits and EEOC filings by women on the Neptune police force alleging sexual harassment and gender based discrimination, including the failure to promote, provide the same employment opportunities as men, retaliation for complaints, reprimands which were not warranted,  and in general a hostile work environment.  Two women in particular have proceeded with complaints.  The incidents and factual information in the Turner report precede the shooting incident with **TAMARA.**

260. There are also various media postings indicating that women have received poor treatment at the hands of the Neptune Police Department. Further, men have filed lawsuits alleging retaliation for supporting the women who complained about sexual harassment.

261. The lengthy internal affairs file of **SEIDLE** and the notice to **NEPTUNE** of the abuse and harassment of **TAMARA without sufficient and appropriate action** demonstrates that **NEPTUNE** did not take domestic violence seriously and failed to take action in the face of it.

262. **In 2014 SEIDLE was disciplined for yelling profanities at other police officers, and not due to the underlying domestic event that precipitated that interaction, showing a profound disregard for TAMARA solely on the basis of her sex.**

263. Upon information and belief there are other internal affairs files relating to other members of the police force involving domestic violence and the failure to take action in the face of it.

264. There is an internal bias against women in the police department as established by the series of complaints regarding gender bias.

265. **TAMARA** was treated differently in the handling of **SEIDLE's** discipline and employment because she was a woman; had **SEIDLE** been involved in a series of altercations, abuse or the use of excessive force involving male colleagues **or men NEPTUNE** would have taken quicker and more decisive action to discipline and ultimately terminate **SEIDLE** from the force, thus preventing the subject shooting incident from occurring.

266. **At all relevant times herein NEPTUNE failed to prohibit discriminatory and disparate treatment of women, in particular TAMARA WILSON-SEIDLE, by failing to acknowledge TAMARA's complaints, failing to take action to stop the violence against her**

and instead protecting **SEIDLE** as opposed to the victim of the domestic violence.

267. The **NEPTUNE** policymakers knew about the discriminatory conduct toward women within the department and failed to take corrective action.

268. **At all relevant times herein all agents and employees of NEPTUNE were acting under color of state law and within the scope of their authority.**

269. **NEPTUNE's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S rights under the equal protection clauses of the federal constitution.**

270. **As a direct and proximate result of NEPTUNE'S policy of deliberate indifference, TAMARA was deprived of her right to life under the equal protection clause of the 14th Amendment to the United States constitution.**

271. **As a direct and proximate result of NEPTUNE'S policy of deliberate indifference,** Plaintiff's decedent was deprived of her rights, privileges and immunities secured by the Constitution and laws of the United States and **NEPTUNE** is liable to Plaintiffs pursuant to Title 42, Section 1983 of the United Stated Code.

272. As a direct and proximate result of defendants constitutional violations, Plaintiff's decedent **TAMARA WILSON-SEIDLE** suffered serious and severe injuries which resulted in her death.

273. The decedent left her surviving her nine children.

274. A direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

275. As a direct and proximate result of the violation of constitutional rights as

aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

276.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have been damaged.

277.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sum    s of money for funeral and burial expenses.

278.    By reason of the foregoing pain and suffering and wrongful death plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

279.    **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

280.    **WHEREFORE, the Estate demands judgment against NEPTUNE TOWNSHIP and the NEPTUNE POLICE DEPARTMENT for compensatory damages, funeral bills and costs of suit, together with interest and attorney's fees.**

### COUNT III
### (1983 - Individual Neptune Officials)

281.    Plaintiffs repeat and reallege each and every paragraph of the Complaint and incorporates same by reference.

**Chief O'Neil**

282.    **Police Chief O'NEIL was the policymaker and chief law enforcement officer prior to and including 2012.**

283.    **The abuse and domestic violence to TAMARA by SEIDLE commenced prior**

66

to 2012, during O'NEIL'S tenure. These acts including kicking TAMARA in the stomach during pregnancy, violently assaulting her in the marital bedroom resulting in substantive damage to the walls of the bedroom and giving her a black eye on her birthday.

284. SEIDLE left the family residence after TAMARA filed for divorce in the 2012 time frame. The allegations in the divorce papers from 2012 include affidavits from both TAMARA and SEIDLE. TAMARA stated that she was the victim of horrific abuse; SEIDLE wrote in his affidavit that TAMARA had advised the police department of the gross domestic abuse and violence and that he was being taken to task for it by NEPTUNE, whose chief officer for the police department at the time was O'NEIL.

285. The police were regular visitors at the family home before and including 2012; some visits being documented and some not.

286. In particular TAMARA called the police in 2012 reporting that she had been subjected to past incidents of physical abuse.

287. This complaint resulted in administrative discipline consisting of a two (2) day suspension of SEIDLE and the removal of his gun. O'NEIL was the person responsible for this discipline and approving it.

288. This complaint in 2012 involving SEIDLE cancelling a dispatch call from TAMA relating to domestic violence.

289. Domestic abuse calls began in 1994 and were known to O'NEIL.

290. The 1994 complaint reported a domestic violence incident resulting in TAMARA throwing a chair at SEIDLE. In 2001 there was another documented complaint by one of the Seidle children made at TAMARA's direction regarding a screaming match which escalated into physical contact between the parties.

67

291.   The police were again called in 2006 and 2012, the last one being the subject of specific complaints by TAMARA of a history of abuse at the hands of SEIDLE. SEIDLE's gun was removed after the 2012 incident and on February 8, 2012 he was found "not fit for duty." However, within two (2) months he was found fit for duty and CHIEF O'NEIL recommended, inappropriately, that SEIDLE be re-armed, first by signing his gun in and out of each work shift but then to be re-armed without conditions after 180 days.

292.   As set forth in the factual allegations at length, there were numerous times when the police showed up to deal with domestic violence which were not officially reported, including during O'NEIL'S tenure as Chief of Police.

293.   Also during the period of O'NEIL'S tenure, SEIDLE wrote that his suspension was the result of TAMARA telling the police that SEIDLE was threatening and abusing her and that she was afraid for her safety. She advised that the police had done nothing about it.

294.   Upon information and belief TAMARA personally met with O'NEIL to review her complaints of abuse.

295.   O'NEIL failed to take sufficient action under the circumstances to discipline SEIDLE, to assure that he remained without the use of gun, to terminate him or remove him from an assignment requiring the use and possession of a gun.

296.   O'NEIL failed to see to it that SEIDLE would not have use or possession of a gun when he was off-duty, failed to bring appropriate administrative charges which should have resulted in progressive discipline leading to termination prior to the subject incident; affirmatively agreed to reinstate SEIDLE after only a two (2) day suspension and requested authorization from the Prosecutor for SEIDLE to continue using his gun; failed to take

68

action in the face of questionable fitness for duty evaluations where the evaluator had not personally interviewed TAMARA, the children or others in a position to know the nature and extent of the abuse; failed to review internal affairs investigations into the use of excessive force and domestic violence by SEIDLE, failed to comply with the AG domestic violence guidelines by failing to assist TAMARA in filing and pursuing restraining orders and obtaining counselling and guidance; ignored and tolerated repeated domestic violence incidents between SEIDLE and TAMARA and failed to take action to stop them; permitted and allowed the police to act with impunity and at will in providing escorts to SEIDLE without documentation or reporting to the marital home in connection with disputes and domestic violence, failed to assure that SEIDLE was properly disciplined; failed to assure that officers engaged as escorts or coming to the family home without properly documenting the event were disciplined; all the time knowing with a substantial certainly that harm would come to TAMARA as a result of these derelictions.

297.    O'NEIL failed to train and supervise his subordinates in the handling of domestic violence complaints, discipline for the failure to take appropriate action in the face of numerous internal affairs complaints on SEIDLE and turned a blind eye to the comings and goings of the police force to the Seidle marital home.

298.    O'NEIL was deliberately indifferent to the risk of domestic violence and harm to TAMARA.

299.    O'NEIL's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S rights under the substantive due process clauses of the federal constitution.

300.    As a direct and proximate result of O'NEIL's policy of deliberate

indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendments to the United States constitution.

301.    **As a direct and proximate result of O'NEIL's policy of deliberate indifference,** Plaintiff's decedent was deprived of her rights, privileges and immunities secured by the Constitution and laws of the United States under the **Fourth** and Fourteenth Amendments, and **O'NEIL** is liable to Plaintiffs pursuant to Title 42, Section 1983 of the United Stated Code.

<u>**Chief Robert Adams.**</u>

302.    **Police Chief ADAMS was the policymaker and chief law enforcement officer between 2012 and 2014.**

303.    **ADAMS had full knowledge of the history of domestic violence including discipline imposed on SEIDLE and TAMARA's complaints.**

304.    **ADAMS was the chief when SEIDLE was re-armed without conditions in the 2013 time frame.**

305.    **Adams was personally aware of the continuing and escalating problems between the parties during his tenure, based on the history as well as continued complaints.**

306.    **ADAMS permitted and condoned inadequate fitness for duty evaluations which did not contain interviews of those with the most knowledge of the abuse, TAMARA and her children.**

307.    **ADAMS failed to assure that the AG guidelines for the handling of domestic violence incidents involving law enforcement officers was followed, including permitting and allowing undocumented visits to the marital household by police officers offering their services as "escorts" to assist SEIDLE when a complaint was made by TAMARA or the children**

70

308.    Upon information and belief TAMARA personally complained to ADAMS about the abuse.

309.    ADAMS knew that SEIDLE continued to threaten TAMARA during his tenure by screaming and intimidating her over custody disputes and arrangements to take the children on visitation,; that SEIDLE threatened to commit serious bodily harm and to assault TAMARA and that SEIDLE was also stalking her. The basis of this knowledge was TAMARA's continued complaints as well as knowledge by many police officers of the problem, acknowledged to children Kirsten and Monica during the 2014 beach incident described in this complaint; that the police were regular visitors to the marital home with some documented and other undocumented visits.

310.    While on ADAM's tenure, SEIDLE would often call the police as "backup" or "escorts" to assist him with custody disputes and arguments with TAMARA.

311.    The children recall several visits by the police during ADAM's tenure, a period within one (1) year of the shooting, including  an incident where the police had to physically restrain SEIDLE who was screaming and yelling at TAMARA while a younger child waited in SEIDLES car; another where the police came to the house to intervene in a dispute over hair clippers and another where Seidle demanded to get into the house for some papers and yet another screaming and volatile argument ensued.

312.    In the 2013 times frame, after getting his gun back, SEIDLE was again disciplined or reprimanded by his supervisors under the control of ADAMS, for problems relating to his performance as an officer and psychological  readiness to continue as an officer in 2013; yet ADAMS permitted SEIDLE to retain and carry a service weapon.

313.    In the 2014 time frame still during ADAM's tenure, SEIDLE was again

71

disciplined and received a 30 day suspension for his involvement in a custody dispute over visitation. TAMARA called the police and reported that SEIDLE was harassing her, yelling and threatening her; she further indicated that she wanted to file a complaint for harassment. When SEIDLE was advised that Tamara intended to sign a complaint, he began screaming profanities at the officers who responded.

314.    Instead of concerning themselves with TAMARA and her safety, the police, with ADAM's and DIRECTOR BASCOM's approval, determined that SEIDLE should be disciplined for his behavior against the police, and not TAMARA.  This decision and administrative discipline evidenced the profound lack of respect and discrimination towards women and the victims of domestic violence.

315.    The discipline consisted of a 30 day paid administrative leave, pending another fitness for duty evaluation. SEIDLE was not disarmed as he should have been by ADAMS and BASCOM.  The fitness for duty evaluator did not consult TAMARA, the children, or anyone familiar with the domestic violence and history of intimidation, threats and physical violence upon TAMARA by SEIDLE, including threats of violence.

316.    In the summer of 2014, upon information and belief still during ADAM's tenure, there was the beach incident involving the Seidle children, where, after calling for help in a threatening incident with their father, were told by officers Jay Hunter Elison and Officer Gallerio that the police knew what was "going on," that her father was a "known problem" and that the police department was concerned "for the children's safety."

317.    Another officer, Mike Allen, also advised the children that the police department knew about the problems with SEIDLE, also during the tenure of ADAMS.

318.    Accordingly, ADAMS was personally aware of the SEIDLE situation and

failed to take action to remediate it.

319.    ADAMS failed to take sufficient action under the circumstances to discipline SEIDLE, to assure that he remained without the use of gun, to terminate him or remove him from an assignment requiring the use and possession of a gun.

320.    ADAMS failed to see to it that SEIDLE would not have use or possession of a gun when he was off-duty, failed to bring appropriate administrative charges which should have resulted in progressive discipline leading to termination prior to the subject incident; affirmatively agreed to reinstate SEIDLE after only a two (2) day suspension and requested authorization from the Prosecutor for SEIDLE to continue using his gun; failed to take action in the face of questionable fitness for duty evaluations where the evaluator had not personally interviewed TAMARA, the children or others in a position to know the nature and extent of the abuse; failed to review internal affairs investigations into the use of excessive force and domestic violence by SEIDLE, failed to comply with the AG domestic violence guidelines by failing to assist TAMARA in filing and pursuing restraining orders and obtaining counselling and guidance; ignored and tolerated repeated domestic violence incidents between SEIDLE and TAMARA and failed to take action to stop them; permitted and allowed the police to act with impunity and at will in providing escorts to SEIDLE without documentation or reporting to the marital home in connection with disputes and domestic violence, failed to assure that SEIDLE was properly disciplined; failed to assure that officers engaged as escorts or coming to the family home without properly documenting the event were disciplined; all the time knowing with a substantial certainly that harm would come to TAMARA as a result of these derelictions.

321.    ADAMS failed to train and supervise his subordinates in the handling of

73

domestic violence complaints, discipline for the failure to take appropriate action in the face of numerous internal affairs complaints on SEIDLE and turned a blind eye to the comings and goings of the police force to the Seidle marital home.

322.    ADAMS was deliberately indifferent to the risk of domestic violence and harm to TAMARA.

323.    ADAMS' failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S rights under the substantive due process clauses of the federal constitution.

324.    As a direct and proximate result of ADAM'S policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendments to the United States constitution.

325.    As a direct and proximate result of ADAM's policy of deliberate indifference, Plaintiff's decedent was deprived of her rights, privileges and immunities secured by the Constitution and laws of the United States under the **Fourth** and Fourteenth Amendments, and **ADAMS** is liable to Plaintiffs pursuant to Title 42, Section 1983 of the United Stated Code.

Director Michael Bascom

326.    Police Director BASCOM was the policymaker and chief law enforcement officer between 2012 and 2014.

327.    BASCOM was on the same notice and had the same knowledge as CHIEF O'NEIL and CHIEF ADAMS as detailed above.

328.    BASCOM failed to take action to remediate the situation, knowing with substantial certainty that the failure to do so would likely result in serious injury or death to TAMARA-WILSON SEIDLE.

74

329.     BASCOM, as the Director of Police, had personal involvement, authority and control over SEIDLE, SEIDLE's discipline and any administrative proceedings required to discipline him. BASCOM was also responsible for assuring that the AG policies regarding domestic violence were heeded and followed by law enforcement officers, and that the Internal Affairs function in terms of reviewing and disciplining SEIDLE for his history of excessive force complaints and other misconduct was handled properly.

330.     BASCOM was deliberately indifferent to the risk of domestic violence and harm to TAMARA.

331.     BASCOM's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S rights under the substantive due process clauses of the federal constitution.

332.     As a direct and proximate result of BASCOM'S policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution.

333.     As a direct and proximate result of BASCOM's policy of deliberate indifference, Plaintiff's decedent was deprived of her rights, privileges and immunities secured by the Constitution and laws of the United States under the **Fourth** and Fourteenth Amendments, and **ADAMS** is liable to Plaintiffs pursuant to Title 42, Section 1983 of the United Stated Code.

Chief James M. Hunt

334.     Police Chief HUNT was the policymaker and chief law enforcement officer between 2014- present.

335.     HUNT was on the same notice and had the same knowledge as CHIEF O'NEIL, CHIEF ADAMS and DIRECTOR BASOM as detailed above.

336.    In addition, TAMARA sat down with HUNT to complain about the abuse and domestic violence, and that she was in fear for her life. This was done in the late 2014 time frame.

337.    HUNT was on notice of worsening and continually escalating episodes involving screaming and harassment, including stalking, by SEIDLE against TAMARA.

338.    After the 2014 beach incident the harassment continued. There is one recorded and documented dispatch from April 2015 involving yet another dispute between SEIDLE and TAMARA about 45 days prior to the shooting and yet another reported incident upon information and belief on or about May 21, 2015.

339.    The various incidents and threats reported to HUNT and known by HUNT personally since before 2012 should have alerted him that by April 2015 there was more than sufficient cause to remove SEIDLE's service or any other weapons and that the failure to do so would be substantially certain to result in physical harm, serious injury or death to TAMAR WILSON-SEIDLE.

340.    Most extraordinary, less than a year before the shootings, SEIDLE offered to retire from the force over problems with TAMARA and his performance issues and attempted to hand in his badge and gun. But instead of accepting his resignation, knowing of the explosive nature of the couple's confrontations and the history of domestic violence and prior discipline, HUNT gave SEIDLE a free pass and asked him to stay, in gross contempt and with deliberate indifference to the civil rights of TAMARA.

341.    Also known to HUNT was that SEIDLE thereafter filed his own civil complaint seeking a restraining order against TAMARA, claiming that she had threatened him in the past. That order was denied. TAMARA's efforts to obtain a restraining order

76

were also denied as she did not have the assistance from HUNT and his subordinates as was required under the subject AG policy.

342.    HUNT failed to see to it that SEIDLE would not have use or possession of a gun when he was off-duty, failed to bring appropriate administrative charges which should have resulted in termination prior to the subject incident; failed to take action in the face of questionable fitness for duty evaluations where the evaluator had not personally interviewed TAMARA, the children or others in a position to know the nature and extent of the abuse; failed to review internal affairs investigations into the use of excessive force and domestic violence by SEIDLE, failed to comply with the AG domestic violence guidelines by failing to assist TAMARA in filing and pursuing restraining orders and obtaining counselling and guidance; ignored and tolerated repeated domestic violence incidents between SEIDLE and TAMARA and failed to take action to stop them; permitted and allowed the police to act with impunity and at will in providing escorts to SEIDLE without documentation or reporting to the marital home in connection with disputes and domestic violence, failed to assure that SEIDLE was properly disciplined; failed to assure that officers engaged as escorts or coming to the family home without properly documenting the event were disciplined; all the time knowing with a substantial certainly that harm would come to TAMARA from these derelictions.

343.    HUNT failed to train and supervise his subordinates in the handling of domestic violence complaints, discipline for the failure to take appropriate action in the face of numerous internal affairs complaints on SEIDLE and turned a blind eye to the comings and goings of the police force to the Seidle marital home.

344.    HUNT was deliberately indifferent to the risk of domestic violence and harm

to **TAMARA.**

345.    **HUNT's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S rights under the substantive due process clauses of the federal constitution.**

346.    **As a direct and proximate result of HUNT's policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution.**

347.    **As a direct and proximate result of HUNT's policy of deliberate indifference,** Plaintiff's decedent was deprived of her rights, privileges and immunities secured by the Constitution and laws of the United States under the **Fourth** and Fourteenth Amendments, and **ADAMS** is liable to Plaintiffs pursuant to Title 42, Section 1983 of the United Stated Code.

348.    **O'NEIL, ADAMS, BASCOM and HUNT, by their own individual actions and personal involvement in these activities and conduct produced and directly caused the death and damages to TAMARA WILSON-SEIDLE.**

349.    As a direct and proximate result of defendants constitutional violations, Plaintiff's decedent **TAMARA WILSON-SEIDLE** suffered serious and severe injuries which resulted in her death.

350.    The decedent left her surviving her nine children.

351.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

352.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** and other next of kin have

been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

353.   By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have been damaged.

354.   By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

355.   By reason of the foregoing pain and suffering and wrongful death plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

356.   **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

357.   **WHEREFORE, the Estate demands judgment against CHIEF O'NEIL, CHIEF ADAMS, DIRECTOR BASCOM and CHIEF HUNT jointly and severally for compensatory and punitive damages, funeral bills and costs of suit, together with interest and attorney's fees.**

**COUNT IV**
**(1983- Asbury Park – Monell)**

358.   Plaintiffs repeat and reallege each and every paragraph contained in this complaint and incorporates same by reference.

359.   **TAMARA WILSON-SEIDLE had a right, under the substantive due process clause of the 14th Amendment to the United States Constitution and under the 4th Amendment to be free of arbitrary state action that deprived her of her life and liberty.**

360.   **TAMARA WILSON-SEIDLE had a right to be protected from SEIDLE by**

law enforcement agencies who intervened to protect her and affirmatively responded to an attack by SEIDLE, regardless of whether he was or was not acting under color of law.

361.    ASBURY PARK, through its employees and agents, undertook to protect TAMARA, and arbitrarily and irrationally failed to do so by their failure to have any proper training or policy regarding active shooter/rapid responder/hostage events.

362.    The abject failure to have any training or policy regarding active shooter/rapid responder/hostage events in the context of national and state standards and nationwide attention and focus on the handling of such events was arbitrary, capricious and substantially certain to result in serious injury or death.

363.    ASBURY PARK officials in policy-making positions, here CHIEF SALERNO and DEPUTY CHIEF KELSO, were aware of the gross deficiencies in training yet took no steps to correct or remediate them.

364.    The abject failure to have any training or policy regarding active shooter/rapid responder/hostage events amounted to a policy of deliberate indifference to TAMARA's rights under the substantive due process clauses of the federal constitution.

365.    The failure to have any training or policy was a direct and proximate cause of the deprivation of TAMARA's constitutional rights regardless of whether SEIDLE was acting under color of law at the time of the shooting.

366.    In the alternative, the training and supervision regarding the handling of an active shooter/rapid responder/hostage situation was grossly deficient in that proper policies, procedures, mandated and ministerial, were not followed, such deficiencies amounting to a policy of deliberate indifference to the constitutional rights of TAMARA.

367.    Having treated SEIDLE as a police officer as set forth in this complaint and

having perceived SEIDLE as acting under color of law at the time of the shooting, SEIDLE is deemed to have been acting under color of law so as to require affirmative efforts by law enforcement, here ASBURY PARK through its responding officers LOVE, LAWSON, GRISWOLD, CHRISTIE and CRAWFORD, to protect and intervene to prohibit the use of excessive force by SEIDLE.

368.    In the alternative, even if SEIDLE was not acting under color of law at the time he shot TAMARA, once having intervened, the responding officers had a duty to follow mandated policy, procedure and protocol, and to act in accordance with ministerial duties and functions so as not to make the situation worse or put TAMARA in greater danger than she already was.

369.    In particular, the various deficiencies and lack of training manifested themselves as follows together or alternatively:  (1) the lack of command and coordination with a lead commanding officer ordering subordinates where to stand, what tactical positions to take, what action to take regarding civilians in the area, how to de-escalate or "talk down" SEIDLE, whether and under what circumstances to shoot SEIDLE or advise him that his failure to permit assistance to TAMARA would result in his being shot; and taking the lead to deal directly with SEIDLE; (2) the failure to shoot SEIDLE and neutralize him as a threat to TAMARA; (3) having responders or law enforcement at the scene running away from SEIDLE; (4) calling out wrong or confusing dispatch instructions and commands  so as to create chaos and an inefficient and timely response; (5) the failure to have proper equipment available and in use under an active shooter/rapid responder/hostage situation; (6) in causing and creating confusion and chaos so that subordinate officers had no idea what they were doing or what they should be doing; (7)

81

failing to recognize that SEIDLE was not attempting suicide as his finger was not on the trigger of his gun and he was listening to a Bluetooth connection (8) that SEIDLE was not the subject of protection in light of the fact that he was murdering someone and (9) the failure to extricate TAMARA and get her medical attention as the scene unfolded, among other policy and training issues.

370.   As a direct and proximate result of the failure to train, supervise and the grossly inadequate response of ASBURY PARK at the scene of the shooting which put her in greater danger than had they not responded at all, TAMARA WILSON-SEIDLE was deprived of her right to life under the substantive due process clause 4th and 14th Amendments to the United States Constitution.

371.   As a direct and proximate result of defendants constitutional violations, Plaintiff's decedent TAMARA WILSON-SEIDLE suffered serious and severe injuries which resulted in her death.

372.   The decedent left her surviving her nine children.

373.   As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent TAMARA WILSON-SEIDLE was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

374.   As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent TAMARA WILSON-SEIDLE and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

375.   By reason of the foregoing pain and suffering and wrongful death of plaintiff's

82

decedent, plaintiffs have been damaged.

376.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

377.    By reason of the foregoing pain and suffering and wrongful death plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

378.    **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

379.    **WHEREFORE, the Estate demands judgment against ASBURY PARK for compensatory damages, funeral bills and costs of suit, together with interest and attorney's fees.**

## COUNT V
### (1983- Asbury Park Individual Officers and Officials)

380.    **Plaintiffs repeat and reallege each and every paragraph of the Complaint and incorporates same by reference.**

### Acting Chief Anthony Salerno

381.    **SALERNO was the Chief of Police for ASBURY PARK at the time of the shooting and prior thereto.**

382.    **SALERNO failed to assure that his subordinates received appropriate and critical training concerning the handling of an active shooter/rapid responder/hostage situation.**

383.    **SALERNO failed to enact, promulgate and enforce any policies or practices for the handling of an active shooter/rapid responder/hostage situation,**

384.    **Best practices in policing require that such training be given and such**

policies be implemented. The Police Training Commission guidelines, which are used to train all new police recruits, lists as a "Performance Objective" for active shootings in a school that the priority of law enforcement is to "Stop shooter- as soon as possible," which means to neutralize the threat immediately by shooting the suspect.

385.    In a 2017 directive by the Bergen County Prosecutor Gurbir S. Grewal, now the Attorney General, mandatory active shooter training requires that the first priority be to "stop the active shooter." "Officers responding to an active shooter situation should: (a) use only aimed-directed fire at targets which can be identified as posing an imminent threat of death or serious bodily injury..."

386.    SALERNO, as a policy-making official for ASBURY PARK, was personally responsible to enact policies and train his law enforcement officers in the appropriate way to handle an active shooter/rapid responder/hostage situation

387.    SALERNO's failure to enact policies on this critical police response and failure to train and supervise his subordinates was so grossly inadequate as to constitute a policy of deliberate indifference to the constitutional rights of TAMARA WILSON-SEIDLE.

388.    SALERNO's failures amount to a ratification and maintenance of a practice, policy or custom of failing to train or supervise their subordinates, particularly the individually named defendant responders herein, in conformity with clearly established constitutional principles which govern their conduct, including the handling of an active shooter/rapid responder/hostage situation.

389.    The policy of deliberate indifference was the direct and proximate cause of TAMARA's death.

84

<u>Deputy Chief David Kelso</u>

390.    KELSO was the Deputy Chief of Police for ASBURY PARK at the time of the shooting and prior thereto.

391.    KELSO failed to assure that his subordinates received appropriate and critical training concerning the handling of an active shooter/rapid responder/hostage situation.

392.    KELSO failed to enact, promulgate and enforce any policies or practices for the handling of an active shooter/rapid responder/hostage situation,

393.    Best practices in policing require that such training be given and such policies be implemented. The Police Training Commission guidelines, which are used to train all new police recruits,  lists as a "Performance Objective" for active shootings in a school that the priority of law enforcement is to "Stop shooter- as soon as possible," which means to neutralize the threat immediately by shooting the suspect.

394.    In a 2017 directive by the Bergen County Prosecutor Gurbir S. Grewal, now the Attorney General, mandatory active shooter training requires that the first priority be to "stop the active shooter." "Officers responding to an active shooter situation should: (a) use only aimed-directed fire at targets which can be identified as posing an imminent threat of death or serious bodily injury..."

395.    KESLO, as a policy-making official for ASBURY PARK, was personally responsible to enact policies and train his law enforcement officers in the appropriate way to handle an active shooter/rapid responder/hostage situation

396.    KELSO's failure to enact policies on this critical police response and failure to train and supervise his subordinates was so grossly inadequate as to constitute a policy

of deliberate indifference to the constitutional rights of TAMARA WILSON-SEIDLE.

397.    KELSO's failures amount to a ratification and maintenance of a practice, policy or custom of failing to train or supervise their subordinates, particularly the individually named defendant responders herein, in conformity with clearly established constitutional principles which govern their conduct, including the handling of an active shooter/rapid responder/hostage situation.

398.    The policy of deliberate indifference was the direct and proximate cause of TAMARA's death.

Marshawn Love

399.    LOVE was the highest ranking officer at the scene of the shooting, and mandated to take command and control over the scene and situation.  He failed to do so, causing chaos, confusion and the inability of the ASBURY PARK responding officers to effectively and properly respond to the situation.

400.    Instead of taking control, which would have and should have included direct interventions with SEIDLE, LOVE took the child Teresa into his patrol car and left the scene while the crime was still in progress.

401.    LOVE did not provide his rookie officers GRISWOLD, CHRISTIE and CRAWFORD any guidance as to tactical positions, the handling of civilians, how to approach SEIDLE and when and whether to shoot him, how to extricate the victim, TAMARA and provide assistance.

402.    The detailed facts and dereliction of LOVE as an individual in his personal capacity are set forth in this complaint under "Factual Allegations."

403.    The mismanagement and lack of training by LOVE  resulted in the failure to

ascertain that SEIDLE was not in fact trying to commit suicide and even if he was the responding officers were permitted by the AG guidelines to use deadly force to avoid a further round of bullets or the use by SEIDLE of deadly force; the failure to advise SEIDLE that he would be shot if he took any action to prevent TAMARA from being assisted; to talk directly and without interference from other officers to SEIDLE in an effort to get him to be compliant; to use the 2.3 minutes standoff effectively to extricate TAMARA, among other acts of misfeasance and mishandling of the event.

404.    LOVE failed to properly assess the situation and prioritize the goals, allowed and permitted SEIDLE to stand for over 2 minutes without taking any action to save TAMARA or provide medical attention, treated the shooter as the victim and considered SEIDLES needs and interests before TAMARA's and failed to follow any accepted guidelines on how to handle an active shooter/rapid responder/hostage event.

405.    LOVE had a duty to intervene to protect TAMARA from the excessive use of force by another officer; and/or LOVE had a duty to intervene to protect TAMARA where his affirmative actions created a substantial danger to her and put her in a more precarious position than she otherwise would have been.

406.    In failing to advise the responding officers that the car into which SEIDLE was shooting was his former wife's, in failing to take immediate command and control over the operations and leaving the scene in the active shooter/rapid responder emergent situation, defendant LOVE failed in his ministerial duties and failed to act in a reasonably objective manner, such failure directly leading to the lack of perception by the responding officers that SEIDLE was an active shooter and homicidal, and the inability to properly respond and intervene and was a direct and proximate cause of the death and damages to TAMARA

87

**WILSON-SEIDLE.**

407.    In allowing and permitting the situation to escalate as opposed to taking immediate action against **SEIDLE** and in the failure to extricate **TAMARA** after the first round of shots, and in his various affirmative acts in the handling of the matter, **LOVE** made the situation worse in that **SEIDLE** had stopped shooting and would likely not have continued shooting but for the intervention of the police and the inappropriate methods used to attempt to engage **SEIDLE**.

408.    The perception and assumption that **SEIDLE** was acting under color of law and involved in official police business prohibited immediate and proper response and delayed appropriate intervention directly resulting in the death and damages to plaintiff **TAMARA-WILSON SEIDLE**.

409.    Ineffective communications and control between **LOVE** and the responding officers created chaos and the inability to contain and stop **SEIDLE** from shooting **TAMARA** and killing her.

410.    Although **SEIDLE** at certain points had a gun to his head, **LOVE** should have known that his finger was not on the trigger and that he was not planning on committing self-harm, permitting additional action in the use of force, further that there were several means to disarm **SEIDLE** from various positions as there were to save **TAMARA** or at a minimum permit a chance to save **TAMARA** and attend to her.

411.    **TAMARA** was made more vulnerable to danger as **LOVE** escalated the situation, providing the opportunity for **SEIDLE**, who became increasingly psychologically and emotionally impaired due to the presence and confusion created by the police responders to shoot a second round of multiple shots into the car.

412.   LOVE also bears responsibility for the failure to train and supervise in addition to his individual actions of dereliction at the scene.

413.   **LOVE's actions and omissions constitute deliberate indifference to the constitutional rights of TAMARA.**

414.   **As a direct and proximate result of LOVE's failures and affirmative acts, TAMARA WILSON-SEIDLE was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution, and LOVE is liable to plaintiffs under 42 U.S.C. §1983.**

Officer Ahmed Lawson

415.   **Officer LAWSON was an ASBURY PARK police officer already on the scene when SEIDLE rammed his car into TAMARA's vehicle.**

416.   **LAWSON knew SEIDLE as a law enforcement officer.   He saw SEIDLE shooting into a car.   He then ran in the opposite direction.   He yelled inappropriate and meaningless phrases including "shots fired" to dispatch that would not allow any rational or effective response. LAWSON failed to notify dispatch or communicate to other responding officers that SEIDLE was engaged in shooting someone in a motor vehicle, thus delaying effective response.**

417.   **These actions were against police policy and evidenced a shocking lack of training.**

418.   **There was no trained response to an active shooter which would have required LAWSON to immediately neutralize the threat, meaning to shoot SEIDLE.**

419.   **In the alternative, LAWSON believed SEIDLE was acting under color of law and entitled to be shooting someone in a car.**

89

420.     In either event LAWSON's response was wholly inappropriate.  He should have run toward the shooter and positioned himself appropriately by taking available cover with a direct line of fire to SEIDLE, who was in the process of shooting a civilian.

421.     The factual detailed of LAWSON's actions and inactions are reviewed in the Factual Allegations section of this complaint.

422.     LAWSON had the ability to stop SEIDLE immediately and instead he created havoc, confusion and chaos placing TAMARA in greater danger as SEIDLE then set himself up in a standoff with the police, creating the circumstances that led to a second round of shots being fired 2.3 minutes after the first round.

423.     In particular, LAWSON, as a trained officer, had a duty to protect TAMARA first; accordingly he had a duty to advise SEIDLE that he was going to extricate TAMARA from the car and/or get medical providers to attend to her and that in the event SEIDLE made any attempt to move or use his gun LAWSON would shoot him.  This constitutes the proper course of action for a trained police officer.

424.     LAWSON had a duty to intervene to protect TAMARA from the excessive use of force by another police officer; and/or LAWSON had a duty to intervene to protect TAMARA where his affirmative actions created a substantial danger to her.

425.     The actions and inactions of LAWSON as described in this Complaint were made with deliberate indifference to the civil rights of TAMARA WILSON-SEIDLE.

426.     As a direct and proximate result of LAWSON'S failures and affirmative acts, TAMARA WILSON-SEIDLE was deprived of her right to life  under the 4th and 14th Amendments to the United States Constitution and are liable to plaintiffs under 42 U.S.C. §1983.

90

**Officer Carl Christie**

427.    CHRISTIE was a police officer employed by ASBURY PARK.

428.    CHRISTIE was called to respond to the scene of the shooting.  In an active shooter situation, certain equipment such as bulletproof vests and shields are required and CHRISTIE did not show up in accordance with proper protocol and police standards.

429.    CHRISTIE exhibited a shocking  lack of training or in the alternative was trained but failed to follow mandated, required protocol in the situation before him: taking an appropriate defensive position in the direct line of fire to SEIDLE; to neutralize the threat of harm to TAMARA by shooting SEIDLE once he began the second round of shots as required under the AG guidelines for the use of deadly force; failed to ascertain that SEIDLE was not attempting to commit suicide during the 2.3 minute standoff but instead did not have his finger on the trigger and was listening to a Bluetooth phone connection; failed to remove civilians from the area to the extent there were any in the direct line of fire or potential line of fire to SEIDLE; failed to remove TAMARA from her vehicle and failed to share command responsibilities with the other responding officers when LOVE failed to do so.

430.    The actions and inactions of CHRISTIE are set forth in detail in the Factual Allegation section of this complaint.

431.    CHRISTIE had a duty to intervene to protect TAMARA from the excessive use of force by another police officer; and/or CHRISTIE had a duty to intervene to protect TAMARA where his affirmative actions created a substantial danger to her.

432.    The chaos and confusion engendered by the failure to follow mandated ministerial duties in the handling of the event created more danger for TAMARA and

SEIDLE seized upon the attention and confusion to direct attention to his perceived plight and grievances causing a second round of shots with everyone watching which would not otherwise have occurred.

433.   The actions and inactions of CHRISTIE as described in this Complaint were made with deliberate indifference to the civil rights of TAMARA WILSON-SEIDLE.

434.   As a direct and proximate result of CHRISTIE's failures and affirmative acts, TAMARA WILSON-SEIDLE was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution and are liable to plaintiffs under 42 U.S.C. §1983.

Officer Timothy Griswold

435.   OFFICER TIMOTHY GRISWOLD ("GRISWOLD") was a police officer employed by ASBURY PARK.

436.   GRISWOLD was called to respond to the scene of the shooting.  In an active shooter situation, certain equipment such as bulletproof vests and shields are required and GRISWOLD did not show up in accordance with proper protocol and police standards.

437.   GRISWOLD exhibited a shocking  lack of training or in the alternative was trained but failed to follow mandated, required protocol in the situation before him: taking an appropriate defensive position in the direct line of fire to SEIDLE; to neutralize the threat of harm to TAMARA by shooting SEIDLE once he began the second round of shots as required under the AG guidelines for the use of deadly force; failed to ascertain that SEIDLE was not attempting to commit suicide during the 2.3 minute standoff but instead did not have his finger on the trigger and was listening to a Bluetooth phone connection; failed to remove civilians from the area to the extent there were any in the direct line of fire

92

or potential line of fire to SEIDLE; failed to remove TAMARA from her vehicle and failed to share command responsibilities with the other responding officers when LOVE failed to do so.

438.    The actions and inactions of GRISWOLD are set forth in detail in the Factual Allegation section of this complaint.

439.    GRISWOLD had a duty to intervene to protect TAMARA from the excessive use of force by another police officer; and/or GRISWOLD had a duty to intervene to protect TAMARA where his affirmative actions created a substantial danger to her.

440.    The chaos and confusion engendered by the failure to follow mandated ministerial duties in the handling of the event created more danger for TAMARA and SEIDLE seized upon the attention and confusion to direct attention to his perceived plight and grievances causing a second round of shots with everyone watching which would not otherwise have occurred.

441.    The actions and inactions of GRISWOLD as described in this Complaint were made with deliberate indifference to the civil rights of TAMARA WILSON-SEIDLE.

442.    As a direct and proximate result of GRISWOLD'S failures and affirmative acts, TAMARA WILSON-SEIDLE was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution and are liable to plaintiffs under 42 U.S.C. §1983.

Officer James Crawford

443.    OFFICER JAMES CRAWFORD ("CRAWFORD") was a police officer employed by ASBURY PARK.

444.    CRAWFORD was called to respond to the scene of the shooting. In an active

93

shooter situation, certain equipment such as bulletproof vests and shields are required and CRAWFORD did not show up in accordance with proper protocol and police standards.

445. CRAWFORD exhibited a shocking lack of training or in the alternative was trained but failed to follow mandated, required protocol in the situation before him: taking an appropriate defensive position in the direct line of fire to SEIDLE; to neutralize the threat of harm to TAMARA by shooting SEIDLE once he began the second round of shots as required under the AG guidelines for the use of deadly force; failed to ascertain that SEIDLE was not attempting to commit suicide during the 2.3 minute standoff but instead did not have his finger on the trigger and was listening to a Bluetooth phone connection; failed to remove civilians from the area to the extent there were any in the direct line of fire or potential line of fire to SEIDLE; failed to remove TAMARA from her vehicle and failed to share command responsibilities with the other responding officers when LOVE failed to do so.

446. The actions and inactions of CRAWFORD are set forth in detail in the Factual Allegation section of this complaint.

447. CRAWFORD had a duty to intervene to protect TAMARA from the excessive use of force by another police officer; and/or CRAWFORD had a duty to intervene to protect TAMARA where his affirmative actions created a substantial danger to her.

448. The chaos and confusion engendered by the failure to follow mandated ministerial duties in the handling of the event created more danger for TAMARA and SEIDLE seized upon the attention and confusion to direct attention to his perceived plight and grievances causing a second round of shots with everyone watching which would not

otherwise have occurred.

449.    **The actions and inactions of CRAWFORD as described in this Complaint were made with deliberate indifference to the civil rights of TAMARA WILSON-SEIDLE.**

450.    **As a direct and proximate result of CRAWFORD'S failures and affirmative acts, TAMARA WILSON-SEIDLE was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution and are liable to plaintiffs under 42 U.S.C. §1983.**

451.    **Each of these individual defendants were acting under color of law at all relevant times.**

452.    As a direct and proximate result of **these individual** defendants constitutional violations, Plaintiff's decedent **TAMARA WILSON-SEIDLE** suffered serious and severe injuries which resulted in her death.

453.    The decedent left her surviving her nine children.

454.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

455.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

456.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have been damaged.

457. By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

458. By reason of the foregoing pain and suffering and wrongful death plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

459. **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

460. **WHEREFORE, the Estate demands judgment against CHIEF SALERNO, DEPUTY CHIEF KELSO, MARSHAWN LOVE, AHMED LAWSON, OFFICER CARL CHRISTIE, OFFICER TIMOTHY GRISWOLD, JAMES CRAWFORD and all JOHN DOE defendants, jointly and severally for compensatory and punitive damages, funeral bills and costs of suit, together with interest and attorney's fees.**

## COUNT VI
### (1983- Monmouth County- Monell)

461. Plaintiffs repeat and reallege each and every paragraph in the complaint and incorporates same by reference.

462. **TAMARA WILSON-SEIDLE had a right, under the substantive due process clause of the 14th Amendment and under the 4th Amendment to the United States Constitution, to be free from arbitrary state action that deprived her of her life and liberty.**

**Prosecutors Office**

463. **The COUNTY, through its agents and employees including members of the MONMOUTH COUNTY PROSECUTOR's OFFICE ("the PROSECUTOR" or the "PROSECUTOR's OFFICE"), knew of SEIDLE's extensive history of domestic violence against TAMARA through their Prosecutor Summary Reports filed by NEPTUNE and**

discussions entered into with NEPTUNE about performance issues, fitness for duty and domestic violence issues pertaining to SEIDLE.

464.    At all relevant times herein the members of the PROSECUTOR's OFFICE, including defendants GRAMICCIONI, SCHWEERS, SEELY and INCREMONA were not acting in any advocacy role or in their law enforcement or investigatory duties pertaining to their role as advocates.  Rather, these persons on behalf of the COUNTY were engaged in the handling of personnel and administrative issues relating to disarming and rearming of SEIDLE with a gun, an administrative duty undertaken by the COUNTY and under the auspices of the COUNTY, as opposed to state functions.

465.    The specific allegations against the COUNTY through its agents and employees are set forth in detail in the Factual Allegations section of this complaint.

466.    The COUNTY was directly involved in determining whether SEIDLE should have his gun and service weapon returned subject to any specific conditions after SEIDLE was disciplined for domestic violence in 2012 by NEPTUNE and his weapon taken away.

467.    There are specific policies which are mandated and which must be followed when the municipality employing a police officer seeks removal and then return of a gun.

468.    As the employer, only NEPTUNE has the authority to hire, fire and make personnel decisions including discipline. NEPTUNE may also request that the PROSECUTOR'S OFFICE take action to return a gun and on what conditions.  The Prosecutor must be notified when weapons have been surrendered or seized.

469.    Any department –issued weapon seized or surrendered is maintained by the employer who issued the weapon.

470.    Under the AG guidelines, NEPTUNE is required to conduct an investigation

and recommends to the County Prosecutor whether the officer should be permitted to carry weapons and what conditions, if any should be imposed for the return of the weapons.

471.    NEPTUNE always has the authority to disarm an officer including SEIDLE, with or without approval from the anyone in the PROSECUTOR'S OFFICE.

472.    NEPTUNE always has the authority to discipline an officer including SEIDLE with or without approval from anyone in the PROSECUTOR'S OFFICE.

473.    However, the COUNTY does not have to return a gun even if requested by the employer and the COUNTY can impose conditions and restrictions on use of a gun.

474.    The COUNTY was required to and had a duty to undertake an appropriate investigation to determine whether SEIDLE was fit to be re-armed.

475.    The COUNTY did determine that SEIDLE could be re-armed in 2013 after a suspension related to domestic violence.  This determination was faulty and grossly deficient, arbitrary and capricious as SEIDLE was not found fit for duty or was found fit for duty under questionable circumstances and protocols; that the COUNTY knew about the continued domestic violence incidents that had not abated since removal of the gun in 2012 as described in this complaint; and that the COUNTY continued to permit SEIDLE to carry a gun without any conditions or restrictions after a period of 180 days after its return in the 2013 time frame.

476.    The COUNTY was on notice of repeated problems in 2014 and 2015 including a 30 day suspension with pay where SEIDLE was inappropriately permitted to keep his service weapon.  They were also on notice of SEIDLE's extensive Internal Affairs files showing complaints of excessive force. They were also on notice of hundreds of

98

documented use of force reports for NEPTUNE between 2012 and 2016, many of which involved matters for which officers should have been reprimanded and disciplined but were not. In particular, 52 officers should have been flagged for re-training or discipline based on a media examination and report but were not.

477. The COUNTY knew about these issues including the failure to train and supervise by NEPTUNE based on their direct interactions with the Chiefs of Police for NEPTUNE and the Prosecutor Summary Reports which are filed each year by each municipality putting the COUNTY on notice of complaints regarding use of force ad domestic violence.

478. These incidents and analysis show a pattern, practice, custom or policy to ignore civilian complaints, fail to take action regarding the use of excessive force including domestic violence, tolerate and acquiesce in misconduct. The pattern and practice is also evident from the lack of adequate response to the internal affairs complaints of SEIDLE pre-dating the shooting and death of TAMARA.

479. Based on these circumstances, the failure of the COUNTY to take action to see to it that SEIDLE's gun was removed or that there were strict conditions imposed on its use within a year prior to the shooting evidenced a policy of deliberate indifference to the violation of TAMARA's constitutional rights.

480. The COUNTY officials in policy-making positions at the PROSECUTOR'S OFFICE were aware of the increasing violence and problems with SEIDEL and took no steps to correct or remediate the problem.

Dispatch

481. The allegations against the dispatchers, all COUNTY employees, are set forth

in the Factual Allegations of this complaint.

482.    The COUNTY failed to properly train and supervise the dispatchers in how to handle an active shooter/rapid responder situation so that the dispatchers were unable to obtain accurate information and dispatch in accordance with policy directives on the handling of such an event.

483.    In the alternative, the COUNTY failed to enact, promulgate and implement policies and standards for dispatch regarding the handling of an active shooter/rapid responder/hostage situation occurring, so that the dispatchers were unable to properly advise what equipment was necessary, who was in control and command, and effectively dispatch.

484.    As a result of the lack of training and supervision, the COUNTY gave false or inaccurate information regarding the event, resulting in the responding officers being unprepared and unable to coordinate to neutralize SEIDLE or de-escalate the situation so that TAMARA could be extricated from the vehicle and attended to.

485.    The dispatchers gave false information by failing to advise that SEIDLE was threatening TAMARA with death; that there was an active shooter situation, in that they were trying to protect SEIDLE whom they knew as a member of law enforcement; and failed to provide correct information on the position and location of the cars.

486.    At all relevant times herein all  agents and employees of the COUNTY were acting under color of state law and within the scope of their authority.

487.    The COUNTY'S failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S rights under the substantive due process clauses of the federal constitution.

488.    **As a direct and proximate result of the COUNTY's policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution.**

489.    **As a direct and proximate result of the COUNTY's policy of deliberate indifference,** Plaintiff's decedent was deprived of her rights, privileges and immunities secured by the Constitution and laws of the United States under the **Fourth** and Fourteenth Amendments, and **NEPTUNE** is liable to Plaintiffs pursuant to Title 42, Section 1983 of the United Stated Code.

490.    As a direct and proximate result of defendants constitutional violations, Plaintiff's decedent **TAMARA WILSON-SEIDLE** suffered serious and severe injuries which resulted in her death.

491.    The decedent left her surviving her nine children.

492.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

493.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

494.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have been damaged.

495.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's

decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

496.    By reason of the foregoing pain and suffering and wrongful death plaintiff's decedent TAMARA WILSON-SEIDLE has suffered loss of enjoyment of life.

497.    **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

498.    **WHEREFORE, the Estate demands judgment against MONMOUTH COUNTY and the MONMOUTH COUNTY PROSECUTOR'S OFFICE for compensatory damages, funeral bills and costs of suit, together with interest and attorney's fees.**

## COUNT VII
### (1983- Individual County Officials)

499.    **Plaintiffs repeat and reallege each and every allegation contained in this Complaint and incorporates same by reference.**

Prosecutor Christopher Gramiccioni

500.    **TAMARA WILSON-SEIDLE had a right, under the substantive due process clause of the 14th Amendment the 4th Amendment to the United States Constitution to be free from arbitrary state action that deprived her of her life and liberty.**

501.    **GRAMICCIONI was the policymaker and chief law enforcement officer for the COUNTY at the time of subject events in this complaint, acting under color of law.**

502.    **The allegations involving GRAMICCIONI are detailed in the Factual Allegations section of this complaint.**

503.    **GRAMICCIONI had full knowledge of the history of domestic violence including discipline imposed on SEIDLE and TAMARA's complaints.**

504.    **GRAMICCIONI was personally involved in the decision to re-arm SEIDLE**

102

first with and then without conditions in the 2013 time frame.

505.    GRAMICCIONI was personally aware of the continuing and escalating problems between the parties during his tenure, based on the history as well as continued complaints brought to his attention by the Chief of Police at NEPTUNE as well as through the investigation GRAMICCIONI conducted into the fitness for duty and domestic violence history of SEIDLE upon seizure of his weapon.

506.    GRAMICCIONI was aware of and permitted and condoned inadequate fitness for duty evaluations conducted on behalf of NEPTUNE which did not contain interviews of those with the most knowledge of the abuse, TAMARA and her children.

507.    GRAMICIONI failed to assure that the AG guidelines for the handling of domestic violence incidents involving law enforcement officers was followed, despite knowledge of multiple and increasing incidents of harassment, intimidation and abuse between SEIDLE and TAMARA, and in particular, that SEIDLE threatened TAMARA with serious bodily harm.

508.    In the 2013 times frame, after getting his gun back, SEIDLE was again disciplined or reprimanded by his supervisors at NEPTUNE for problems relating to his performance as an officer and psychological readiness to continue as an officer in 2013; GRAMICCIONI knew about these circumstances yet permitted SEIDLE to retain and carry a service weapon.

509.    In the 2014 time frame SEIDLE was again disciplined and received a 30 day suspension for his involvement in a custody dispute over visitation. TAMARA called the police and reported that SEIDLE was harassing her yelling and threatening her; she further indicated that she wanted to file a complaint for harassment. When SEIDLE was

advised that Tamara intended to sign a complaint, he began screaming profanities at the officers who responded.

510.   GRAMICCIONI was personally notified that SEIDLE was again subjected to discipline but that he would be permitted to keep and carry his service weapon.

511.   GRAMICCIONI should not have permitted SEIDLE to continue to carry a gun in light of the lengthy and known history of domestic violence between SEIDLE and TAMARA and his failure to remove the gun evidenced deliberate indifference to the substantial likelihood of serious physical harm to TAMARA.

512.   Nor should GRAMICCINI have permitted SEIDLE to regain full use of his gun in 2013, as the domestic violence was continuing unabated.

513.   GRAMICCIONI failed to take sufficient action under the circumstances to discipline SEIDLE, to assure that he remained without the use of gun, to advise NEPTUNE to terminate him or remove him from an assignment requiring the use and possession of a gun.

514.   GRAMICIONI failed to see to it that SEIDLE would not have use or possession of a gun when he was off-duty, failed to have his gun seized prior to the shooting, wrongfully agreed to reinstate SEIDLE with a gun, failed to take action in the face of questionable fitness for duty evaluations where the evaluator had not personally interviewed TAMARA, the children or others in a position to know the nature and extent of the abuse; failed to review internal affairs investigations into the use of excessive force and domestic violence by SEIDLE and NEPTUNE, failed to comply with the AG domestic violence guidelines by failing to assist TAMARA in filing and pursuing restraining orders and obtaining counselling and guidance; ignored and tolerated repeated domestic violence

incidents between SEIDLE and TAMARA and failed to take action to stop them; all the time knowing with a substantial certainly that harm would come to TAMARA from such derelictions.

515.   In addition, GRAMICCIONI personally failed to train and supervise his subordinates, in particular SCHWEERS, SEELY and INCREMONA in the handling of domestic violence complaints, discipline NEPTUNE for the failure to take appropriate action in the face of numerous internal affairs complaints on SEIDLE and was deliberately indifferent to the substantial likelihood of physical harm certain to occur if the domestic violence did not stop.

516.   GRAMICCIONI's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S civil rights.

517.   As a direct and proximate result of GRAMICCIONI's policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendment to the United States Constitution and is liable to plaintiffs under 42 U.S.C. §1983.

Former Asst Prosecutor Gregory Schweers

518.   SCHWEERS was an employee of the COUNTY and the PROSECUTOR's OFFICE and reporting to GRAMICIONI, acting under color of law.

519.   SCHWEERS was part of the team which included Asst. Prosecutors SEELY and INCREMONIA assigned to investigate the SEIDLE matter, report to GRAMICCIONI and take appropriate action regarding the use of a service weapon and any restrictions or conditions on that use by SEIDLE.

520.   SCHWEERS had the same knowledge base as GRAMICCIONI, and knew of

105

the longstanding history of domestic violence involving SEIDLE as well as his lengthy internal affairs files containing numerous excessive force complaints.

521.    SCHWEERS played a personal role in the decision to return the gun to SEIDLE first with then without conditions in the 2013 time frame, and then was involved in the decision not to seize or take any action regarding SEIDLE's use of a gun in 2014 after NEPTUNE permitted SEIDLE to keep his gun during a 30 day suspension.

522.    SCHWEERS knew of the escalating domestic violence, threats, intimidation and harassment of SEIDLE toward TAMARA but did nothing about it.

523.    SCHWEERS knew that the failure to take action regarding the continued use of a gun by SEIDLE would most likely lead to serious injury or the death of TAMARA.

524.    SCHWEERS should not have permitted SEIDLE to continue to carry a gun in light of the lengthy and known history of domestic violence between SEIDLE and TAMARA and his failure to remove the gun evidenced deliberate indifference to the substantial likelihood of serious physical harm to TAMARA.

525.    Nor should SCHWEERS have permitted SEIDLE to regain full use of his gun in 2013, as the domestic violence was continuing unabated.

526.    SCHWEERS failed to take sufficient action under the circumstances to discipline SEIDLE, to assure that he remained without the use of gun and to advise NEPTUNE to terminate him or remove him from an assignment requiring the use and possession of a gun.

527.    SCHWEERS failed to see to it that SEIDLE would not have use or possession of a gun when he was off-duty, failed to have his gun seized prior to the shooting, wrongfully agreed to reinstate SEIDLE with a gun, failed to take action in the face of

questionable fitness for duty evaluations where the evaluator had not personally interviewed TAMARA, the children or others in a position to know the nature and extent of the abuse; failed to review internal affairs investigations into the use of excessive force and domestic violence by SEIDLE and NEPTUNE, failed to comply with the AG domestic violence guidelines by failing to assist TAMARA in filing and pursuing restraining orders and obtaining counselling and guidance; ignored and tolerated repeated domestic violence incidents between SEIDLE and TAMARA and failing to take action to stop them; all the time knowing with a substantial certainly that harm would come to TAMARA from such derelictions.

528.    SCHWEERS's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S civil rights.

529.    As a direct and proximate result of SCHWEER'S policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendment to the United States Constitution and are liable to plaintiffs under 42 U.S.C. §1983.

Assistant Prosecutor Jacquelynn F. Seely

530.    SEELY was an employee of the COUNTY and the PROSECUTOR's OFFICE and reporting to GRAMICIONI, acting under color of law.

531.    SEELY was part of the team which included Asst. Prosecutors SCHWEERS and INCREMONIA assigned to investigate the SEIDLE matter, report to GRAMICCIONI and take appropriate action regarding the use of a service weapon and any restrictions or conditions on that use by SEIDLE.

532.    SEELY had the same knowledge base as GRAMICCIONI, and knew of the longstanding history of domestic violence involving SEIDLE as well as his lengthy internal

affairs files containing numerous excessive force complaints.

533.    SEELY played a personal role in the decision to return the gun to SEIDLE first with then without conditions in the 2013 time frame, and then was involved in the decision not to seize or take any action regarding SEIDLE's use of a gun in 2014 after NEPTUNE permitted SEIDLE to keep his gun despite more domestic violence incidents during a 30 day suspension.

534.    SEELY knew of the escalating domestic violence, threats, intimidation and harassment of SEIDLE toward TAMARA but did nothing about it.

535.    SEELY knew that the failure to take action regarding the continued use of a gun by SEIDLE would most likely lead to serious injury or the death of TAMARA.

536.    SEELY should not have permitted SEIDLE to continue to carry a gun in light of the lengthy and known history of domestic violence between SEIDLE and TAMARA and his failure to remove the gun evidenced deliberate indifference to the substantial likelihood of serious physical harm to TAMARA.

537.    Nor should SEELY have permitted SEIDLE to regain full use of his gun in 2013, as the domestic violence was continuing unabated.

538.    SEELY failed to take sufficient action under the circumstances to discipline SEIDLE, to assure that he remained without the use of gun and to advise NEPTUNE to terminate him or remove him from an assignment requiring the use and possession of a gun.

539.    SEELY failed to see to it that SEIDLE would not have use or possession of a gun when he was off-duty, failed to have his gun seized prior to the shooting, wrongfully agreed to reinstate SEIDLE with a gun, failed to take action in the face of questionable

108

fitness for duty evaluations where the evaluator had not personally interviewed TAMARA, the children or others in a position to know the nature and extent of the abuse; failed to review internal affairs investigations into the use of excessive force and domestic violence by SEIDLE and NEPTUNE, failed to comply with the AG domestic violence guidelines by failing to assist TAMARA in filing and pursuing restraining orders and obtaining counselling and guidance; ignored and tolerated repeated domestic violence incidents between SEIDLE and TAMARA and failing to take action to stop them; all the time knowing with a substantial certainly that harm would come to TAMARA from such derelictions.

540.    SEELY's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S civil rights.

541.    As a direct and proximate result of SEELY'S policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution, and is liable to plaintiffs under 42 U.S.C. §1983.

Assistant Prosecutor Richard Incremona

542.    INCREMONA was an employee of the COUNTY and the PROSECUTOR's OFFICE and reporting to GRAMICIONI, acting under color of law.

543.    INCREMONA was part of the team which included Asst. Prosecutors SEELY and SCHWEERS assigned to investigate the SEIDLE matter, report to GRAMICCIONI and take appropriate action regarding the use of a service weapon and any restrictions or conditions on that use by SEIDLE.

544.    INCREMONA had the same knowledge base as GRAMICCIONI, and knew

109

of the longstanding history of domestic violence involving SEIDLE as well as his lengthy internal affairs files containing numerous excessive force complaints.

545.    INCREMONA played a personal role in the decision to return the gun to SEIDLE first with then without conditions in the 2013 time frame, and then was involved in the decision not to seize or take any action regarding SEIDLE's use of a gun in 2014 after NEPTUNE permitted SEIDLE to keep his gun despite more domestic violence incidents during a 30 day suspension.

546.    INCREMONA knew of the escalating domestic violence, threats, intimidation and harassment of SEIDLE toward TAMARA but did nothing about it.

547.    INCREMONA knew that the failure to take action regarding the continued use of a gun by SEIDLE would most likely lead to serious injury or the death of TAMARA.

548.    INCREMONA should not have permitted SEIDLE to continue to carry a gun in light of the lengthy and known history of domestic violence between SEIDLE and TAMARA and his failure to remove the gun evidenced deliberate indifference to the substantial likelihood of serious physical harm to TAMARA.

549.    Nor should INCREMONA have permitted SEIDLE to regain full use of his gun in 2013, as the domestic violence was continuing unabated.

550.    INCREMONA failed to take sufficient action under the circumstances to discipline SEIDLE, to assure that he remained without the use of gun and to advise NEPTUNE to terminate him or remove him from an assignment requiring the use and possession of a gun.

551.    INCREMONA failed to see to it that SEIDLE would not have use or possession of a gun when he was off-duty, failed to have his gun seized prior to the shooting,

110

wrongfully agreed to reinstate SEIDLE with a gun, failed to take action in the face of questionable fitness for duty evaluations where the evaluator had not personally interviewed TAMARA, the children or others in a position to know the nature and extent of the abuse; failed to review internal affairs investigations into the use of excessive force and domestic violence by SEIDLE and NEPTUNE, failed to comply with the AG domestic violence guidelines by failing to assist TAMARA in filing and pursuing restraining orders and obtaining counselling and guidance; ignored and tolerated repeated domestic violence incidents between SEIDLE and TAMARA and failing to take action to stop them; all the time knowing with a substantial certainly that harm would come to TAMARA from such derelictions.

552.    INCREMONA's failure under these circumstances to act to protect TAMARA from SEIDLE amounted to a policy of deliberate indifference to TAMARA'S civil rights.

553.    As a direct and proximate result of INCREMONA'S policy of deliberate indifference, TAMARA was deprived of her right to life under the 4th and 4th Amendments to the United States Constitution and is liable to plaintiffs under 42 U.S.C. §1983.

<u>Dispatchers Karen Clayton, Kristin Aras, Stephanie Migliaccio and Kurt Gibson</u>

554.    CLAYTON was personally involved in the dispatch of the active shooter situation involving SEIDLE, acting under color of law.

555.    CLAYTON failed and refused to provide accurate information necessary for proper dispatch of responders, including vital information provided by the daughter of TAMARA to the effect that SEIDLE was threatening to kill TAMARA, seeking to protect SEIDLE as she knew him as a member of law enforcement, and failed to dispatch

according to active shooter protocols that would have alerted the responding officers of the need to have proper equipment and provide the coordination and backup that was necessary to prevent SEIDLE from shooting or continuing to shoot TAMARA.

556. Instead, CLAYTON advised that there was a report of shots fired at the area of the subject event, improperly relaying that it was an active shooter situation.

557. CLAYTON was also involved in the dispatch and radio communications regarding the 2.3 minute standoff, failing to communicate that SEIDLE was standing in the middle of the street with a gun to his head.

558. ARAS was personally involved in the dispatch of the active shooter situation involving SEIDLE, acting under color of law.

559. ARAS failed and refused to provide accurate information necessary for proper dispatch of responders, including vital information provided by the daughter of TAMARA to the effect that SEIDLE was threatening to kill TAMARA, seeking to protect SEIDLE as she knew him as a member of law enforcement, and failed to dispatch according to active shooter protocols that would have alerted the responding officers of the need to have proper equipment and provide the coordination and backup that was necessary to prevent SEIDLE from shooting or continuing to shoot TAMARA.

560. Instead, ARAS advised that there was a report of shots fired at the area of the subject event, improperly relaying that it was an active shooter situation.

561. ARAS was also involved in the dispatch and radio communications regarding the 2.3 minute standoff, failing to communicate that SEIDLE was standing in the middle of the street with a gun to his head.

562. MIGLIACCIO was personally involved in the dispatch of the active shooter

112

situation involving SEIDLE, acting under color of law.

563.    MIGLIACCIO failed and refused to provide accurate information necessary for proper dispatch of responders, including vital information provided by the daughter of TAMARA to the effect that SEIDLE was threatening to kill TAMARA, seeking to protect SEIDLE as she knew him as a member of law enforcement, and failed to dispatch according to active shooter protocols that would have alerted the responding officers of the need to have proper equipment and provide the coordination and backup that was necessary to prevent SEIDLE from shooting or continuing to shoot TAMARA.

564.    Instead, MIGLIACCIO advised that there was a report of shots fired at the area of the subject event, improperly relaying that it was an active shooter situation.

565.    MIGLIACCIO was also involved in the dispatch and radio communications regarding the 2.3 minute standoff, failing to communicate that SEIDLE was standing in the middle of the street with a gun to his head.

566.    GIBSON was personally involved in the dispatch of the active shooter situation involving SEIDLE, acting under color of law.

567.    GIBSON failed and refused to provide accurate information necessary for proper dispatch of responders, including vital information provided by the daughter of TAMARA to the effect that SEIDLE was threatening to kill TAMARA, seeking to protect SEIDLE as she knew him as a member of law enforcement, and failed to dispatch according to active shooter protocols that would have alerted the responding officers of the need to have proper equipment and provide the coordination and backup that was necessary to prevent SEIDLE from shooting or continuing to shoot TAMARA.

568.    Instead, GIBSON advised that there was a report of shots fired at the area of

113

the subject event, improperly relaying that it was an active shooter situation.

569.    GIBSON was also involved in the dispatch and radio communications regarding the 2.3 minute standoff, failing to communicate that SEIDLE was standing in the middle of the street with a gun to his head.

570.    These actions by each of the dispatchers amounted to deliberate indifference to the civil rights of TAMARA WILSON-SEIDLE, as the failure to give accurate and appropriate dispatch cause additional chaos and confusion and the inability to respond effectively to the situation.

571.    As a direct and proximate result of each individual dispatcher's deliberate indifference, TAMARA was deprived of her right to life under the 4th and 14th Amendments to the United States Constitution and are liable to plaintiffs under 42 U.S.C. §1982,

572.    As a direct and proximate result of defendants constitutional violations, Plaintiff's decedent TAMARA WILSON-SEIDLE suffered serious and severe injuries which resulted in her death.

573.    The decedent left her surviving her nine children.

574.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent TAMARA WILSON-SEIDLE was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

575.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent TAMARA WILSON-SEIDLE and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life

expectancy of decedent.

576.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have been damaged.

577.    By reason of the foregoing pain and suffering and wrongful death of plaintiff's decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

578.    By reason of the foregoing pain and suffering and wrongful death plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

579.    **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

580.    **WHEREFORE, the Estate demands judgment against GRAMICCIONI, SCHWEERS, SEELY, INCREMONA, CLAYTON, ARAS, MIGLIACCIO , GIBSON and all JOHN DOE defendants, for compensatory and punitive damages, funeral bills and costs of suit, together with interest and attorney's fees.**

## COUNT VIII
### (Section 1983 - State Created Danger)

581.    Plaintiffs repeat and reallege each and every allegation contained in this Complaint and incorporate same by reference.

582.    The Due Process clause of the Fourteenth Amendment to the United States Constitution prohibits deprivation of life, liberty or property without due process of law.

583.    Substantive due process under the Fourteenth Amendment requires that a citizen, such as Plaintiff's decedent be protected from state action which deprives the citizen of their life and liberty.

584.    The direct and proximate cause of the injuries, damages and death suffered by

115

Plaintiff's decedent and her surviving children are the result of state action, both by **SEIDLE** directly and by the other defendants which actions increased the substantial likelihood of harm to **TAMARA** that she would not otherwise have been exposed to but for the state action.

585.    Defendants owed a duty to protect plaintiff's decedent **TAMARA WILSON-SEIDLE** from the unlawful actions of both **PHILIP SEIDLE** regardless of whether he was acting under color of law or not at the time of the shooting, as well as to protect her from the affirmative acts of the defendants which exposed her to danger and rendered her more vulnerable to danger as a result of state action.

<u>Neptune</u>

586.    **NEPTUNE was on notice, through its policymakers, of the escalating threats, harassment, domestic violence and intimidation by SEIDLE. NEPTUNE was on notice that SEIDLE was mentally unstable and capable of seriously harming TAMARA.**

587.    **NEPTUNE had disciplined SEIDLE every year starting in 2012 prior to the shooting for domestic violence and violence.**

588.    **The affirmative act of allowing and permitting SEIDLE to retain the use and possession of a gun at all, or at a minimum with serious restrictions and conditions up to the date of the shooting placed TAMARA in a more dangerous and vulnerable position than if SEIDLE had been properly disciplined and his gun permanently removed and/or if he had been terminated from the force. Further, TAMARA was placed in greater danger than she would have been had SEIDLE not been disciplined at all, as the discipline created a more volatile situation between TAMARA and SEIDLE.**

589.    **The affirmative act of  imposing inadequate discipline up to the date of the shooting placed TAMARA in a more dangerous and vulnerable position than if SEIDLE**

had been properly disciplined and his gun permanently removed and/or if he had been terminated from the force.

590. The affirmative act of requesting the Prosecutor to allow SEIDLE to use his weapon without conditions in 2012, 2013, and 2014, reinstating SEIDLE to full duty and returning his weapon to him twice after taking it away in the 2012 and 2014 and/or other time frames, was a proximate and direct cause of the injuries, damages and death suffered by Plaintiff's decedent.

591. By reason of the known complaints by TAMARA regarding SEIDLE's propensity for violence and the Attorney General guidelines mandating her protection, a special relationship existed between NEPTUNE and TAMARA such that Plaintiff's decedent was a foreseeable victim of the acts alleged in returning the weapon to SEIDLE and reinstating him to full duty.

592. In giving SEIDLE the use of his gun and in reinstating him to active duty status, NEPTUNE acted in a manner so obviously reckless as to shock the conscience and/or were deliberately indifferent to the substantial likelihood of harm to TAMARA that said defendants used their authority and by their affirmative acts created a greater danger to TAMARA than had these defendants not acted to give the service weapon back to SEIDLE and reinstate him to full duty, and continued to allow him to remain on the force instead of terminating him or permitting him to resign/retire.

The Neptune Individual Officials O'Neil, Adams, Hunt and Bascom

593. O'NEIL, as the policymaker in 2012, was on notice of the domestic violence and the capacity of SEIDLE to inflict harm on TAMARA, as set forth in this complaint.

594. O'NEIL'S affirmative act was to request that the prosecutor permit

117

SEIDLE to regain use and possession of the service weapon used to kill TAMARA and to permit and allow SEIDLE to continue to have use of his gun despite the clear history showing that there was a strong likelihood that SEIDLE would harm, if not kill, TAMARA.

595.    ADAMS, as the policymaker in the 201-2014 time frame, also was on notice of the domestic violence which was continuing and the capacity of SEIDLE to inflict harm on TAMARA as set forth in this complaint.

596.    ADAM's affirmative act was also to request that the prosecutor permit SEIDLE to regain use and possession of the service weapon used to kill TAMARA and to permit and allow SEIDLE to continue to have use of his gun despite the clear history showing that there was a strong likelihood that SEIDLE would harm, if not kill, TAMARA.

597.    The discipline imposed on SEIDLE during ADAM's tenure in 2013 and 2014 and approved by ADAMS was inadequate and permitted SEIDLE to know that he could get away with continued violence without consequence, affirmative acts that put TAMARA in greater danger than she was before the inadequate discipline

598.    In particular, ADAMS disciplined SEIDLE for yelling profanities at other officers, instead of directing the discipline for the domestic violence incident that precipitated the behavior, thus evidencing a shocking disregard for women and dealing with the domestic violence.

599.    As a policymaker in the 2012-2107 time frame BASCOM had notice of SEIDLE's propensities for violence and domestic violence as set forth in this complaint.

600.    BASCOM's affirmative acts mirror those of both O'NEIL and ADAMS, as BASCOM was the director overlapping both these Chiefs as well as Chief Hunt. BASCOM personally, in addition to O'NEILL and ADAMS, affirmatively sought out approval from

118

the Prosecutor in 2012, 2013 and 2014 to allow SEIDLE to maintain possession and full use of his service weapon, knowing that SEIDLE had threatened TAMARA repeatedly and would likely use violence against her.

601.    The discipline imposed on SEIDLE during BASCOM's tenure in 2013 and 2014, approved by BASCOM, was inadequate and permitted SEIDLE to know that he could get away with continued violence without consequence, affirmative acts that put TAMARA in greater danger than she was before the inadequate discipline.

602.    In particular, BASCOM approved the discipline against SEIDLE for yelling profanities at other officers, instead of directing the discipline for the domestic violence incident that precipitated the behavior, thus evidencing a shocking disregard for women and dealing with the domestic violence.

603.    HUNT, as the policymaker in 2014 to the present, was on notice of the domestic violence and the capacity of SEIDLE to inflict harm on TAMARA, as set forth in this complaint.

604.    HUNT's affirmative act was also to request that the prosecutor permit SEIDLE to use and possess the service weapon used to kill TAMARA despite the clear history showing that there was a strong likelihood that SEIDLE would harm, if not kill, TAMARA.

605.    The discipline imposed on SEIDLE during HUNT's tenure in 2014 and 2015, approved by Hunt, was inadequate and permitted SEIDLE to know that he could get away with continued violence without consequence, affirmative acts that put TAMARA in greater danger than she was before the inadequate discipline.  In particular, HUNT was, in the alternative, responsible for the 2014  30 day suspension for yelling profanities at police

119

officers after learning that TAMARA was filing a complaint, a suspension in which HUNT permitted and allowed SEIDLE to keep the gun inappropriately. This permitted SEIDLE to know that he could get away with continued violence without consequence, affirmative acts that put TAMARA in greater danger than she was before the inadequate discipline.

606.    HUNT, in not accepting SEIDLE's resignation and retirement in 2014 but instead affirmatively encouraging and asking him to remain on the force without any conditions on the use of a weapon, knowing that he had failed fitness for duty examinations in the recent past and/or had passed them where the examinations and findings were deficient, and that SEIDLE was in fact unfit to remain on the force as an officer, having a violent past and exhibiting behavior presenting a substantial likelihood of harm to TAMARA or other civilians, put TAMARA in an increased risk of danger and constitutes a state created danger violative of the United States Constitution.

607.    By reason of the known complaints by TAMARA regarding SEIDLE's propensity for violence and the Attorney General guidelines mandating her protection, a special relationship existed between these officials from NEPTUNE and TAMARA such that Plaintiff's decedent was a foreseeable victim of the acts alleged in returning the weapon to SEIDLE and reinstating him to full duty.

608.    The placing of TAMARA in greater danger was a direct and proximate cause of the injuries and death of TAMARA WILSON- SEIDLE.

Asbury Park individuals Love, Lawson, Christie, Griswold and Crawford

609.    Plaintiffs have alleged facts, that if proved, show that the affirmative acts taken by these responding officers were grossly inadequate, violative of procedure and protocol and instead of preventing or lessening the brutal attack, increased the vulnerability of TAMARA to

continued shooting, which in fact did happen and would not have occurred but for the intervention of these officers at the scene, sufficient to raise a state-created danger.

Love

610.    As detailed in this complaint, LOVE affirmatively carried out his command and coordination responsibilities in a grossly deficient manner, affirmatively choosing to take the minor child, Teresa, out of harm's way himself, as opposed to giving her to a subordinate and assuming his command responsibilities.

611.    As a direct and proximate result of LOVE's actions, TAMARA was put in greater danger than she would have been had he performed his responsibilities in accordance with Best Practices and in accordance with his training, as LOVE's actions left a vacuum of chaos and confusion which gave SEIDLE further opportunity to launch another set of bullets into TAMARA during the 2.3 minute "standoff" between the responding officers and SEIDLE and further allowed SEIDLE to take advantage of the emotional situation by airing his grievances and becoming more volatile.

612.    The placing of TAMARA in greater danger was a direct and proximate cause of the injuries and death of TAMARA WILSON- SEIDLE.

Lawson

613.    As detailed in the complaint, LAWSON carried out his affirmative duties in a grossly deficient manner.  His affirmative acts included running in the opposite direction of the shooting, taking improper cover and tactical positions; in affirmatively relaying the wrong and in fact harmful information of "shots fired" to dispatch, in affirmatively creating panic, confusion and chaos at the scene which operated to increase the agitation and emotional lability and rage of SEIDLE causing him to shoot multiple rounds into

TAMARA's vehicle after a 2.3 minute standoff, which would not have occurred but for LAWSON's intervention.

614.    As a direct and proximate result of LAWSON'S actions, TAMARA was put in greater danger than she would have been had he performed his responsibilities in accordance with applicable standards and in accordance with his training.

615.    The placing of TAMARA in greater danger was a direct and proximate cause of the injuries and death of TAMARA WILSON- SEIDLE.

Christie, Griswold and Crawford

616.    As detailed in this complaint, these three individuals by their affirmative actions put TAMARA in greater danger than she would have been.

617.    Christie's affirmative acts as a responder were (1) taking the wrong positions with respect to SEIDLE that only served to escalate and aggravate the situation; (2) parked their cars inappropriately so as not to effectively close off pedestrian and civilian movement in the immediate area of the shooting; (3) spoke to SEIDLE without waiting for command or coordinating the response to SEIDLE first before attempting any intervention (4); positioned himself so as not to have a straight line of fire to SEIDLE, required under basic training, among other failures.

618.    CHRISTIE's affirmative acts created panic, confusion and chaos at the scene which operated to increase the agitation and emotional lability and rage of SEIDLE causing him to shoot multiple rounds into TAMARA's vehicle after a 2.3 minute standoff, which would not have occurred but for CHRISTIE's intervention.

619.    As a direct and proximate result of CHRISTIE's actions, TAMARA was put in greater danger than she would have been had he performed his responsibilities in

accordance with applicable standards and in accordance with his training.

620. The placing of TAMARA in greater danger was a direct and proximate cause of the injuries and death of TAMARA WILSON- SEIDLE.

621. GRISWOLD's affirmative acts as a responder were (1) taking the wrong positions with respect to SEIDLE that only served to escalate and aggravate the situation; (2) parked their cars inappropriately so as not to effectively close off pedestrian and civilian movement in the immediate area of the shooting; (3) spoke to SEIDLE without waiting for command or coordinating the response to SEIDLE first before attempting any intervention (4); positioned himself so as not to have a straight line of fire to SEIDLE, required under basic training, among other failures.

622. GRISWOLD's affirmative acts created panic, confusion and chaos at the scene which operated to increase the agitation and emotional lability and rage of SEIDLE causing him to shoot multiple rounds into TAMARA's vehicle after a 2.3 minute standoff, which would not have occurred but for GRISWOLD's intervention.

623. As a direct and proximate result of GRISWOLD's actions, TAMARA was put in greater danger than she would have been had he performed his responsibilities in accordance with applicable standards and in accordance with his training.

624. The placing of TAMARA in greater danger was a direct and proximate cause of the injuries and death of TAMARA WILSON- SEIDLE.

625. CRAWFORD's affirmative acts as a responder were (1) taking the wrong positions with respect to SEIDLE that only served to escalate and aggravate the situation; (2) parked their cars inappropriately so as not to effectively close off pedestrian and civilian movement in the immediate area of the shooting; (3) spoke to SEIDLE without

waiting for command or coordinating the response to SEIDLE first before attempting any intervention (4); positioned himself so as not to have a straight line of fire to SEIDLE, required under basic training, among other failures.

626.   CRAWFORD's affirmative acts created panic, confusion and chaos at the scene which operated to increase the agitation and emotional lability and rage of SEIDLE causing him to shoot multiple rounds into TAMARA's vehicle after a 2.3 minute standoff, which would not have occurred but for CRAWFORD's intervention.

627.   As a direct and proximate result of CRAWFORD's actions, TAMARA was put in greater danger than she would have been had he performed his responsibilities in accordance with applicable standards and in accordance with his training.

628.   The placing of TAMARA in greater danger was a direct and proximate cause of the injuries and death of TAMARA WILSON- SEIDLE.

629.   The affirmative actions of the responding officers posed a direct and substantial foreseeable risk of harm to TAMARA, such affirmative acts being a proximate and direct cause of the injuries, damages and death suffered by Plaintiff's decedent.

630.   A special relationship existed between these individual employees of ASBURY PARK and TAMARA such that Plaintiff's decedent was a foreseeable victim of the acts alleged in the handling of the active shooter event.

631.   The responding defendants acted in a manner so obviously reckless as to shock the conscience and that said defendants used their authority and by their affirmative acts created a greater danger to TAMARA than had these defendants not acted.

Gramiccioni, Schweers, Seely and Incremona

632.   GRAMICCIONI was on notice of the escalating threats, harassment, domestic

124

violence and intimidation by SEIDLE and was on notice that SEIDLE was mentally unstable and capable of seriously harming TAMARA.

633.    GRAMICCIONI's affirmative act of giving SEIDLE his gun back and to retain the use and possession of a gun at all, or at a minimum with serious restrictions and conditions up to the date of the shooting placed TAMARA in a more dangerous and vulnerable position than if SEIDLE had been properly disciplined and his gun permanently removed and/or if he had been terminated from the force, which should have occurred.

634.    The affirmative act of imposing inadequate discipline up to the date of the shooting and giving SEIDLE his gun back in 2013, 2014 and up to the date of the shooting placed TAMARA in a more dangerous and vulnerable position than if SEIDLE had been properly disciplined and his gun permanently removed and/or if the Prosecutor had denied the request to allow SEIDLE to have and use the gun that killed TAMARA.

635.    These affirmative acts of permitting and allowing SEIDLE to use his weapon without conditions in 2012, 2013, and 2014 and returning his weapon to him twice after taking it away in the 2012 and 2014 and/or other time frames, was a proximate and direct cause of the injuries, damages and death suffered by Plaintiff's decedent, placed TAMARA in a more dangerous position created a state –created danger.

636.    By reason of the known complaints by TAMARA regarding SEIDLE's propensity for violence and the Attorney General guidelines mandating her protection, a special relationship existed between GRAMICCIONI and TAMARA such that Plaintiff's decedent was a foreseeable victim of the acts alleged in returning the weapon to SEIDLE and reinstating him to full duty.

125

637.    In giving **SEIDLE** the use of his gun **GRAMICCIONI** acted in a manner so obviously reckless as to shock the conscience and/or was deliberately indifferent to the substantial likelihood of harm to **TAMARA** that said defendants used their authority and by their affirmative acts created a greater danger to **TAMARA** than had this defendant not acted to give the service weapon back to **SEIDLE**.

638.    **SCHWEERS** was on notice of the escalating threats, harassment, domestic violence and intimidation by **SEIDLE** and was on notice that **SEIDLE** was mentally unstable and capable of seriously harming **TAMARA**.

639.    **SCHWEERS'** affirmative act of giving **SEIDLE** his gun back and to retain the use and possession of a gun at all, or at a minimum with serious restrictions and conditions up to the date of the shooting placed **TAMARA** in a more dangerous and vulnerable position than if **SEIDLE** had been properly disciplined and his gun permanently removed and/or if he had been terminated from the force, which should have occurred.

640.    The affirmative act of imposing inadequate discipline up to the date of the shooting and giving **SEIDLE** his gun back in 2013, 2014 and up to the date of the shooting placed **TAMARA** in a more dangerous and vulnerable position than if **SEIDLE** had been properly disciplined and his gun permanently removed and/or if **SCHWEERS** had denied the request to allow **SEIDLE** to have and use the gun that killed **TAMARA**.

641.    These affirmative acts of permitting and allowing **SEIDLE** to use his weapon without conditions in 2012, 2013, and 2014 and returning his weapon to him twice after taking it away in the 2012 and 2014 and/or other time frames, was a proximate and direct cause of the injuries, damages and death suffered by Plaintiff's decedent, placed **TAMARA** in a more dangerous position created a state –created danger.

642.    By reason of the known complaints by **TAMARA** regarding **SEIDLE's** propensity for violence and the Attorney General guidelines mandating her protection, a special relationship existed between **SCHWEERS** and **TAMARA** such that Plaintiff's decedent was a foreseeable victim of the acts alleged in returning the weapon to **SEIDLE** and reinstating him to full duty.

643.    In giving **SEIDLE** the use of his gun **SCHWEERS** acted in a manner so obviously reckless as to shock the conscience and/or was deliberately indifferent to the substantial likelihood of harm to **TAMARA** that said defendants used their authority and by their affirmative acts created a greater danger to **TAMARA** than had this defendant not acted to give the service weapon back to **SEIDLE**.

644.    **SEELY was on notice of the escalating threats, harassment, domestic violence and intimidation by SEIDLE and was on notice that SEIDLE was mentally unstable and capable of seriously harming TAMARA.**

645.    **SEELY'S affirmative act of giving SEIDLE his gun back and to retain the use and possession of a gun at all, or at a minimum with serious restrictions and conditions up to the date of the shooting placed TAMARA in a more dangerous and vulnerable position than if SEIDLE had been properly disciplined and his gun permanently removed and/or if he had been terminated from the force, which should have occurred.**

646.    **The affirmative act of imposing inadequate discipline up to the date of the shooting and giving SEIDLE his gun back in 2013, 2014 and up to the date of the shooting placed TAMARA in a more dangerous and vulnerable position than if SEIDLE had been properly disciplined and his gun permanently removed and/or if SEELY had denied the request to allow SEIDLE to have and use the gun that killed TAMARA.**

647.    These affirmative acts of permitting and allowing SEIDLE to use his weapon without conditions in 2012, 2013, and 2014 and returning his weapon to him twice after taking it away in the 2012 and 2014 and/or other time frames, was a proximate and direct cause of the injuries, damages and death suffered by Plaintiff's decedent, placed TAMARA in a more dangerous position created a state –created danger.

648.    By reason of the known complaints by TAMARA regarding SEIDLE's propensity for violence and the Attorney General guidelines mandating her protection, a special relationship existed between SEELY and TAMARA such that Plaintiff's decedent was a foreseeable victim of the acts alleged in returning the weapon to SEIDLE and reinstating him to full duty.

649.    In giving SEIDLE the use of his gun SEELY acted in a manner so obviously reckless as to shock the conscience and/or was deliberately indifferent to the substantial likelihood of harm to TAMARA that said defendants used their authority and by their affirmative acts created a greater danger to TAMARA than had this defendant not acted to give the service weapon back to SEIDLE.

650.    INCREMONA was on notice of the escalating threats, harassment, domestic violence and intimidation by SEIDLE and was on notice that SEIDLE was mentally unstable and capable of seriously harming TAMARA.

651.    INCREMONA'S affirmative act of giving SEIDLE his gun back and to retain the use and possession of a gun at all, or at a minimum with serious restrictions and conditions up to the date of the shooting placed TAMARA in a more dangerous and vulnerable position than if SEIDLE had been properly disciplined and his gun permanently removed and/or if he had been terminated from the force, which should have occurred.

128

652.    The affirmative act of  imposing inadequate discipline up to the date of the shooting and giving **SEIDLE** his gun back in 2013, 2014 and up to the date of the shooting placed **TAMARA** in a more dangerous and vulnerable position than if **SEIDLE** had been properly disciplined and his gun permanently removed and/or if **INCREMONA** had denied the request to allow **SEIDLE** to have and use the gun that killed **TAMARA**.

653.    These affirmative acts of permitting and allowing **SEIDLE** to use his weapon without conditions in 2012, 2013, and 2014 and returning his weapon to him twice after taking it away in the 2012 and 2014 and/or other time frames, was a proximate and direct cause of the injuries, damages and death suffered by Plaintiff's decedent, placed **TAMARA** in a more dangerous position created a state –created danger.

654.    By reason of the known complaints by **TAMARA** regarding **SEIDLE's** propensity for violence and the Attorney General guidelines mandating her protection, a special relationship existed between **INCREMONA** and **TAMARA** such that Plaintiff's decedent was a foreseeable victim of the acts alleged in returning the weapon to **SEIDLE** and reinstating him to full duty.

655.    In giving **SEIDLE** the use of his gun **SEELY** acted in a manner so obviously reckless as to shock the conscience and/or was deliberately indifferent to the substantial likelihood of harm to **TAMARA** that said defendants used their authority and by their affirmative acts created a greater danger to **TAMARA** than had this defendant not acted to give the service weapon back to **SEIDLE**.

**The Dispatchers Clayton, Aras, Migliaccio, Gibson and the County**

**656.**    **The refusal to provide appropriate dispatch instructions and information as previously set forth was willful and constituted shocking misfeasance and affirmative acts**

129

placing TAMARA in more danger than had dispatch not acted at all. By providing wholly inadequate dispatch, the dispatcher defendants individual acts as set forth in this complaint allowed responders to arrive without adequate information, leading to the panic, chaos and confusion at the scene that created the circumstances for the second round of shooting.

657.    The affirmative actions of each individual defendant and NEPTUNE give rise to a state-created danger claim under the substantive due process clause of the 14th amendment.

658.    As a direct and proximate result of defendants constitutional violations, Plaintiff's decedent TAMARA WILSON-SEIDLE suffered serious and severe injuries which resulted in her death.

659.    The decedent left her surviving her nine children.

660.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent TAMARA WILSON-SEIDLE was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

661.    As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent TAMARA WILSON-SEIDLE and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

662.    By reason of the foregoing pain and suffering and wrongful death of Plaintiff's decedent, Plaintiffs have been damaged.

663.    By reason of the foregoing pain and suffering and wrongful death of Plaintiff's decedent, Plaintiffs have suffered pecuniary losses and have been compelled to expend and incur

various sums of money for funeral and burial expenses.

664. By reason of the foregoing pain and suffering and wrongful death Plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

665. **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

666. **WHEREFORE plaintiffs the ESTATE demands judgment against defendants NEPTUNE, O'NEILL, ADAMS, BASCOM, HUNT, LOVE, LAWSON, CHRISTIE, GRISWOLD, CRAWFORD, GRAMICCIONI, SCHWEERS, SEELY, INCREMONA, CLAYTON, ARAS, MIGLIACCIO, GIBSON and all JOHN DOE defendants jointly and severally for compensatory and punitive damages, funeral bills, together with interest, costs of suit and attorney's fees.**

## COUNT IX
**(New Jersey Civil Rights Act)**

667. Plaintiffs repeat and reallege each and every allegation contained in this Complaint and incorporate same by reference.

668. The factual allegations in the Complaint supporting liability under 42 U.S.C. Section 1983 as set forth herein also support a cause of action under the New Jersey Civil Rights Act which is co-extensive with 42 Section 1983.

669. The Defendants, each and every one, acted pursuant to official or unofficial policy and/or custom and to deprive plaintiff's decedent of her constitutional rights under Title 10 of the New Jersey Statutes, known as the New Jersey Civil Rights Act.

670. By reason of the foregoing, defendants violated the civil rights of Plaintiff's decedent **TAMARA WILSON-SEIDLE.**

671. As a direct and proximate result of defendants constitutional violations, Plaintiff's

decedent TAMARA WILSON-SEIDLE suffered serious and severe injuries which resulted in her death.

672. The decedent left her surviving her nine children.

673. As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent TAMARA WILSON-SEIDLE was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

674. As a direct and proximate result of the violation of constitutional rights as aforedescribed, plaintiff's decedent TAMARA WILSON-SEIDLE and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

675. By reason of the foregoing pain and suffering and wrongful death of Plaintiff's decedent, Plaintiffs have been damaged.

676. By reason of the foregoing pain and suffering and wrongful death of Plaintiff's decedent, Plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

677. By reason of the foregoing pain and suffering and wrongful death Plaintiff's decedent TAMARA WILSON-SEIDLE has suffered loss of enjoyment of life.

678. **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

679. **WHEREFORE plaintiffs the ESTATE demands judgment against defendants NEPTUNE, O'NEIL, ADAMS, BASCOM, HUNT, ASBURY PARK, SALERNO, KELSO, LOVE, LAWSON, CHRISTIE, GRISWOLD, CRAWFORD, MONMOUTH COUNTY,**

132

**GRAMICCIONI, SCHWEERS, SEELY, INCREMONA, CLAYTON, ARAS, MIGLIACCIO, GIBSON and all JOHN DOE defendants jointly and severally for compensatory and punitive damages, funeral bills, together with interest, costs of suit and attorney's fees.**

### COUNT X
### (negligence)

680.    Plaintiffs repeat and reallege each and every allegation contained in this Complaint and incorporate same by reference.

681.    At all relevant times herein defendants were under a duty to act reasonably in the performance of their duties as police officers and supervisors in the handling of (1) **SEIDLE's** employment, his training, supervision and retention, including discipline and the bringing of administrative charges; (2) the determination as to whether **SEIDLE** could maintain a weapon, when, whether and how he should be permitted to maintain his service or other weapons; (3) the conditions for use of the weapon; (4) the subject active shooting event; (4) the handling of a known history of domestic violence incidents and use of force; (5) the handling of dispatch responsibilities and (5) the provision of medical care.

682.    The facts as to each individual defendant has been set forth in detail in this complaint and also form the basis of the negligence count under Title 59.

683.    With respect to all of these issues, the duties were ministerial and not subject to discretion or immunities in that (1) the duty **of NEPTUNE** and its officials to take away **SEIDLE's** gun was mandated by policy; (2)  **the duty of MONMOUTH COUNTY, the PROSECUTOR'S OFFICE and its officials to take away SEIDLE's gun was mandated by policy;** (3) **NEPTUNE** and its officials  had a duty to use reasonable care in the hiring, training, supervision and retention of **SEIDLE** and the failure to do so is not subject to any immunity

133

under Title 59; (4) **NEPTUNE and its officials undertook a duty to protect TAMARA under the applicable domestic violence guidelines which were mandated and therefore had a duty to carry out their responsibilities in a reasonable and non-negligent matter; (5) MONMOUTH COUNTY, through the PROSECUTOR'S OFFICE and its officials undertook a duty to protect TAMARA under the applicable domestic violence guidelines which were mandated and therefore had a duty to carry out their responsibilities in a reasonable and non-negligent matter; (6) the Prosecutor defendants GRAMICCIONI, SCHWEERS, SEELY and INCREMONA all had a duty to use reasonable care in the taking of corrective action and/or progressive discipline in making decisions about the use and possession of a gun based on protocol and to follow ministerial duties which are non-discretionary; (7) NEPTUNE through its officials had a duty to use reasonable care in the taking of corrective action and/or progressive discipline in making employment decisions based on specific protocol; (8) The NEPTUNE officials CHIEF O'NEIL, CHIEF ADAMS, CHIEF HUNT and DIRECTOR BASCOM had a duty to act reasonably in connection with the hiring, training and supervision of SEIDLE and to use reasonable care in the discipline of SEIDLE; (9) ASBURY PARK through their officials had a duty to see to it that their training protocol was within the standard of reasonable care and that their supervision and hiring were adequate and reasonable; (10) the ASBURY PARK police defendants LAWSON, LOVE, CHRISTIE, GRISWOLD and CRAWFORD all had a duty to act reasonably in their performance and actions once the duty was undertaken to provide police protection; said officers being responsible for their ministerial duties in offering protection; (11)** once the police undertook a duty to handle the crime and active shooting situation they had a duty to use reasonable care in the performance of their duties which duty

134

was breached; (12) once the police and or other unidentified medical responders such as EMS or paramedic units undertook a duty to provide medical care they had a duty to use reasonable care in the performance of their duties which duty was breached in the failure to get her out of the car and provide such medical care.

684. All of the above duties were breached, leading to and being a direct and proximate cause of the injuries and wrongful death of Plaintiff's decedent.

685. At all relevant times herein defendants were under a duty to act reasonably in following and maintaining proper protocol, procedures, policy, rules and guidelines enacted and propounded with respect to their duties.

686. Defendants were negligent and careless in failing to properly discipline police officers despite knowledge of their failure to take proper action in the handling of the matters set forth herein, in their failure to intervene, failure to render medical aid, and in particular to avoid and prevent the acts complained of herein.

687. The personal injuries and damages suffered by plaintiff's decedent **TAMARA WILSON-SEIDLE** were caused solely as a result of the negligence and carelessness of the defendants.

688. As a direct and proximate result of defendants' negligence and carelessness, Plaintiff's decedent **TAMARA WILSON-SEIDLE** suffered serious and severe injuries which resulted in her death.

689. The decedent left her surviving her nine children.

690. As a direct and proximate result of the negligence and carelessness as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

691. As a direct and proximate result of the negligence and carelessness as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

692. By reason of the foregoing negligence and wrongful death of plaintiff's decedent, plaintiffs have been damaged.

693. By reason of the foregoing negligence and wrongful death of plaintiff's decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

694. By reason of the foregoing negligence and wrongful death plaintiff's decedent

695. **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

696. **The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

697. **WHEREFORE plaintiffs the ESTATE demands judgment against defendants NEPTUNE, O'NEIL, ADAMS, BASCOM, HUNT, ASBURY PARK, SALERNO, KELSO, LOVE, LAWSON, CHRISTIE, GRISWOLD, CRAWFORD, MONMOUTH COUNTY, GRAMICCIONI, SCHWEERS, SEELY, INCREMONA, CLAYTON, ARAS, MIGLIACCIO, GIBSON and all JOHN DOE defendants jointly and severally for compensatory and punitive damages, funeral bills, together with interest, costs of suit and attorney's fees.**

## COUNT XI
### (Wrongful death)

698.  Plaintiffs repeat and reallege each and every allegation contained in this Complaint and incorporates same by reference.

699.  The actions of defendants constitute wrongful death.

700.  As a direct and proximate result of the wrongful death, Plaintiff's decedent **TAMARA WILSON-SEIDLE** suffered serious and severe injuries which resulted in her death.

701.  The decedent left her surviving her nine children.

702.  As a direct and proximate result of the wrongful death, plaintiff's decedent **TAMARA WILSON-SEIDLE** was caused to suffer severe, painful and permanent personal injuries, emotional anguish and great physical pain.

703.  As a direct and proximate result of the wrongful death, plaintiff's decedent **TAMARA WILSON-SEIDLE** and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

704.  By reason of the foregoing and wrongful death of plaintiff's decedent, plaintiffs have been damaged.

705.  By reason of the foregoing and wrongful death of plaintiff's decedent, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

706.  By reason of the foregoing and wrongful death plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

707.  Plaintiffs seek damages under both the survivorship statute and the wrongful death statute, here designated a wrongful death count.

708.    WHEREFORE, the Estate demands judgment against defendants **NEPTUNE, HUNT, JR., BASCOM, ADAMS, O'NEIL, ASBURY PARK, SALERNO, KELSO, LOVE, LAWSON, CHRISTIE, GRISWOLD, CRAWFORD, MONMOUTH COUNTY, THE MONMOUTH COUNTY PROSECUTOR'S OFFICE, GRAMICCIONI, SCHWEERS, SEELY, INCREMONA, CLAYTON, ARAS, MIGLIACCIO, GIBSON, SEIDLE, and all John Doe defendants** jointly and severally for compensatory and punitive damages, funeral bills, together with interest, costs of suit and attorney's fees.

## COUNT XII
### (assault and battery-SEIDLE)

709.    Plaintiffs repeat and reallege each and every allegation contained in this Complaint and incorporate same by reference.

710.    On June 16, 2015 defendant **PHILIP SEIDLE** without cause or justification or consent, did place plaintiff's decedent **TAMARA WILSON-SEIDLE** in fear of imminent physical harm and intentionally assaulted and killed her.

711.    As a direct and proximate result of the assault and battery plaintiff's decedent was caused to be placed in fear of physical harm, suffered severe physical injury which resulted in her death.

712.    The aforedescribed damages and injuries were caused solely and wholly by the intentional and willful assault and battery of the defendant **PHILIP SEIDLE**.

713.    As a direct and proximate result of the assault and battery, Plaintiff's decedent **TAMARA WILSON-SEIDLE** suffered serious and severe injuries which resulted in her death.

714.    The decedent left her surviving her nine children.

715.    As a direct and proximate result of the assault and battery as aforedescribed, plaintiff's decedent **TAMARA WILSON-SEIDLE** was caused to suffer severe, painful and

138

permanent personal injuries, emotional anguish and great physical pain.

716.   As a direct and proximate result of the assault and battery, plaintiff's decedent **TAMARA WILSON-SEIDLE** and other next of kin have been damaged and have been permanently deprived of the services, society, care, companionship, support and guidance and financial support of their mother for the life expectancy of decedent.

717.   By reason of the foregoing assault and battery, plaintiffs have been damaged.

718.   By reason of the foregoing assault and battery, plaintiffs have suffered pecuniary losses and have been compelled to expend and incur various sums of money for funeral and burial expenses.

719.   By reason of the foregoing assault and battery plaintiff's decedent **TAMARA WILSON-SEIDLE** has suffered loss of enjoyment of life.

**720.   The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute, 2A:31-5.**

**721.   WHEREFORE,** the Estate demands judgment against **PHILLIP SEIDLE** for compensatory and punitive damages, funeral bills, together with interest, costs of suit and attorney's fees.

**COUNT XIII**
**(negligent and intentional infliction of emotional distress)**

722.   Plaintiffs repeat and reallege each and every allegation contained in this Complaint and incorporate same by reference.

723.   Defendants **NEPTUNE, ASBURY PARK and MONMOUTH COUNTY,** by their agents, servants and their employees and **each individual defendant, whose actions have been detailed in this complaint,** engaged in actions which were either intended to, or in the breach of exercise of reasonable care caused and inflicted severe emotional trauma upon

139

plaintiff's decedent.

724. These actions included (1) **NEPTUNE by its officials O'NEIL, ADAMS, BASCOM and HUNT in failing and refusing to disarm and take away SEIDLE's gun, leaving TAMARA in constant fear of violence; (2) NEPTUNE by its officials O'NEIL, ADAMS, BASCOM and HUNT** for retaining and failing to supervise, discipline and/or terminate SEIDLE with the knowledge that the failure to do so would inflict severe and continuing emotional distress upon TAMARA; (3) **MONMOUTH COUNTY by its officials GRAMICCIONI, SCHWEERS, SEELY and INCREMONA in failing and refusing to keep SEIDLE disarmed and to assure that he could not use or possess a gun, leaving TAMARA in constant fear of violence; (4) ASBURY PARK by its officers LOVE, LAWSON, CHRISTIE, GRISWOLD and CRAWFORD in failing to protect TAMARA after undertaking to do so; (5) NEPTUNE by its officials and MONMOUTH COUNTY by its officials in failing to advise TAMARA** of her rights to file a restraining order or take other action and assisting her in doing so in violation of express policy and procedure; (6) the failure of dispatch to accurately relay information and to properly dispatch knowing that such failures would inflict severe and continuing emotional distress upon TAMARA; (7) **NEPTUNE through its officials and MONMOUTH COUNTY through its officials failing to take affirmative steps to stop SEIDLE before he could embark on the final assault and shooting TAMARA;** and; (8) once the police and or other unidentified medical responders such as EMS or paramedic units undertook a duty to provide medical care they their failure to do so in a timely manner resulted in the infliction of severe emotional distress, among other failures and misfeasance.

725. By reason of the above affirmative acts, omissions, shooting at plaintiff's decedent and other actions of defendants, plaintiff's decedent was subjected to negligent and/or

intentional infliction of emotional distress.

726. The emotional distress was severe and outrageous.

727. The emotional distress was of such character that no reasonable person could be expected to endure it.

728. As a direct and proximate result of defendant's actions, plaintiff's decedent was caused to suffer emotional distress and damage, was prevented from engaging in her usual activities, and suffered other losses, all to her damage.

729. By reason of the foregoing Plaintiffs suffered damages as aforedescribed in this Complaint.

730. The Estate seeks damages both under the Survival Statute, N.J.S.A. 2A:15-3 and the wrongful death statute 2A:31-5.

731. **WHEREFORE, the Estate** demands judgment against defendants **NEPTUNE, HUNT, JR., BASCOM, ADAMS, O'NEIL, ASBURY PARK, SALERNO, KELSO, LOVE, LAWSON, CHRISTIE, GRISWOLD, CRAWFORD, MONMOUTH COUNTY, THE MONMOUTH COUNTY PROSECUTOR'S OFFICE, GRAMICCIONI, SCHWEERS, SEELY, INCREMONA, CLAYTON, ARAS, MIGLIACCIO, GIBSON, SEIDLE, and all John Doe defendants** jointly and severally for compensatory and punitive damages, funeral bills, together with interest, costs of suit and attorney's fees.

## COUNT XIV
### (portee claim)

732. Plaintiffs repeat and reallege each and every paragraph contained in this Complaint and incorporate same by reference.

733. At all relevant times herein plaintiff and minor **TERESA SEIDLE** was the daughter of Plaintiff's decedent **TAMARA WILSON-SEIDLE**.

141

734.    **TERESA SEIDLE** witnessed the events and circumstances of the shooting having been a passenger in the vehicle driven by defendant **SEIDLE** when he rammed into **TAMARA'S** vehicle, got out and shot her.

735.    As a direct and proximate result of the aforesaid, the plaintiff **TERESA SEIDLE** suffered extreme emotional distress, anguish, pain and suffering.

736.    By reason of the foregoing plaintiff **TERESA SEIDLE** has been damaged.

737.    Plaintiff Teresa Seidle meets all the requirements for a claim established by the Tort Claims Act, Title 59 of the New Jersey Statutes, having suffered a permanent loss of use of a bodily function, here, psychiatric, and having spent more than $3500 in medical care relating to this injury.

738.    **WHEREFORE** plaintiff Theresa **SEIDLE** demands judgment against defendants **NEPTUNE, HUNT, JR., BASCOM, ADAMS, O'NEIL, ASBURY PARK,  SALERNO, KELSO, LOVE, LAWSON, CHRISTIE, GRISWOLD, CRAWFORD, MONMOUTH COUNTY, THE MONMOUTH COUNTY PROSECUTOR'S OFFICE, GRAMICCIONI, SCHWEERS, SEELY, INCREMONA, CLAYTON, ARAS, MIGLIACCIO, GIBSON, SEIDLE, and all John Doe defendants** jointly and severally for compensatory and punitive damages, funeral bills,  together with interest, costs of suit and attorney's fees.

Pursuant to Rule 38B of the Federal Rules of Civil Procedure plaintiff demands that trial by jury in these actions for all issues triable by a jury.

**PLAINTIFF MAINTAINS ITS DEMAND SET FORTH IN THE ORIGINAL COMPLAINT AND FIRST AMENDED COMPLAINT THAT ALL DEFENDANTS BE IDENTIFIED AND NOTIFIED OF THE PENDING LAWSUITS AS ONLY THE DEFENDANTS ARE IN POSSESSION OF THE IDENTITY  OF THE JOHN DOES AND**

FICTITIOUS DEFENDANTS.  PLAINTIFF FURTHER DEMANDS RELEASE OF THE ENTIRE PROSECUTOR'S FILE AND INTENDS TO SEEK COURT RELIEF ON THAT ISSUE.

Dated:  January 25, 2019                    By:_____
                                            SHELLEY L. STANGLER, ESQ.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

                                            By:_____
                                            SHELLEY L. STANGELR, ESQ.
Dated: January 25, 2019

## DESIGNATION OF TRIAL COUNSEL

Shelley L. Stangler, Esq. is hereby designated as trial counsel on behalf of the plaintiff in the within matter.

Dated:  January 25, 2019                    By:_____
                                            SHELLEY L. STANGLER, ESQ.

## CERTIFICATION

I, SHELLEY L. STANGLER, ESQ., of full age, certify:

1.     I have been retained to represent Plaintiffs KIRSTEN SEIDLE, as Administratrix of the Estate of TAMARA WILSON-SEIDLE, TERESA SEIDLE, minor by her guardian KIRSTEN SEIDLE, and KIRSTEN SEIDLE, PHILIP SEIDLE, JR., JOHN SEIDLE, CHRISTOPHER SEIDLE, MONICA SEIDLE, DOROTHY SEIDLE and

**MARIA SEIDLE, minor** and **STEVEN SEIDLE, minor by their guardian KIRSTEN SEIDLE, individually,** in connection with the within matter.

2.     The matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no other action or arbitration proceeding is contemplated by plaintiffs.

3.     There are no other parties of whom I am presently aware who should be joined in this action.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

BY: _____
**SHELLEY L. STANGLER, ESQ.**
Attorney for Plaintiffs

Dated:   January 25, 2019