**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

KIRSTEN SEIDLE, *as Administratrix of the Estate of Tamara Wilson-Seidle, et al.*,

        Plaintiffs,

        v.

NEPTUNE TOWNSHIP, et al.,

        Defendants.

Civil Action No. 17-4428 (MAS) (LHG)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

This matter comes before the Court upon three Motions to Dismiss,[1] which the following Defendants filed: (1) Defendant Marshawn Love ("Sergeant Love") (ECF No. 117); (2) Defendants Neptune Township, Neptune Township Police Department, James M. Hunt, Jr., Michael Bascom, Robert Adams, and Howard O'Neil (collectively, the "Neptune Defendants") (ECF No. 118); and (3) Defendants City of Asbury Park, David Kelso, Anthony Salerno, Ahmed Lawson, Carl Christie, James Crawford and Timothy Griswold (collectively, the "Asbury Park Defendants") (ECF No. 119).[2]

---

[1] On July 25, 2019, the Attorney General requested leave to file a Motion to Dismiss in this matter "solely as to the claims in the Third Amended Complaint that concern [Monmouth County Prosecutor's Office] and Prosecutor Gramiccioni." (ECF No. 139.) The Court granted that Motion and administratively terminated the Monmouth County Defendants' Motion to Dismiss pending full briefing of the Attorney General's Motion to Dismiss. (ECF No. 140.) The Court, accordingly, does not address Plaintiffs' claims against the Monmouth County Defendants in this Memorandum Opinion.

[2] The Court refers to Sergeant Love, the Neptune Defendants, and the Asbury Park Defendants collectively as "Defendants".

Plaintiffs Kirsten Seidle, individually and as Administratrix of the Estate of Tamara Wilson-Seidle; Teresa Seidle, Maria Seidle, and Steven Seidle, minors by their guardian Kirsten Seidle; Philip Seidle, Jr.; John Seidle; Christopher Seidle; Monica Seidle; and Dorothy Seidle (collectively "Plaintiffs") opposed Defendants' Motions (ECF Nos. 123, 126, 127),[3] and Defendants replied (ECF Nos. 131, 134, 136, 137). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motions to Dismiss are granted in part and denied in part.

## I. BACKGROUND

This action arises out of the killing of Tamara Wilson-Seidle ("Tamara") on June 16, 2015 by her former husband, Philip Seidle ("Seidle"). (Third Am. Compl. ("TAC") ¶ 27, ECF No. 110.) Tamara and Seidle married in 1990 and, over the course of twenty-seven years, had nine children together. (*Id.* ¶ 66.) In 2012, Tamara filed for divorce, and Seidle moved out of the family residence. (*Id.* ¶ 69.) Tamara and Seidle's divorce was finalized May 27, 2015. (*Id.* ¶ 70.)

Plaintiffs' Third Amended Complaint alleges a long history of domestic violence between Seidle and Tamara (*id.* ¶ 68), and further alleges that the Neptune Police Department, which was Seidle's employer, was aware of these incidents. (*See generally* ¶¶ 71-109.) Seidle was disciplined multiple times in relation to Tamara's domestic abuse complaints. For example, in 2012, Tamara reported to the Neptune Police Department that Seidle physically abused her. (*Id.* ¶ 85.) This report resulted in a two-day suspension. (*Id.*) Also around that time, Seidle was disciplined for cancelling a dispatch call from Tamara regarding domestic abuse. (*Id.* ¶ 87.) As

---

[3] Plaintiffs responded to the Asbury Park Defendants' and Sergeant Love's Motions to Dismiss in a single opposition brief. (ECF No. 126.)

a result, Neptune suspended Seidle, and Seidle's weapon was revoked. (*Id.*) Nearly one year later, Seidle's weapon was returned to him. (*Id.* ¶ 89.) In March 2014, Seidle was again disciplined and suspended for a domestic violence incident involving Tamara. (*Id.* ¶ 98.) Plaintiffs also allege that Seidle was the subject of numerous excessive force complaints. (*Id.* ¶¶ 92, 97, 312.)

On June 16, 2015, Tamara reported to her daughter Kirsten that Seidle was chasing her in his car. (*Id.* ¶ 162.) Kirsten called 9-1-1 and relayed that information, apparently to four different dispatchers. (*Id.* ¶ 164.) During the chase, Seidle turned onto Sewell Avenue in Asbury Park, where he rammed into Tamara's vehicle and forced her off the road into a parked vehicle. (*Id.* ¶ 165.) Seidle was in his personal car, out of his jurisdiction, and accompanied by one of his children, seven-year-old Teresa. (*Id.* ¶¶ 163, 165, 182.)

Seidle exited his vehicle and shot several times through the driver's side window of Tamara's vehicle. (*Id.* ¶ 165.) A standoff between Seidle and Asbury Park police officers ensued, and Plaintiffs allege at certain points during this event, Seidle turned the gun on himself and pointed the gun at his own head. (*Id.* ¶¶ 181-85.) After around two and one-half minutes, Seidle fired a final round of shots into Tamara's vehicle. (*Id.* ¶ 197.) Seidle was eventually arrested and later pleaded guilty to aggravated manslaughter. (*Id.*) It is unclear from the Third Amended Complaint the exact duration of the standoff.

On April 19, 2018, this Court dismissed Plaintiffs' First Amended Complaint, finding Plaintiffs failed to meet the requirements of Federal Rule of Civil Procedure 8(a). (*See* Apr. 19, 2018 Op. 4-5, ECF No. 76.) The Court determined that "[r]ather than setting forth the allegations in a systematic and appropriate way, Plaintiff[s] ha[ve] elected to group plead the various Defendants in this case." (*Id.* at 5 (internal quotation marks and citation omitted).) Therefore, because the Court "had difficulty discerning which claims were brought against

3

which entities or individuals and the factual basis for each claim," the Court granted Defendants' Motions to Dismiss. (*Id.* at 4.) Additionally, the Court dismissed with prejudice Plaintiffs' claims against the Monmouth County Prosecutor's Office ("MCPO") and Prosecutor Gramiccioni in their official capacities and in connection with their law enforcement investigatory functions. (*Id.* at 8.)

On December 11, 2018, this Court dismissed Plaintiffs' Second Amended Complaint, finding it "suffer[ed] from the same flaws as the [First] Amended Complaint" and stating, "Plaintiffs' Second Amended Complaint, again mainly group pleads Defendants without applying specific facts to specific actors." (Dec. 11, 2018 Op. 2, ECF No. 107.) Additionally, Plaintiffs "conflat[ed] their individual liability claims and [municipal liability] claims and fail[ed] to allege with sufficient particularity the conduct of each Defendant associated with those claims." (*Id.* at 3.) The Court granted Plaintiffs one final opportunity to amend their claims and address the deficiencies described above. (*Id.*)

On January 25, 2019, Plaintiffs filed their Third Amended Complaint. (*See generally* TAC.) Currently before the Court are Defendants' Motions to Dismiss Plaintiffs' Third Amended Complaint. (ECF Nos. 117, 118, 119.)

## II.   **LEGAL STANDARD**

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). On a motion to dismiss for failure to state a claim, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).

4

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must review "the complaint to strike conclusory allegations." *Id.* The court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UMPC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). In doing so, however, the court is free to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679); *see also Iqbal*, 556 U.S. at 678-79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

## III. DISCUSSION

Plaintiffs' Third Amended Complaint brings the following claims:

1. Count One—42 U.S.C. § 1983 ("Section 1983") *Monell*[4] claim against Neptune Township;

2. Count Two—Section 1983 *Monell* claim against Neptune Township for Equal Protection violations;

3. Count Three—Section 1983 Fourth Amendment Claims against James M. Hunt, Jr., Michael Bascom, Robert Adams, and Howard O'Neil (collectively, the "Individual Neptune Defendants");

---

[4] *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978).

4. Count Four—Section 1983 *Monell* claim against Asbury Park;

5. Count Five—Section 1983 Fourth Amendment Claim against Sergeant Love, Deputy Chief David Kelso, Former Police Chief Anthony Salerno, and Police Officers Ahmed Lawson, Carl Christie, James Crawford and Timothy Griswold (collectively, the "Individual Asbury Park Defendants");

6. Count Six—Section 1983 *Monell* claim against Monmouth County;

7. Count Seven—Section 1983 Fourth Amendment claim against Gregory J. Schweers, Jacquelyn F. Seely, Richard E. Incremona, Karen Clayton, Kristin Aras, Stephanie Migliaccio, Kurt Gibson, and Christopher Gramiccioni (collectively, the "Individual Monmouth County Defendants");

8. Count Eight—Section 1983 Fourteenth Amendment Substantive Due Process State-Created Danger claims against all Defendants;

9. Count Nine—New Jersey Civil Rights Act claims against all Defendants;

10. Count Ten—Negligence against all Defendants;

11. Count Eleven—Wrongful Death against all Defendants;

12. Count Twelve—Assault and Battery as to Philip Seidle;[5]

13. Count Thirteen—Negligent and Intentional Infliction of Emotional Distress against all Defendants; and

14. Count Fourteen—a *Portee*[6] claim on behalf of Teresa Seidle against all Defendants.

The Court will address each claim as it pertains to Sergeant Love, the Asbury Park Defendants,

and the Neptune Township Defendants.

---

[5] Seidle has not appeared in this action.

[6] *Portee v. Jaffee*, 417 A.2d 521 (N.J. 1980). *Portee* creates a negligent infliction of emotional distress cause of action for an individual who can demonstrate "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familiar relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." *Id.* at 528.

A.    **Plaintiffs' Federal Law Claims**

    1.    **Section 1983 *Monell* Claims Against Neptune Township and Asbury Park (collectively, the "Municipality Defendants") (Counts One and Four)**

Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred. . . .'" *Pearson v. Prison Health Servs.*, 850 F.3d 526, 534 n.2 (3d Cir. 2017) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

Generally, local government units and supervisory officials are not liable under Section 1983 solely based on a theory of *respondeat superior*. *See Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690-91 (1978). Rather, municipal liability attaches "when [a municipality] causes a constitutional violation through the implementation of a policy, custom, or practice." *Wolf v. Escala*, No. 14-5985, 2015 WL 2403106, at *17 (D.N.J. May 20, 2015) (citing *Monell*, 436 U.S. at 691). Further, "[a] municipality cannot be held liable on a *Monell* claim absent an underlying constitutional violation." *Johnson v. City of Phila.*, 837 F.3d 343, 354 n.58 (3d Cir. 2016) (citing *Grazier ex rel. White v. City of Phila.*, 328 F.3d 120, 124 (3d Cir. 2003)).

Defendants argue Seidle was not acting under color of law at the time of the shooting. (Asbury Park Defs.' Moving Br. 21 n.2, ECF No. 119-1; Neptune Defs.' Moving Br. 12, ECF No. 118-1.) Namely, they assert Seidle was acting in his private capacity because, *inter alia*, he was off duty, out of his jurisdiction, and using his private vehicle during the course of the incident. (*See* Asbury Park Defs.' Moving Br. 21 n.2; Neptune Defs.' Moving Br. 12.)

Moreover, Defendants contend that because Seidle was not acting under color of law, no constitutional violation occurred and, therefore, they cannot be held liable under § 1983 for Seidle's private acts of criminal conduct. (Asbury Park Defs.' Moving Br. 21 n.2; Neptune Defs.' Moving Br. 12.)

a.    <u>Whether Seidle was Acting Under Color of Law</u>

"To state a claim under [Section] 1983, a plaintiff [(1)] must allege the violation of a right secured by the Constitution and laws of the United States, and [(2)] must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Id.* at 49 (citation omitted).

Conversely, "[a] state employee who pursues purely private motives and whose interaction with the victim is unconnected with his [or her] execution of official duties does not act under color of law." *Ecotone Farm LLC v. Ward*, 639 F. App'x 118, 126 (3d Cir. 2016) (quoting *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir. 1997)); *see also Barna v. City of Perth Amboy*, 42 F.3d 809, 817 (3d Cir. 1994) (determining that an off-duty police officer acting outside of his jurisdiction did not act under color of law when he assaulted the plaintiff with his police-issued nightstick); *Delcambre v. Delcambre*, 635 F.2d 407, 408 (5th Cir. 1981) (per curiam) (determining that a police chief did not act under color of law when he assaulted an individual in a police station because the altercation arose out of a personal dispute).

In relation to purported or perceived state authority, Plaintiffs and Defendants both discuss *Van Ort v. Stanewich*, 92 F.3d 831 (9th Cir. 1996). The *Van Ort* defendant, a San Diego County Sheriff's deputy whose duties included undercover narcotics investigations, conducted a

8

narcotics search of a residence. *Id.* at 833. During the search, the deputy learned that the home's safe contained jewelry and other valuables. *Id.* Approximately one month later, the deputy returned to the home when he was off duty. *Id.* at 833. The homeowner testified that he recognized the deputy, at which time the deputy put on a mask and proceeded to rob the *Van Ort* plaintiff and his family members. *Id.* During the incident, the deputy did not flash a badge and denied being a police officer. *Id.*

The Ninth Circuit affirmed the district court's finding that the deputy did not act under color of law, reasoning that "[the deputy] was 'pursuing his own goals and was not in any way subject to control by [his public employer].'" *Id.* at 838 (second alteration in original) (citing *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1151 (3d Cir. 1995)). Furthermore, the Ninth Circuit emphasized that "[m]erely because a police officer is recognized as an individual employed as a police officer does not alone transform private acts into acts under color of state law." *Id.* at 839.

Here, the Court agrees with Defendants that Plaintiffs have not pleaded any facts demonstrating Seidle was acting under color of law at the time of the shooting. Based on Plaintiffs' allegations, it appears Seidle was off duty and driving his personal vehicle with his daughter in the car. (TAC ¶¶ 163-67.) The shooting also did not occur in Seidle's police jurisdiction—Neptune Township—but rather occurred in Asbury Park. (*Id.*); *see, e.g., Barna*, 42 F.3d at 817 (citing N.J. Stat. Ann. § 40A:14-152) (stating that unless exceptions apply, "New Jersey law provides that a municipal police officer's jurisdiction is limited to the municipality in which the officer was appointed"). The Third Amended Complaint, moreover, does not state Seidle used his police-issued firearm during the killing. Even if Seidle had used a police-issued weapon, however, that alone would not establish Seidle was acting under color of state law. *See, e.g., id.* at 818-19. After a careful review of the allegations in Plaintiffs' Third Amended

9

Complaint, the Court finds that Plaintiffs failed to raise a plausible claim that Seidle's actions arose out of anything other than his own private motives.

Nor does the Court find persuasive Plaintiffs' assertion that the Asbury Park Defendants' alleged perception of Seidle as a police officer somehow transformed Seidle's actions into those under color of law. "[O]ne who is without actual authority, but who purports to act according to official power, may also act under color of state law." *Barna*, 42 F.3d at 816; *see also Screws v. United States*, 325 U.S. 91, 111 (1945) ("It is . . . clear that under 'color' of law means under 'pretense' of law."). The conduct, however, must have more than a "tenuous connection to state authority." *Barna*, 42 F.3d at 819 (citation omitted). For example, "[m]anifestations of such pretended authority may include flashing a badge, identifying oneself as a police officer, placing an individual under arrest, or intervening in a dispute involving others pursuant to a duty imposed by police department regulations." *Id.* at 816 (citations omitted).

Here, Plaintiffs' Third Amended Complaint fails to plead any facts that would demonstrate Seidle acted with "pretended authority" or "purported" to act under color of law. Rather, the Third Amended Complaint alleges Seidle rammed Tamara's car off the road, fired two rounds of shots into that vehicle, and then held the gun to his own head. (*See* TAC ¶¶ 163-68, 181.) None of those actions demonstrate that Seidle acted with purported or pretended authority. The Court, accordingly, finds Seidle was not acting under color of law.

                b.    Whether Municipalities May Be Liable Despite Seidle's Actions not Being Under Color of Law

Finding Seidle was not acting under color of state law, however, does not end the Court's inquiry. Rather, as the Neptune Defendants emphasize, "the question of whether a municipality can be held liable for an individual officer's conduct when the officer did not commit a

constitutional violation *under color of state law* is an open question in the Third Circuit." (Neptune Defs.' Moving Br. 17.)

In *Fagan v. City of Vineland (Fagan I)*, a City of Vineland, New Jersey police officer engaged in a high-speed pursuit, which resulted in a car accident that caused the death of innocent third parties. 22 F.3d 1283, 1288-89 (3d Cir. 1994). On behalf of one of those third parties, the plaintiffs sued the officer for violations of § 1983 and the Fourteenth Amendment for recklessly conducting a high-speed pursuit in violation of the New Jersey Attorney General's guidelines. *Id.* at 1289. The plaintiffs also sued the City under § 1983 for failing to properly train and supervise police officers regarding appropriate conduct during high-speed chases and for following a policy of not enforcing the pursuit guidelines. *Id.*

The District Court granted summary judgment in favor of the City and the police officers, and on appeal, the Third Circuit was faced with the question of whether the City could be held liable under § 1983 even if the individual officer did not commit a constitutional violation. *Id.* at 1291. The Third Circuit ultimately held that "[a] finding of municipal liability does not depend automatically or necessarily on the liability of any police officer." *Id.* at 1292.[7] Thus, "*Fagan I* stands for the proposition that [a municipality] can independently violate the Constitution if it has a policy, practice, or custom of deliberate indifference that causes the deprivation of some constitutional right through the actions of an officer, the 'causal conduit.'" *Washington-Pope v. City of Phila.*, 979 F. Supp. 2d 544, 576 (E.D. Pa. 2013).

Following *Fagan I*, the Third Circuit clarified that *Fagan I*'s holding was not confined solely to police pursuits, and stated, "It is possible for a municipality to be held independently

---

[7] Although *Fagan I* was reheard en banc, the Third Circuit only reconsidered the liability of the individual officers in *Fagan II*, 22 F.3d 1296. *Fagan I* and *Fagan II* were released contemporaneously, and *Fagan I* was reinstated in a manner consistent with *Fagan II*. *Fagan I*, 22 F.3d at 1287 n.1.

11

liable for a substantive due process violation even in situations where none of its employees are liable." *Brown v. Pa. Dep't of Health Emergency Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir. 2003). The Third Circuit, however, further provided, "[F]or there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights. It is not enough that a municipality adopted with deliberate indifference a policy of inadequately training its officers. There must be a direct causal link between the policy and a constitutional violation." *Id.* (internal quotation marks and citations omitted).

In *Galliano v. Borough of Seaside Heights*, this Court denied summary judgment on the plaintiff's § 1983 municipal liability claims after the Court found the officer whose acts gave rise to the events had not acted under color of law. No. 03-1463, 2007 WL 979850, at *20 (D.N.J. Mar. 30, 2007). Specifically, the Court stated,

> The court is careful to note . . . that any finding of municipal liability based on failure to train or supervise by the [d]efendants must be premised on the failure to properly supervise and train its supervisory personnel rather than the failure to train [the police officer] as this Court's finding that [the police officer] was not acting under color of state law precludes [the p]laintiffs from premising their municipal liability claim on the failure to train or supervise him.

*Id.*; *see also id.* at *18 ("[The p]laintiffs' municipal liability claims appear [to] rest on allegations that [the d]efendants . . . individually and collectively violated the [plaintiffs'] rights through their unconstitutional customs, policies and practices . . . [,] which [the p]laintiffs allege made [the officers'] acts possible."). Moreover, in *Washington-Pope v. City of Philadelphia*, the District Court for the Eastern District of Pennsylvania acknowledged that "the *Fagan I* Court was not confronted with a scenario . . . in which the individual officer did not violate the Constitution because he did not act under color of law" but found that "its rationale is broad enough to encompass [the plaintiff's] claim." 979 F. Supp. 2d at 577-78.

Although the Neptune Defendants correctly note that neither of those cases is binding upon this Court, the Court agrees with the *Washington-Pope* court and finds *Fagan I*'s holding sufficiently broad enough to encompass the instant matter. Moreover, as the Court recognized in *Galliano*, causation is not per se broken where the state employee does not act under color of law if the Municipality Defendants' unconstitutional customs or policies failed to avert the ultimate harm. *See Galliano*, 2007 WL 979850, at *19-20. Thus, "to prevail on [their] . . . municipal liability claim[s], [Plaintiffs] will ultimately have to prove that the [municipalities] had a policy or custom . . . as well as 'a direct causal link' between [that] municipal policy or custom and the alleged constitutional violation." *Washington-Pope*, 979 F. Supp. 2d at 580 (fifth alteration in original).

Here, the Court finds Plaintiffs pleaded sufficient facts to demonstrate that the harm to Tamara could have been averted in the absence of the Municipality Defendants' "alleged collective failure to enforce [their] policies or to enact necessary policies." *Galliano*, 2007 WL 979850, at *19. For example, Plaintiffs pleaded facts supporting their assertion that Neptune Township was aware of Seidle's violent tendencies through numerous excessive force and domestic violence complaints yet failed to properly respond to those allegations. (TAC ¶¶ 71-134.) *See, e.g., Galliano*, 2007 WL 979850, at *20 (finding the plaintiffs sufficiently presented evidence supporting municipality liability, and stating "[the p]laintiffs present evidence of excessive absenteeism, incidents of domestic violence requiring confiscation of [the officer's] weapons, personal tragedy and financial difficulties, which they claim require some form of evaluative actions by [the d]efendants."). Further, Plaintiffs allege that Asbury Park failed to enforce or enact necessary policies related to active shooter situations. (TAC ¶¶ 166-178.) Therefore, at this motion to dismiss stage, and viewing the facts in the light most

favorable to Plaintiffs, the Court finds Plaintiffs sufficiently pleaded § 1983 *Monell* claims against the municipalities; accordingly, Counts One and Four may proceed.

## 2. Section 1983 *Monell* Claim Against Neptune Township for Equal Protection Violations (Count Two)

To allege an equal protection violation arising from allegations regarding the unequal treatment of domestic violence victims, a plaintiff must plead facts that support (1) "it is the policy or custom of the police to provide less protection to victims of domestic violence than to other victims of violence," (2) "discrimination . . . was a motivating factor," and (3) "the plaintiff was injured by the policy or custom." *Hynson v. City of Chester Legal Dep't*, 864 F.2d 1026, 1031 (3d Cir. 1988).[8]

Plaintiffs aver that Neptune Township "had a history of disregarding or ignoring women's concerns and allowing discriminatory and adverse treatment of women by the police department, both internally and externally," and this history amounted to a "policy of deliberate indifference to Tamara's rights under the equal protection clause[]." (TAC ¶¶ 255, 269.) Plaintiffs also allege that Tamara was a victim of such discriminatory treatment and Neptune Township "failed and refused to properly deal with [Seidle's] domestic violence and use of force issues." (*Id.* ¶ 256.)

---

[8] Notably, the *Hynson* court presented this test in the context of a summary judgment motion rather than a motion to dismiss and stated in a footnote, "We enunciate the standard for plaintiffs' prima facie case in order to eliminate the all too common shotgun pleading approach to these equal protection claims . . . [, as we have] cautioned that '[i]n this circuit, plaintiffs in civil rights cases are required to plead facts with specificity.'" *Id.* at 1031 n.13 (quoting *Rotolo v. Borough of Charleroi*, 532 F.2d 920, 922 (3d Cir. 1976) (per curiam)). This heightened pleading standard for equal protection claims has since been rejected in *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). *See also Lawson v. Walp*, No. 94-1629, 1995 WL 355733, at *6-7 (M.D. Pa. June 6, 1995). Courts, however, continue to follow the *Hynson* standard in analyzing equal protection claims related to the unequal treatment of domestic violence victims. *See, e.g., Wright v. City of Phila.*, No. 01-6160, 2005 WL 3091883 (E.D. Pa. Nov. 17, 2005).

14

To support these allegations, Plaintiffs contend that Neptune Township was aware Seidle abused and harassed Tamara yet failed to take any action. (TAC ¶ 261.) Plaintiffs further support their equal protection claim by stating,

> Several lawsuits and complaints have been filed against [Neptune Township] and its police department with respect to hostile work environment based on sex, retaliatory actions towards women, the failure to promote, unwarranted reprimands, vulgar and unabated sexual and unwarranted comments, and in general complaints evidence a negative and dismissive attitude toward women.

(*Id.* ¶ 257.) Plaintiffs also reference the Turner Report, which, according to the Neptune Defendants, is an investigative report that Neptune Township commissioned following the initiation of lawsuits against them. (*Id.* ¶ 258; *see also* Neptune Defs.' Moving Br. 30-31.) According to Plaintiffs,

> [t]he Turner Report relates to a series of complaints, lawsuits and [Equal Employment Opportunity Commission] filings by women on the Neptune police force alleging sexual harassment and gender based discrimination, including the failure to promote, provide the same employment opportunities as men, retaliation for complaints, reprimands which were not warranted, and in general a hostile work environment.

(*Id.* ¶ 259.)

The Neptune Defendants assert that the lawsuits they face have no bearing on domestic violence, but rather "relate to harassment/retaliation lawsuits filed by two female Neptune Police officers." (Neptune Defs.' Moving Br. 30-31.) They further aver that the Turner Report has no bearing on the instant action because it was generated in response to the above-referenced lawsuits and further concluded that the plaintiffs' allegations in those matters were unfounded. (*Id.* at 31.) Thus, the Neptune Defendants argue that Plaintiffs failed to allege that there was a custom or policy of the Neptune Defendants failing to provide equal protection to domestic

violence victims. The Neptune Defendants further contend that Plaintiffs failed to allege that gender discrimination was the motivating force behind the alleged unequal protection. (*Id.*)

The Court finds Plaintiffs have pleaded sufficient facts to support an allegation that the Neptune Defendants had a custom of ignoring domestic violence complaints. In fact, Plaintiffs allege facts demonstrating that Tamara contacted the Neptune Police Department on numerous occasions to report domestic violence incidents. (TAC ¶¶ 73-76; 84-88; *see also id.* ¶ 76 ("There were at least twelve . . . documented domestic violence or incident calls placed to Neptune by either Tamara or Seidle . . . .").) Further, although the Neptune Defendants aver that the other lawsuits they face pertain to harassment and retaliation claims—not domestic violence claims— the Neptune Defendants fail to recognize that such allegations support a finding of differential treatment based on gender, which supports an inference that gender discrimination was the motivating force behind the Neptune Defendants' alleged inadequate response to domestic violence complaints.

Finally, the Neptune Defendants' argument regarding Plaintiffs alleging facts based upon lawsuits that have been initiated, but not fully adjudicated, lacks persuasion. At the motion to dismiss stage, Plaintiffs need only plead sufficient facts to give rise to a *plausible* equal protection claim; Plaintiffs, at this stage, are not required to prove those claims with evidentiary support. *See, e.g., Walp,* 1995 WL 355733, at *6-7 (adopting the magistrate judge's report and recommendation and finding that the defendants improperly focused on the plaintiff's evidentiary burden, not the pleading standard, when moving to dismiss the plaintiff's domestic violence-based equal protection claims).

Thus, contrary to the Neptune Defendants' assertion, (Neptune Defs.' Moving Br. 31), the Court need not determine the veracity of the active lawsuits that have been filed against them. Rather, the Court must determine whether the filing of those lawsuits in conjunction with

Plaintiffs' other allegations lends support to a plausible equal protection claim. Viewing the facts in the light most favorable to Plaintiffs, the Court finds Plaintiffs have pleaded sufficient facts to support their equal protection claim and, therefore, denies the Neptune Defendants' Motion to Dismiss. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) ("The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974))).

### 3. Section 1983 Fourth Amendment Claim Against Individual Neptune Defendants and Individual Asbury Park Defendants (Counts Three and Five)

Plaintiffs allege claims pursuant to § 1983 against all Individual Neptune Defendants and Individual Asbury Park Defendants in this matter. The Individual Defendants oppose these claims, arguing, in part, that they are immune from suit. "Under certain circumstances, government officials are protected from . . . § 1983 suits by qualified immunity." *Couden v. Duffy*, 446 F.3d 483, 492 (3d Cir. 2006). "In considering whether qualified immunity applies, a court must first decide whether the facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation." *Id.* (citing *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002)). Second, a court "determines whether the constitutional right in question was clearly established." *Id.* (citing *Curley*, 298 F.3d at 277). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his [or her] conduct was unlawful in the situation he [or she] confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)).

"A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he [or she] is doing violates that right." *Mammaro v. N.J. Div.*

*of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (internal quotation marks and alterations omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "In other words, there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited." *Id.* (citation omitted). To determine whether the conduct is constitutionally prohibited, the Court must "look first for applicable [United States] Supreme Court precedent." *Id.* If none exists, the Court may consider "a 'robust consensus of cases of persuasive authority' in the Court of Appeals [that] could clearly establish a right for purposes of qualified immunity.'" *Id.* (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015) (per curiam)).

The Unites States Supreme Court has cautioned courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *al-Kidd*, 563 U.S. at 742). Rather, "[t]he dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Id.* (emphasis in original) (quoting *al-Kidd*, 563 U.S. at 742). The Court must undertake this inquiry "in light of the specific context of the case, not as a broad general proposition." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2001) (per curiam)). "Such specificity is especially important in the Fourth Amendment context, where . . . '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'" *Id.* (alteration in original) (quoting *Saucier*, 553 U.S. at 205).

a.    Individual Neptune Defendants

Plaintiffs allege essentially the same general facts pertaining to each Individual Neptune Defendant's violation of Tamara's constitutional rights. Namely, Plaintiffs contend that the Individual Neptune Defendants failed to train and supervise subordinates in handling domestic violence complaints, failed to give appropriate consideration to Tamara's domestic violence

18

complaints, failed to appropriately discipline Seidle even though they had knowledge of his domestic violence history, allowed Seidle to retain his service weapon despite that violent history, and failed to discipline officers who escorted Seidle to and from the Seidle marital residence. (TAC ¶¶ 296-97, 320-21, 342-43.) Plaintiffs also allege that approximately one year before the shooting, Seidle tendered his resignation to Police Chief Hunt, but Police Chief Hunt asked Seidle to remain on the police force despite being aware of Seidle's history of domestic violence. (*Id.* ¶ 340.)

The Neptune Defendants aver that Plaintiffs failed to sufficiently allege facts demonstrating a clearly established constitutional right. (*See* Neptune Defs.' Moving Br. 32.) Furthermore, the Neptune Defendants allege that "even assuming that constitutional rights were violated, qualified immunity should attach because not every reasonable official in the Neptune Defendants' shoes would have understood beyond debate that their actions violated Section 1983." (*Id.* at 32 (internal quotation marks omitted).)

Plaintiffs oppose, arguing that in light of the Individual Neptune Defendants' above-referenced failures, and despite their knowledge and awareness of Seidle's proclivity for violence, it was "foreseeable that Seidle would use his service weapon to harm Tamara or exact continued violence against her and the children[,] and that . . . failure . . . evidenced a depraved or deliberate indifference to the constitutional rights of Tamara and [was] a direct and proximate cause of her death." (Pls.' Opp'n to Neptune Defs.' 29.)

Defendants have the burden of demonstrating they are entitled to qualified immunity. *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010). Although "it is true that qualified immunity should be resolved at the earliest possible stage of the litigation, at the motion to dismiss stage, 'qualified immunity will be found only when the immunity is established on the face of the complaint.'" *O'Donnell v. Cumberland Cty.*, 195 F. Supp. 3d 724, 734-35 (M.D. Pa.

19

2016) (internal citations omitted) (quoting *Schor v. N. Braddock Borough*, 801 F. Supp. 2d 369, 378-79 (W.D. Pa. 2011)). "Thus, only where a plaintiff 'fails to state a claim of a violation of a clearly established law, [is] a defendant pleading qualified immunity . . . entitled to dismissal before the commencement of discovery.'" *O'Donnell*, 195 F. Supp. 3d at 735 (alteration and omission in original) (quoting *Schor*, 801 F. Supp. at 379).

Here, the Court finds it premature to address whether the Individual Neptune Defendants are entitled to qualified immunity. "A supervising authority may be liable under § 1983 for failing to train police officers when the failure to train demonstrates deliberate indifference to the constitutional rights of those with whom the officers may come into contact." *Gilles v. Davis*, 427 F.3d 197, 207 n.7 (3d Cir. 2005). Here, construing the facts alleged in the Third Amended Complaint as true and in the light most favorable to Plaintiffs, the Individual Neptune Defendants' repeated failure to respond to Tamara's domestic violence complaints and failure to discipline Seidle for those complaints may constitute a violation of her clearly established rights. The Court, accordingly, declines to dismiss Plaintiffs' claims against the Individual Neptune Defendants at this early stage of the litigation and finds the matter best addressed at summary judgment. *See Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) ("[I]t is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases.").[9]

---

[9] The Court acknowledges the Third Circuit's admonishment against overly relying upon the *Reehorst* court's caution against deciding qualified immunity on the pleadings. *See Olson v. Ako*, 724 F. App'x 160, 161, 164 (3d Cir. 2018) (vacating the district court's order denying the defendants' motion to dismiss and determining the district court's reliance on *Reehorst* was misplaced because the district court had a "robust factual record" before it, including six exhibits, containing interview transcripts and the defendant's affidavit). Unlike the Court in *Olson*, however, here, the Court does not have a "robust factual record" and, therefore, *Reehorst*'s caution remains persuasive.

### b.    Individual Asbury Park Defendants

Regarding the Individual Asbury Park Defendants, Plaintiffs allege that Salerno and Kelso "failed to assure [their] subordinates received appropriate and critical training concerning the handling of an active shooter/rapid responder/hostage situation." (TAC ¶¶ 382, 391.) Plaintiffs also allege that Salerno and Kelso "failed to enact, promulgate[,] and enforce any policies or practices for the handling of an active shooter/rapid responder/hostage situation." (*Id.* ¶¶ 383, 392.)

Plaintiffs aver that Sergeant Love failed to properly advise subordinate officers, "failed to follow any accepted guidelines on how to handle an active shooter/rapid responder/hostage event," and failed to "properly assess the situation and prioritize goals," thereby allowing the standoff situation to escalate. (*Id.* ¶¶ 403, 404, 406, 407.) Further, Plaintiffs aver that Sergeant Love failed to recognize that Seidle was not trying to commit suicide, and even had Seidle threatened suicide, Sergeant Love failed to recognize that he was required to use deadly force against Seidle. (*Id.* ¶ 403.) Sergeant Love also allegedly failed in his duty to intervene to protect Tamara, failed "to advise Seidle that he would be shot if he took any action to prevent Tamara from being assisted," failed to talk to Seidle "in an effort to get him to be compliant," and further failed to "effectively . . . extricate Tamara." (*Id.*) Finally, Plaintiffs allege that Sergeant Love failed to train and supervise his subordinates. (*Id.* ¶ 412.)

Plaintiffs contend that Officer Lawson ran away from the scene and "failed to notify dispatch or communicate to other responding officers that Seidle was engaged in shooting someone in a motor vehicle, thus delaying effective response." (*Id.* ¶ 416.) Plaintiffs also argue that Lawson's yelling "shots fired" instead of "active shooter" was a critical error that undermined any ability to effectively aid Tamara. (*Id.* ¶¶ 167, 170, 416.) Further, per Plaintiffs, Officer Lawson failed to intervene and protect Tamara. (*Id.* ¶ 424.)

21

Plaintiffs allege Officers Christie, Griswold, and Crawford failed to wear bulletproof vests and shields, and such equipment is required when responding to an active shooter situation. (*Id.* ¶¶ 428, 436, 444.) Plaintiffs also aver that these officers should have been aware that "Seidle was not attempting to commit suicide during the 2.3-minute standoff but instead did not have his finger on the trigger and was listening to a Bluetooth phone connection." (*Id.* ¶¶ 429, 437, 445.) According to Plaintiffs, these officers further failed to take appropriate defensive positions, "failed to remove civilians from the area to the extent there were any in the direct line of fire" with Seidle, and failed to remove Tamara from her vehicle. (*Id.*)

Preliminarily, the Court questions the logic underlying Plaintiffs' argument that the Individual Asbury Park Defendants, in the heat of the moment and without the benefit of hindsight, should have recognized that Seidle was not truly threatening suicide, and that such a realization should have prompted them to use lethal force against Seidle. Such a position promotes the notion that police officers should shoot first and ask questions later and pushes the Court to support a policy under which lethal force is not merely condoned, but affirmatively required. The Court is loath to endorse such a position, particularly when it runs counter to the substantial body of law questioning whether the use of lethal force violates a person's constitutional rights. *See, e.g., Mullenix*, 136 St. Ct. at 311-12; *Bland v. City of Newark*, 900 F.3d 77, 85-87 (3d Cir. 2018); *Brown v. Rinehart*, 325 F. App'x 47, 50 (3d Cir. 2009). The Court, therefore, finds that Plaintiffs have failed to establish that the Individual Asbury Park Defendants' conduct regarding their failure to use lethal force constitutes a constitutional violation.

Moreover, construing the facts as true and in the light most favorable to Plaintiffs, the Court finds that even if Plaintiffs had alleged facts demonstrating a constitutional violation regarding their remaining allegations, none of the Individual Asbury Park Defendants could have

realized that their conduct—improperly parking cars, yelling "shots fired" instead of "active shooter," failing to wear bulletproof vests and shields, and rescuing Teresa from the scene of the shooting—was unlawful. *See Mammaro*, 814 F.3d at 169; *see also Olson v. Ako*, 724 F. App'x 160, 165 (3d Cir. 2018) ("[The p]laintiffs' allegations are the kinds of broad propositions of law that cannot guide a court in determining whether a constitutional right is clearly established." (internal quotation marks and citation omitted)). The Court, accordingly, finds the Individual Asbury Park Defendants are entitled to qualified immunity on Plaintiffs' Fourth Amendment claims and dismisses with prejudice Count Five of the Third Amended Complaint against them.

### 4. Section 1983 Fourteenth Amendment Substantive Due Process State-Created Danger Claims Against all Defendants (Count Eight)

"Although as a general rule, 'the state has no affirmative obligation to protect its citizens from the violent acts of private individuals,' the 'state-created danger' theory of liability is an exception to this rule." *Hansell v. City of Atl. City.*, 152 F. Supp. 2d 589, 603 (D.N.J. 2001) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir. 1997), *aff'd*, 46 F. App'x 665 (3d Cir. 2002). The state-created danger doctrine recognizes that a violation of substantive due process may result when state authority is affirmatively employed in a manner that injures a citizen or renders that citizen more vulnerable to injury than he or she would have been absent state intervention. *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006); *see also Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015).

Under the state-created danger doctrine, a state "may assume responsibility for the safety of an individual for whom it affirmatively creates or enhances a risk of danger." *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 431 (3d Cir. 2006) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1208 (3d Cir. 1996)). Liability is imposed when the harm—though at the hands of a private actor—is the product of state action that legitimately can be characterized as affirmative conduct. *Id.* Courts

do not impose liability in cases where the state failed to act, examples of which include the following: a police officer refusing to arrest an abusive boyfriend who had kidnapped his former girlfriend, *Brown v. Grabowski*, 922 F.2d 1097, 1102, 1114 (3d Cir. 1990); a school being aware of, but failing to prevent, students from sexually assaulting other students in the bathroom, *D.R. ex rel. L.R. v. Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1367, 1376 (3d Cir. 1992) (en banc); and law enforcement failing to detain a man who violated his probation for sexually assaulting a twelve-year-old, resulting in that man murdering the twelve-year-old's sister in "retaliat[ion] against the family for its efforts to prevent him from seeing the twelve-year-old," *Bright*, 443 F.3d at 278, 281.

For the state-created danger theory to apply, Plaintiffs must sufficiently allege facts which, if accepted as true, would satisfy the following four-part test:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) the state actor acted in willful disregard for the safety of the
> plaintiff; (3) there existed some relationship between the state and
> the plaintiff; [and] (4) the state actors used their authority to create
> an opportunity that otherwise would not have existed for the third
> party's crime to occur.

*Kneipp*, 95 F. 3d at 1208 (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995)). When applying the state-created danger theory, the Court must consider "whether the state actors involved affirmatively acted to create [the] plaintiff's danger, or to render him or her more vulnerable to it." *D.R. ex rel. L.R.*, 972 F.2d at 1373 (emphasis omitted); *see also Mark*, 51 F.3d at 1152 (collecting cases and agreeing that "the environment created by the state actors must be dangerous[,] they must know it to be dangerous[,] and . . . they must have used their authority to create an opportunity that would not otherwise have existed for the third party's crime to occur" (omission in original)).

The Third Circuit has noted, "The cases where the state-created danger theory was applied were based on discrete, grossly reckless acts committed by the state or state actors using their peculiar positions as state actors, leaving a discrete plaintiff vulnerable to foreseeable injury." *Mark*, 51 F.3d at 1153. The Third Circuit has "never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised." *Bright*, 443 F.3d at 282.

Here, Defendants all argue Plaintiffs failed to plead affirmative conduct such that it satisfies the fourth prong of the state-created danger test. (Asbury Park Defs.' Moving Br. 13-15; Love's Moving Br. 19-22; Neptune Defs.' Moving Br. 25-29.) The Court agrees with Defendants.[10]

Regarding the Neptune Township Defendants, Plaintiffs argue that allowing Seidle to retain the use of his police-issued weapon and inadequately disciplining Seidle prior to the shooting placed Tamara in a more dangerous and vulnerable position than if the state had not acted at all. (TAC ¶¶ 588, 589.) Plaintiffs also allege that the Individual Neptune Defendants all requested that the Monmouth County Prosecutor's Office allow Seidle to regain and maintain use of his police-issued weapon despite awareness of Seidle's domestic violence history. (*Id.* ¶¶ 594, 596, 600, 604.)[11]

---

[10] Because Plaintiffs failed to plead affirmative conduct, the Court does not address the remaining factors of the state-created danger test.

[11] Plaintiffs further allege that Neptune Township's improper discipline of Seidle "created a more volatile situation between Tamara and Seidle" such that Tamara was in greater danger than if Neptune Township had not disciplined Seidle at all. (TAC ¶ 588.) Plaintiffs, however, fail to plead adequate facts to support this conclusory statement. For example, Plaintiffs fail to allege facts that Seidle was enraged due to his being disciplined at the time he ran Tamara's car off the road. To the extent Plaintiffs wish to argue Seidle harbored general hostility towards Tamara due to Neptune Township disciplining him on earlier occasions, the Court finds such speculative allegations "too remote . . . to establish proximate cause." *See Green v. City of Phila.*, 92 F. App'x 873, 876 (3d Cir. 2004).

The Third Circuit upheld the district court's decision to grant the defendant's motion to dismiss on a similar factual basis in *Green v. City of Philadelphia.* 92 F. App'x 873 (3d Cir. 2004). In that case, two police officers investigated a domestic dispute between the plaintiff and his girlfriend. *Id.* at 874. During their investigation, the plaintiff alerted the officers to his girlfriend's "violent tendencies," including that she had threatened him with a gun. (*Id.*) The officers took the girlfriend's gun but later returned it to her. *Id.* Nearly one month later, the girlfriend shot the plaintiff, and the plaintiff subsequently brought suit against the City of Philadelphia and the officers. *Id.*

The Third Circuit ultimately upheld the district court's judgment for the officers on the plaintiff's state-created danger claims on summary judgment, determining that by returning the gun to the girlfriend, the officers did not place the plaintiff in a worse position than had they not intervened at all. *Id.* at 875-86. The Third Circuit further stated that "the shooting . . . was too remote from the officers' allegedly wrongful acts to establish proximate cause." *Id.* at 876 (citing *Sheets v. Mullins*, 287 F.3d 581, 588 (6th Cir. 2002)).

Here, the Court similarly finds Plaintiffs failed to plead facts demonstrating that the Neptune Township Defendants affirmatively created a danger or rendered Tamara more vulnerable to danger than had they not acted at all. It is not enough for Plaintiffs to merely allege that the Neptune Township Defendants were aware of the dangers Tamara faced. Rather, Plaintiffs could only sustain a state-created danger claim by pleading that those Defendants affirmatively acted in a manner that rendered Tamara more vulnerable. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 201 (1989) ("While the State may have been aware of the dangers that [the victim] faced in the free world, it played no part in their creation, nor did it do anything to render [the victim] any more vulnerable to them."). Here, like the

officers in *Green*, the Neptune Defendants allowing Seidle to retain his weapon did not put Tamara in a worse situation than had they not acted at all.[12]

Moreover, Plaintiffs' allegation that the Neptune Defendants "inadequately discipline[d]" Seidle is merely an artful attempt to reframe an inaction—*i.e.*, failure to discipline—as an action. *See Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013) (en banc) ("[M]erely restating the [d]efendant's inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct.") The Court, therefore, finds Plaintiffs failed to adequately allege an affirmative action that would give rise to a viable state-created danger claim against the Neptune Defendants.

Regarding Sergeant Love, Plaintiffs aver that he "affirmatively carried out his command and coordination responsibilities in a grossly deficient manner," including "affirmatively choosing to take the minor child, Teresa, out of harm's way himself, as opposed to giving her to a subordinate and assuming his command responsibilities." (TAC ¶ 610.) Therefore, Plaintiffs argue, Sergeant Love's actions caused "a vacuum of chaos and confusion" that allowed Seidle to fire a second round of shots into Tamara's vehicle. (*Id.* ¶ 611.)

"The requirement of an actual affirmative act is not intended to turn on semantics of act and omission. Instead, the requirement serves . . . to distinguish cases where . . . officials might have done more . . . [from] cases where . . . officials created or increased the risk itself." *Morrow*, 719 F.3d at 179 (alterations in original); *see also Burella v. City of Phila.*, 501 F.3d 134, 147-48 (3d Cir. 2007). Here, the Court finds Plaintiffs are merely pleading facts demonstrating Sergeant Love's alleged inaction rather than any affirmative conduct that put Tamara at risk. In fact, the only affirmative conduct Plaintiffs pleaded with respect to Sergeant Love is that he removed Teresa from the scene and "out of harm's way." (*Id.*) This action,

---

[12] The Court reiterates that it makes no findings regarding the Monmouth County Defendants.

27

however, bears no relation to placing Tamara at harm and merely references Sergeant Love's alleged failure to "assum[e] his command responsibilities." (TAC ¶ 610.) The Court, accordingly, dismisses with prejudice the state-created danger claims as to Sergeant Love.

Plaintiffs argue that Officer Lawson also acted in a "grossly deficient manner," including "running in the opposite direction of the shooting, taking improper cover and tactical positions, . . . [and] relaying the wrong and in fact harmful information of 'shots fired' to dispatch," which added "confusion and chaos" to the scene. (TAC ¶ 613.) Regarding Officers Christie, Griswold, and Crawford, Plaintiffs allege these individuals also "took wrong positions" such that they blocked the view of Seidle and, therefore, there was no "straight line of fire." (*Id.* ¶¶ 617, 621, 625.) Plaintiffs also allege that Officers Christie, Griswold, and Crawford improperly parked cars, which did not "effectively close off pedestrian and civilian movement in the immediate area of the shooting," and "spoke to Seidle without waiting for command or coordinating the response . . . first before attempting any intervention." (*Id.* ¶ 621.)

Regarding Officers Griswold, Christie, and Crawford taking "wrong positions," "improperly parking" police cars, and speaking with Seidle, thereby failing to "wait[] for command or coordinat[e] the response," the Court finds that, again, Plaintiffs are merely recasting inaction as action. Regarding Officer Lawson's running from the scene, Plaintiffs fail to indicate that such action, assuming for the purposes of this motion to dismiss that it even occurred,[13] demonstrates that Officer Lawson used his authority in such a way as to "create an opportunity that would not otherwise have existed." *Mark*, 51 F.3d at 1152. "[T]he Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not

---

[13] Plaintiffs simultaneously plead that Officer Lawson ran away from the scene, while also pleading that Officer Lawson was present for the police standoff that preceded Seidle firing a second round of shots into Tamara's vehicle. (*Compare* TAC ¶ 613 *with, id.* ¶ 197.)

deprive the individual." *DeShaney*, 489 U.S. at 196 (citing *Harris v. McRae*, 448 U.S. 297, 317-18 (1980)). "[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197. Here, Officer Lawson's alleged running from the scene, assuming it is not merely Plaintiffs' attempt to allege Officer Lawson failed to intervene, does not rise to the level of a constitutional violation because it did not put Tamara in a more dangerous position than had he not acted at all. *See, e.g.*, *White v. City of Phila.*, 118 F. Supp. 2d 564, 571-72 (E.D. Pa. 2000) ("The [o]fficers did nothing to place [the victim] in jeopardy—they only failed to protect [her] from private violence. Such inaction does not create liability.").

Finally, regarding Officer Lawson's yelling "shots fired" instead of "active shooter," the Court finds Plaintiffs failed to allege any facts that would support their assertion that there is a meaningful difference between those two phrases. Assuming there was such a difference, Plaintiffs fail to support their argument that Officer Lawson's use of one phrase rather than the other made Tamara in any way more vulnerable. Rather, Plaintiffs aver that,

> [t]he words ["]shots fired" is a meaningless phrase devoid of any intelligent communication that would alert other responders and dispatch of the situation to be addressed, creating havoc, confusion and chaos resulting in placing Tamara in greater danger . . . .

(TAC ¶ 170.) Those bald allegations, however, are unsupported by any other facts and are therefore insufficient to support a state-created danger claim against Officer Lawson.

The Court, accordingly, finds Plaintiffs failed to sufficiently allege facts to support their state-created danger claims and therefore dismisses with prejudice Count Eight of the Third Amended Complaint. Because the Court finds Plaintiffs have insufficiently supported the claims, the Court does not reach the issue of qualified immunity.

## B.  Plaintiffs' State Law Claims

The Court next turns to Plaintiffs' state law claims.  Plaintiffs bring claims for violation of the New Jersey Civil Rights Act, common law negligence, and wrongful death.

### 1.  New Jersey Civil Rights Act Claims Against all Defendants (Count Nine)

Plaintiffs allege state constitutional claims against all Defendants pursuant to the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2 ("NJCRA").  The NJCRA "was modeled after § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitution[]." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). The NJCRA provides in pertinent part,

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. Stat. Ann. § 10:6-2(c).  "This Court has repeatedly interpreted NJCRA analogously to § 1983." *Wang v. N.J. State Police*, No. 18-11933, 2019 WL 3887126, at *8 n.5 (D.N.J. Aug. 19, 2019) (citations omitted).

Preliminarily, the Court notes that Plaintiffs failed to specify which New Jersey constitutional provision Defendants allegedly violated.  *See, e.g., Celestine v. Foley*, No. 10-1775, 2010 WL 5186145, at *6 (D.N.J. Dec. 14, 2010) (dismissing the plaintiff's NJCRA claims because the "[p]laintiff failed to identify which New Jersey State constitutional provisions [the d]efendants allegedly violated").  Plaintiffs, however, clearly intended for their NJCRA claims to be coextensive with their § 1983 claims, and therefore the Court declines to dismiss

Plaintiffs' NJCRA claims solely for that oversight. (*See* TAC ¶ 668 ("The factual allegations in the [Third Amended] Complaint supporting liability under . . . Section 1983 as set forth herein also support a cause of action under the [NJCRA] . . . .").) Accordingly, because the NJCRA is analogous to § 1983, the Court grants in part and denies in part Defendants' Motions to Dismiss the NJCRA claims in a manner consistent with Section A above.

## 2. Negligence Against All Defendants (Count Ten)

To sustain a cause of action for negligence, a plaintiff must establish four elements: "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015) (quoting *Polzo v. Cty. of Essex*, 960 A.2d 375, 384 (N.J. 2008)). "The most common test of negligence . . . is whether the consequences of the alleged wrongful act were reasonably to be foreseen as injurious to others coming within the range of such acts." *Di Cosala v. Kay*, 450 A.2d 508, 517 (N.J. 1983) (citation omitted); *see also Rappaport v. Nichols*, 156 A.2d 1, 8 (N.J. 1959) ("Negligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others."), *superseded by statute on other grounds*; *Tose v. Greate Bay Hotel & Casino Inc.*, 819 F. Supp. 1312, 1321 (D.N.J. 1993).

Defendants all argue the New Jersey Tort Claims Act (the "Act" or "TCA") immunizes them from Plaintiffs' negligence claims. As a general matter, public entities are not liable for any injury caused unless the Act stipulates such liability. *See* N.J. Stat. Ann. § 59:2-1. "[The] most important command of the Act [is] . . . that the immunities set forth in the Act prevail over any liabilities, whether found in the Act or in preexisting law, including statutes." *Tice v. Cramer*, 627 A.2d 1090, 1103 (N.J. 1993); *see also* N.J. Stat. Ann. §§ 59:2-1b–3-1b. "[I]mmunity for public entities is the general rule and liability is the exception." *Parsons ex rel Parsons v. Mullica Twp. Bd. of Educ.*, 142 A.3d 715, 718 (N.J. 2016).

The Act provides in relevant part,

> Neither a public entity nor a public employee is liable for failure to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service.

N.J. Stat. Ann. § 59:5-4. Although this statute reads broadly, the New Jersey Supreme Court has held that the Act does not provide complete immunity from all tort liability arising out of acts or omissions, and police officers may be subject to liability for negligence in the performance of their ministerial (as opposed to discretionary) duties. *Lee v. Doe*, 557 A.2d 1045, 1049-50 (N.J. Super. Ct. App. Div. 1989). "A discretionary act . . . calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *S.P. v. Newark Police Dep't*, 52 A.3d 178, 190 (N.J. Super. Ct. App. Div. 2012) (omission in original) (internal quotation marks and citation omitted). A ministerial act, on the other hand, is one that "a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his [or her] own judgment upon the propriety of the act being done." *Id.* (citation omitted).

Preliminarily, the Court notes that it is unclear which specific duties Plaintiffs allege against which specific Defendants because Plaintiffs, again, resort to group pleading.[14] (*See, e.g.*, TAC ¶ 683 (alleging, in a nearly two-page paragraph all duties against all Defendants and relying upon the facts set forth in the preceding 682 paragraphs).) Regarding Sergeant Love, and Officers Lawson, Christie, Griswold, and Crawford, Plaintiffs allege that they "had a duty to act

---

[14] The flaw in Plaintiffs' group pleading method is further underscored by their failure to name any duty as it pertains to Deputy Chief David Kelso and former Police Chief Anthony Salerno. Because Plaintiffs fail to explicitly plead any duty pertaining to those defendants, the Court dismisses with prejudice Plaintiffs' negligence-based claims against Kelso and Salerno.

reasonably in their performance and actions," and it appears that Plaintiffs rely on their assertion that those officers failed to use deadly force. (*Id.*)

To the extent Plaintiffs base their negligence claims on the Asbury Park Defendants' response to the events that unfolded during the standoff, such as the Asbury Park Defendants' taking improper tactical cover and parking cars, speaking to Seidle "without first waiting for command," yelling "shots fired,"[15] and "creating panic," the Court finds these acts are discretionary. (TAC ¶¶ 197-200, 613, 617, 621, 625.)

Regarding the Neptune Defendants, Plaintiffs allege that they had a duty to hire, train, supervise, and discipline Seidle, as well as to decline to return Seidle's firearm. (*Id.* ¶ 683.) Further, Plaintiffs allege that Chief Adams, Hunt, and O'Neil "undertook a duty to protect Tamara under the applicable domestic violence guidelines." (*Id.*) Disciplinary decisions and decisions to rearm officers are generally discretionary in nature. *See Love v. Essex Cty. Prosecutor's Office*, No. 4743-03, 2006 WL 435390, at *4 (N.J. Super. Ct. App. Div. 2006) (per curiam) (finding the decision to rearm a police officer was a discretionary act); *Denis v. City of Newark*, 704 A.2d 1003, 1009 (N.J. Super. Ct. App. Div. 1998) (declining to address whether a municipality is immunized from liability, but stating that "[w]hether to discharge or retain a police officer after he or she has been charged with official misconduct is, of course, a discretionary decision"); *see also Bilbili v. Klein*, No. 02-2953, 2005 WL 1397016, at *11-12 (D.N.J. 2005) (reviewing *Denis* and finding the defendants were entitled to immunity because, under N.J. Admin. Code § 4A:2-25(a)(1), "an employer having the authority to suspend an

---

[15] Plaintiffs argue that Asbury Park lacks a proper procedure pertaining to active shooter situations. (*See* TAC ¶ 41 (alleging that Asbury Park knew and was deliberately indifferent to its lack of procedures pertaining to active shooter situations).) As such, Officer Lawson's yelling "shots fired" instead of "active shooter" could not have been a ministerial act performed pursuant to "the mandate of legal authority, without regard to or the exercise of his own judgment," because, as Plaintiffs themselves aver, there is no policy established regarding such circumstances. *Newark Police Dep't*, 52 A.3d at 191.

employee must necessarily exercise personal discretion and judgment in making his [or her] decision"), *aff'd*, 249 F. App'x 284 (3d Cir. 2007). Here, the Court finds the disciplinary decisions and decisions pertaining to Seidle's weapon were similarly discretionary in nature.

Determining whether Chief Adams, Hunt, or O'Neil are entitled to immunity due to their alleged failure to properly act out their duties with respect to enforcing domestic violence guidelines is a more difficult inquiry. The Court, however, ultimately finds that Chief Adams, Hunt, and O'Neil are also immune. Plaintiffs' allegations rely on the proposition that Chief Adams, Hunt and O'Neil failed to comply with the New Jersey Attorney General's domestic violence guidelines. (*See, e.g.*, TAC ¶ 296.) The New Jersey Superior Court, Appellate Division, has held that certain New Jersey Attorney General Guidelines have "the force of law for police entities." *E.g.*, *O'Shea v. Twp. of W. Milford*, 982 A.2d 459, 465-66 (N.J. Super. Ct. App. Div. 2009) ("Th[e Attorney General G]uidelines . . . cannot be ignored . . . . [T]hey are binding and enforceable on local law enforcement agencies."). Police officers, however, are immune from suit regarding allegations that they failed to enforce the law. *See* N.J. Stat. Ann. § 59:3-5. Thus, despite the significant deference New Jersey affords the Attorney General Guidelines, this Court finds Chief Adams, Hunt, and O'Neil are immune from Plaintiffs' negligence claims due to the TCA's "broad immunity protection" for claims arising from alleged failures to enforce the law. *See* N.J. Stat. Ann. § 59:5-4 ("[A] public employee is [not] liable for failure to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service."); *Ogborne v. Mercer Cemetery Corp.*, 963 A.2d 828, 835 (N.J. 2009).

To the extent Plaintiffs allege that any Defendants had a duty to use lethal force, the Court finds no such legal duty exists. "Central to the determination of whether a duty does or should exist is a value judgment, based on an analysis of public policy, and notions of fairness."

34

*Acuna v. Turkish*, 930 A.2d 416, 424 (N.J. 2007) (internal quotation marks and citations omitted). "In weighing competing public policy concerns, courts must consider the real-life consequences of imposing a duty and cannot be oblivious of the social realities of the day." *Id.* For the reasons previously discussed, the Court finds imposing a duty to use lethal force is contrary to public policy, *see supra* A(iii)(2), and would interfere with "[t]he deep-rooted nature of law-enforcement discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005).

Finally, when individuals are immune from liability under the TCA, so too are the municipalities. *Bilbili*, 2005 WL 1397016, at *12 ("A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." (quoting N.J. Stat. Ann. § 59:2-2(b))). The Court, accordingly, dismisses with prejudice Plaintiffs' negligence claims against the Asbury Park Defendants, the Neptune Defendants, and Sergeant Love. Further, because the Court dismisses Plaintiffs' negligence claims, Plaintiffs' derivative wrongful death claims are also dismissed with prejudice.

### 3. Negligent and Intentional Infliction of Emotional Distress and *Portee* Claims Against All Defendants (Counts Thirteen and Fourteen)

To state a claim for intentional infliction of emotional distress, a plaintiff must plead facts showing "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Taylor v. Metzger*, 706 A.2d 685, 694 (N.J. 1998) (citation omitted). "To recover for negligent infliction of emotional distress, a plaintiff must demonstrate that the defendant's negligent conduct placed the plaintiff in reasonable fear of immediate personal injury, which gave rise to emotional distress that resulted in substantial bodily injury or sickness." *Thomas v. E. Orange Bd. of Educ.*, 998 F. Supp. 2d 338, 355 (D.N.J. 2014) (citation omitted). Alternatively, to sufficiently plead a *Portee* claim, a plaintiff must demonstrate that the defendant's negligent conduct caused the death or serious injury of another individual with

whom the plaintiff had a sufficient "familial relationship," that the plaintiff witnessed the death or injury, and that the plaintiff experienced "resulting severe emotional distress." 417 A.2d at 528.

Here, Plaintiffs' Third Amended Complaint fails to raise a plausible right to relief because it completely lacks any alleged facts that Defendants intended to cause Plaintiffs emotional distress, and for that reason alone Plaintiffs' intentional infliction of emotional distress claim fails. *See, e.g., Buckley v. Trenton Sav. Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988) ("For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress."). Moreover, because the Court dismissed Plaintiffs' negligence claims, any derivative claim, including the negligent infliction of emotional distress claim, must also be dismissed. *See Abramson*, 2011 WL 2149454, at *5. The Court, accordingly, dismisses with prejudice Counts Thirteen and Fourteen of the Third Amended Complaint.

## IV.     CONCLUSION

The Court grants in part and denies in part Defendants' Motions to Dismiss. The Court grants Defendants' Motions to Dismiss Counts Five and Nine (only as they pertain to the Individual Asbury Park Defendants' failure to use lethal force), Eight, Ten, Eleven, Thirteen, and Fourteen of Plaintiffs' Third Amended Complaint, and the Court dismisses with prejudice those counts. The Court denies Defendants' Motions to Dismiss Counts One, Two, Three, Four, and the balance of Counts Five and Nine of Plaintiffs' Third Amended Complaint. The Court will enter an order consistent with this Memorandum Opinion.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

**Dated:** October 31, 2019