**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| KIRSTEN SEIDLE *as Administratrix of the Estate of Tamara Wilson-Seidle*, *et al.*, | |
| Plaintiffs, | Civil Action No. 17-4428 (MAS) (LHG) |
| v. | **MEMORANDUM OPINION** |
| NEPTUNE TOWNSHIP, et al., | |
| Defendants. | |

**SHIPP, District Judge**

      This matter comes before the Court upon Defendants Monmouth County Prosecutor's Office ("MCPO"), Christopher Gramiccioni, Gregory J. Schweers, Jacquelynn F. Seely, and Richard E. Incremona's (together, "Prosecutor Defendants," collectively with MCPO, "Defendants") Motion to Dismiss Plaintiffs Kirsten Seidle, personally, and as Administratrix of the Estate of Tamara Wilson-Seidle, Philip Seidle, Jr., John Seidle, Christopher Seidle, Monica Seidle, Dorothy Seidle, Maria Seidle, and Stephen Seidle's (collectively, "Plaintiffs") Third Amended Complaint. (ECF No. 204.) Plaintiffs opposed (ECF No. 217), and Defendants replied (ECF No. 220). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendants' Motion to Dismiss is granted in part and denied in part.

## I.   BACKGROUND

The Court assumes familiarity with the factual background of this matter and, therefore, only includes the facts necessary to decide the instant motion. This action arises out of the killing of Tamara Wilson-Seidle ("Tamara") on June 16, 2015 by her former husband, Philip Seidle ("Seidle"). (Third Am. Compl. ("TAC") ¶ 27, ECF No. 110.) Tamara and Seidle married in 1990 and, over the course of twenty-seven years, had nine children together. (*Id.* ¶ 66.) Plaintiffs' TAC alleges a long history of domestic violence between Seidle and Tamara. (*Id.* ¶ 68.)

Seidle was employed by Neptune Township and the Neptune Township Police Department as a law enforcement officer, first as a police officer and then as a Sergeant, for approximately twenty-one years as of June 16, 2015. (*Id.* ¶¶ 4, 67.) The TAC alleges that Seidle had a "known and documented history of mental instability, fitness for duty problems, temperament, emotional and psychological problems requiring anger management and other related psychological care and counselling[.]" (*Id.* ¶ 48.) For example, Plaintiffs maintain that excessive force complaints, beginning as early as 2004 allege "that Seidle threw a man on top of a police cruiser and then punched him in the jaw and kicked him in the ribs. Another claims he hit a man on a bicycle with his police car and then kneed and kicked him." (*Id.* ¶ 92.)

Plaintiffs also allege that the MCPO and Prosecutor Defendants "knew that Seidle was disciplined almost every year for three (3) years prior to the shooting, that he had been suspended and had on multiple occasions been found unfit for duty." (*Id.* ¶ 141.) For example, Plaintiffs allege that Defendants were "aware of affidavits [from] Seidle" relating to a 2012 suspension "establishing that Tamara had in fact called the police and told them that she feared for her safety, noting physical abuse." (*Id.* ¶ 142.) According to Plaintiffs, in that affidavit, Seidle avers that he "was later told by two sergeants that Tamara told them I went at her in a menacing manner and

2

that she feared for her safety. She also accused me of abusing her, and putting a gun to her head and pulling the trigger in the past." (*Id.* ¶ 88.) The TAC asserts that Seidle had been "found unfit for duty or psychologically unstable in 2012, 2013, 2014[,] and 2015 up to and including the date of the shooting[.]" (*Id.* ¶ 29.)

Plaintiffs maintain that together with Neptune Township Police officials, the MCPO and Prosecutor Defendants are alleged to have had disciplinary authority over Seidle.[1] (*Id.* ¶ 144 ("Upon information and belief[,] in or about 2013[,] Gramiccioni, Schweers, Seely[,] and Incremona were personally involved in the decision to allow Seidle to again use his gun, and again in 2014 and 2015 were involved in determining how and under what circumstances Seidle would again be disciplined.").) Plaintiffs allege that the MCPO, Gramiccioni, Schweers, Seely, and Incremona were aware of Seidle's troubled history but nevertheless, on multiple occasions, "permitted and allowed Seidle to possess and use a weapon, and reinstated his weapon to him without conditions." (*Id.* ¶ 48.) Plaintiffs assert that "[t]he discipline imposed by these individuals in conjunction with Neptune was insufficient, inadequate[,] and ineffective." (*Id.* ¶ 145.) With respect to Gramiccioni specifically, Plaintiffs allege that he "failed to properly supervise, monitor[,] and train the individually named [Assistant] Prosecutors Schweers, Seely[,] and Incremona in [the] handling of domestic violence and use of force incidents by law enforcement officers within their jurisdiction, including Seidle," which was "a direct and proximate cause of the shooting and death of Tamara." (*Id.* ¶ 50.)

Plaintiffs commenced this action on June 16, 2017. (ECF No. 1.) On April 19, 2018, the Court dismissed Plaintiffs' First Amended Complaint because of its failure to meet the

---

[1] In a prior opinion, the Court granted in part and denied in part a motion to dismiss brought by the Neptune Township Police. *Seidle v. Neptune Twp.*, No. 17-4428, 2019 WL 5685731 (D.N.J. Oct. 31, 2019).

requirements of Federal Rule of Civil Procedure 8(a).  (*See* Apr. 19, 2018 Op. 3-4, ECF No. 76.)
Among other things, "the Court dismissed with prejudice Plaintiffs' claims against the [MCPO]
and Prosecutor Gramiccioni in their official capacities and in connection with their law
enforcement investigatory functions." *Seidle*, 2019 WL 5685731, at *2 (citing (Apr. 19, 2018 Op.
8)).  While dismissing claims against MCPO and Gramiccioni in their official capacities, the Court
"ma[de] no finding as to whether specific actions were administrative or investigatory/law
enforcement functions."  (Apr. 19, 2018 Op. 9.)  Moreover, the Court also noted that "other
sovereign immunity or governmental immunity doctrines may be applicable and makes no
determinations on these issues at this time."  (*Id.*)  Plaintiffs' Second Amended Complaint was
ultimately dismissed for failure to cure the Rule 8(a) deficiencies present in the First Amended
Complaint. *Seidle*, 2019 WL 5685731, at *2.

Plaintiffs filed the TAC on January 25, 2019.  (*See* TAC.)   In a parallel state court
proceeding, the MCPO and its employees litigated the State's duty to defend and indemnify them
in this matter. *See generally Gramiccioni v. Dep't of L. & Pub. Safety*, 235 A.3d 129 (N.J. 2020).
On July 27, 2020, the Court administratively terminated a motion to dismiss filed on behalf of the
MCPO and its employees pending the resolution of the state court litigation.  (Order to Show Cause
2, ECF No. 183.)  The July 27, 2020 Order found that the state court litigation might determine
"which allegations in the Third Amended Complaint fell within classic law enforcement or
investigatory actions."  (*Id.*)  After the New Jersey Supreme Court resolved *Gramiccioni*, this
Court denied Defendants' prior motion to dismiss without prejudice while also granting them leave
to file a renewed motion to dismiss.  (ECF No. 193.)  The Defendants filed a renewed motion to
dismiss on September 25, 2020.  (ECF No. 204.)

4

## II.     LEGAL STANDARD

District courts undertake a three-part analysis when considering a motion to dismiss

pursuant to Federal Rule of Civil Procedure 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d

Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a

claim.'" *Id*. (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second,

the court must accept as true all of the plaintiff's well-pled factual allegations and "construe the

complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203,

210 (3d Cir. 2009) (internal quotation marks and citation omitted). In doing so, the court is free

to ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-

unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

555 (2007)). "[M]ere restatements of the elements of [a] claim[] . . . are not entitled to the

assumption of truth." *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) (alterations

in original) (internal quotation marks and citation omitted). Finally, the court must determine

whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible

claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). "The defendant bears

the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744,

750 (3d Cir. 2005) (citation omitted).

"Rule 12 prohibits the court from considering matters outside the pleadings in ruling on a

motion to dismiss for failure to state a claim . . . and a court's consideration of matters outside the

pleadings converts the motion to a motion for summary judgment." *Kimbugwe v. United States*,

No. 12-7940, 2014 WL 6667959, at *3 (D.N.J. Nov. 24, 2014). "[A]n exception to the general

rule is that a document integral to or explicitly relied upon in the complaint may be considered

without converting the motion [to dismiss] into one for summary judgment." *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (second alteration in original) (emphasis omitted) (internal quotation marks omitted).  Notwithstanding these principles, courts may not consider claims raised for the first time in a plaintiff's opposition to a motion to dismiss. *See Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (internal quotation marks and citation omitted)).

## III.   DISCUSSION

### A.   Federal Law Claims

#### 1.   Count VI – Monmouth County Prosecutor's Office (*Monell*)

Plaintiffs assert that "[i]n light of the [New Jersey] Supreme Court's ruling" in *Gramiccioni v. Dep't of L. & Pub. Safety*, 235 A.3d 129, 144 (N.J. 2020), "which now makes applicable the Eleventh Amendment immunity, Plaintiffs consent to dismissal of the suit against the MCPO as an entity[.]"  (Pls.' Opp'n Br. 1-2, ECF No. 217.)  Accordingly, with the consent and agreement of the parties, the Court will dismiss Plaintiffs' *Monell* claim against the MCPO. *See Turner v. New Jersey*, No. 20-533, 2021 WL 926597, at \*4 (D.N.J. Mar. 11, 2021) ("[N]o answer or motion for summary judgment has been filed [by the opposing party], and the State's motion to dismiss 'does not cut off' [Federal] Rule [of Civil Procedure] 41(a)(1) because it is not an answer or motion for summary judgment." (quoting *In re Bath & Kitchen Fixtures Antitrust Litig.*, 535 F.3d 161, 166 (3d Cir. 2008))).

#### 2.   Count VII – Gramiccioni, Schweers, Seely, Incremona (Individual 42 U.S.C. § 1983 Claims)

Separate and apart from their *Monell* claim against MCPO, Plaintiffs bring Section 1983 claims against Gramiccioni, Schweers, Seely, and Incremona as individual prosecutors who either

6

personally participated in the decision to rearm Seidle or otherwise failed to train and supervise prosecutors who made the decision to rearm Seidle. (*See, e.g.*, TAC ¶ 515.) Plaintiffs allege that "as a direct and proximate result of" their "policy of deliberate indifference, Tamara was deprived of her right to life under the 4th and 14th Amendments[.]" (*Id.* ¶¶ 517, 529, 541, 553.) In their opposition brief, Plaintiffs assert that "[i]n light of the [New Jersey] Supreme Court's ruling . . . Plaintiff[s] consent[] to dismissal of the suit against . . . all the individual defendants in their official capacities[.]" (Pls.' Opp'n Br. 1-2.) Plaintiffs maintain, however, that "Eleventh Amendment immunity applies only to state entities, and those who act in their official capacity on behalf of the state. It does *not* apply to those sued in their individual capacities, even if employed by the state or arms of the state." (*Id.* at 14 (citing *Estate of Lagano v. Bergen Cnty. Prosecutor's Office*, 769 F.3d 850, 854 (3d Cir. 2014)).)

The Court agrees with Plaintiffs that following *Gramiccioni*, there can be little doubt that Eleventh Amendment immunity defeats their claims as to MCPO and its employees in their official capacities. In *Gramiccioni*, the New Jersey Supreme Court held that "[t]he decisions of the MCPO defendants who considered whether Seidle could be re-armed and then remain armed were prosecutorial functions exercised on behalf of the State." *Gramiccioni*, 235 A.3d at 144. Accordingly, if the MCPO acted as an arm of the State while implementing policies that allowed Seidle to be rearmed, the office cannot be held liable for *Monell* violations. *See, e.g.*, *Rouse v. N.J. Dep't of Health & Hum. Servs.*, No. 15-1511, 2015 WL 5996324, at *4 (D.N.J. Oct. 13, 2015) ("having found that . . . the Hudson County Prosecutors Office [is an] 'arm[] of the state' for Eleventh Amendment purposes, this [c]ourt need not analyze whether [p]laintiff has sufficiently ple[d] a claim of *Monell* liability as against these [d]efendants"). Importantly for the Prosecutor Defendants, where "officials acted in their official capacities as agents of the State, they qualify

7

for Eleventh Amendment immunity." *Hyatt v. Cnty. of Passaic*, 340 F. App'x 833, 837 (3d Cir. 2009). In light of the MCPO's immunity, Gramiccioni, Schweers, Seely, and Incremona are immune to Section 1983 claims insofar as they are sued in their official capacities.

Nevertheless, as Plaintiffs argue, "to the extent these state employees are named in their individual capacities, they are amenable to suit under § 1983 as 'persons.'" *Harris v. Soto*, No. 16-2551, 2016 WL 7391037, at *5 (D.N.J. 21, 2016) (quoting 42 U.S.C. § 1983). "[O]fficials sued in their personal capacities," however, "unlike those sued in their official capacities, may assert personal immunity defenses[.]" *Evans v. City of Newark*, No. 14-120, 2016 WL 2742862, at *10 (D.N.J. May 10, 2016).

Here, Gramiccioni, Schweers, Seely, and Incremona assert that they are entitled to qualified immunity as to Plaintiffs' Section 1983 claims. *See Couden v. Duffy*, 446 F.3d 483, 492 (3d Cir. 2006) ("Under certain circumstances, government officials are protected from . . . § 1983 suits by qualified immunity."). "Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action." *Mahmoud v. City of Paterson*, No. 10-5711, 2014 WL 2155370, at *6 (D.N.J. May 22, 2014), *aff'd*, 611 F. App'x 95 (3d Cir. 2015). "But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken with independence and without fear of consequences." *Id.* (internal quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)).

"In considering whether qualified immunity applies, a court must first decide whether the facts, taken in the light most favorable to the plaintiff, demonstrate a constitutional violation." *Couden*, 446 F.3d at 492 (citing *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002)). Second, a

8

court "determines whether the constitutional right in question was clearly established." *Id.* (citing *Curley*, 298 F.3d at 277). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). "Under qualified immunity, government officials are not subject to damages liability for the performance of their discretionary functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Fogle v. Sokol*, 957 F.3d 148, 158 (3d Cir. 2020) (internal quotation marks and citation omitted). Defendants have the burden of demonstrating they are entitled to qualified immunity. *Reedy v. Evanson*, 615 F.3d 197, 223 (3d Cir. 2010).

### a.     Failure to Discipline Seidle

In conjunction with the Neptune Township Police officials, the Prosecutor Defendants are alleged to have had disciplinary authority over Seidle. (TAC ¶ 144 ("Upon information and belief[,] in or about 2013[,] Gramiccioni, Schweers, Seely and Incremona were personally involved in the decision to allow Seidle to again use his gun, and again in 2014 and 2015 were involved in determining how and under what circumstances Seidle would again be disciplined.").) Plaintiffs assert that "[t]he discipline imposed by these individuals in conjunction with Neptune was insufficient, inadequate and ineffective." (*Id.* ¶ 145.) In an earlier opinion, the Court found that "construing the facts alleged in the Third Amended Complaint as true and in the light most favorable to Plaintiffs, the [Neptune police officials'] repeated failure to respond to Tamara's domestic violence complaints and failure to discipline Seidle for those complaints may constitute a violation of her clearly established rights." *Seidle*, 2019 WL 5685731, at *11.

In contrast to the Neptune Township Police officials, however, it is not clearly established that the MCPO or the Prosecutor Defendants actually had disciplinary authority over Seidle. As the Prosecutor Defendants argue, New Jersey law provides that *municipalities* "by ordinance, may create and establish . . . a police force . . . and provide for the maintenance, regulation and control thereof." N.J. Stat. Ann. § 40A:14-118.

> Any such ordinance, or rules and regulations, shall provide that *the chief of police*, if such position is established, shall be the head of the police force and that he shall be directly responsible to the appropriate authority for the efficiency and routine day to day operations thereof, and that he shall, pursuant to policies established by the appropriate authority[,] . . . [a]dminister and enforce rules and regulations and special emergency directives for the disposition and *discipline* of the force and its officers and personnel[.]

N.J. Stat. Ann. § 40A:14-118(a) (emphasis added). Pursuant to Section 118, Neptune Township has created a police force with both a "Police Committee" designated as the "appropriate authority" for establishing disciplinary rules,[2] Neptune Twp. Ordinances §§ 2-10.1, 2-10.2, and a Chief of Police in charge of administering and enforcing those rules, Neptune Twp. Ordinances § 2-10.3(c).

Under these circumstances, the Court finds that the Prosecutor Defendants have met their burden of establishing their entitlement to qualified immunity for the alleged failure to discipline Seidle. Here, as a matter of law, it appears that Defendants engaged in no conduct whatsoever with respect to disciplining Seidle. *Compare with Mahmoud*, 611 F. App'x at 96, 98 (dismissing officer's Section 1983 claim against individual police officials for discrimination where, although the police chief "recommended" plaintiff not be rearmed, the decision not to rearm him "was ultimately decided by the [p]rosecutor"). Reasonable persons in the Prosecutor Defendants' shoes

---

[2] "The Police Committee shall report to the Township Committee and shall be responsible to review the performance of the Police Department and report such to the Township Committee. It shall serve as the administrative and oversight body of the Police Department." Neptune Twp. Ordinance § 2-10.3(b)(1).

would not have known that their failure to discipline Seidle where they lacked legal authority to do so may have violated Tamara's constitutional rights. Accordingly, the Prosecutor Defendants are entitled to qualified immunity for their alleged failure to discipline Seidle.

### b.  Decision to Rearm Seidle

The Court reaches a different result, however, with respect to the Prosecutor Defendants' qualified immunity for Section 1983 liability arising from their decision to rearm Seidle.

As the New Jersey Supreme Court observed, "the [New Jersey] Attorney General has been given statutory authority to guide law enforcement entities" and "that authority has been used to adopt guidelines, directives, and policies for law enforcement in this state." *Gramiccioni*, 235 A.3d at 142 (internal quotation marks and citation omitted).  Pursuant to that authority, "[t]he Attorney General issued Attorney General Law Enforcement Directive No. 2000-3 (the 'Directive') to promote the uniform and expeditious handling of domestic violence issues involving a special subset of individuals: law enforcement officers – individuals who are authorized to carry state-issued weapons in the cause of law enforcement." *Id.*

"[T]he Directive specifically details a unique series of procedures to be followed when an act of domestic violence is committed by a law enforcement officer and mandates that all law enforcement agencies and law enforcement officers authorized to carry firearms comply with the Directive." *Id.* at 142-43.  The Directive's "uniform procedures . . . require the county prosecutor's personnel to act in the role of a neutral assessor of the propriety of re-arming an officer in those circumstances and not leave such decisions entirely to colleagues with whom the officer serves." *Id.* at 143; *see also Mahmoud*, 2014 WL 2155370, at *4 ("[t]he Directive clearly sets forth that the seizure or return of the weapon [from municipal law enforcement officers involved in domestic violence incidents] is within the discretion of the County Prosecutor's Office").  While "N.J.S.A.

2C:25-21(d)(1) broadly covers seized weapons taken from any domestic violence perpetrator and addresses the means for the weapons' ultimate return to their owner via a civil proceeding[,]" *Gramiccioni*, 235 A.3d at 142, the Attorney General's directive "is, in essence, a form of specialized enforcement of the domestic violence law as it relates to a subset of individuals." *Id.* at 143. The New Jersey Supreme Court observed that "the Directive's instructions are vitally important because the Attorney General is rightfully concerned about the care and circumspection necessary for a fair and correct decision about whether to re-arm a law enforcement officer accused of domestic violence." *Id.*

In the case at bar, Plaintiffs bring Section 1983 claims against Gramiccioni, Schweers, Seely, and Incremona as individual prosecutors who either personally participated in the decision to rearm Seidle or otherwise failed to train and supervise prosecutors who made the decision to rearm Seidle pursuant to the Attorney General's Directive, notwithstanding their knowledge of Seidle's history of domestic violence. (*See, e.g.*, TAC ¶¶ 513-15, 521, 531, 545.) In its opinion, the New Jersey Supreme Court held that Tamara was murdered "using [Seidle's] service weapon."[3] *Gramiccioni*, 235 A.3d. at 132. Plaintiffs allege that "as a direct and proximate result of" their "policy of deliberate indifference, Tamara was deprived of her right to life under the 4th and 14th Amendments[.]" (TAC ¶¶ 517, 529, 541, 553.)

There is case law establishing that officials may be ineligible for qualified immunity for Fourth and Fourteenth Amendment violations where they "had the sole de jure responsibility to authorize rearming" of a police officer who later used his service weapon to violate a citizen's constitutional rights. *See, e.g.*, *Camilo-Robles v. Hoyos*, 151 F.3d 1, 14 (1st Cir. 1998). In *Camilo-*

---

[3] When resolving "a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint." *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426 (3d Cir. 1999).

*Robles*, an officer had a long, troubled history reflecting at least eighteen "disciplinary infractions involving violent and/or threatening behavior . . . many of which entailed unwarranted brandishing of his weapon." *Id.* at 5. "The denouement occurred in August 1989 when, after assaulting his wife, [the officer] entered the Catano police station, seized a shotgun, and held several gendarmes (including the acting police superintendent) hostage for several hours." *Id.* The officer was involuntarily committed to a psychiatric hospital and eventually diagnosed as schizophrenic. *Id.* Nevertheless, doctors employed by the police department eventually found him free from mental illness and fit for active duty. *Id.* The officer eventually shot and killed one of two "unarmed, law-abiding neighborhood residents" in an area he was patrolling. *Id.* Although "[t]he police department immediately confiscated his weapon[,]" it was eventually returned to him after the department's doctors "again declared him ready for unrestricted active duty and fit to carry a weapon." *Id.*

Finally, after many incidents, the officer "sought to park in an area reserved for judges at the Bayamon Judicial Center." *Id.* at 4. A security guard told the officer that he could not park in that area. *Id.* "In response to this perceived affront, [the officer] placed his hand on his gun, arrested [the security guard], handcuffed him, shoved the prisoner into [the officer's] police cruiser, and drove to the station house (pausing to punch [the security guard] in the stomach and slap him in the face)." *Id.* The First Circuit found the officials' decision to rearm the officer was unreasonable and ineligible for qualified immunity. *Id.* at 15. With regard to the police superintendent specifically, the First Circuit found that the superintendent knew of the troubled officer's:

> vicious propensities and the peril presented; he had the sole de jure
> responsibility to authorize rearming; and yet he treated [the officer]
> not as a dangerous sociopath, but as any other officer. To cinch
> matters, a causal relationship existed between [the police

13

> superintendent's] conduct and the incident at the Bayamon Judicial
> Center. We think that the police superintendent's latitudinarian
> approach in the face of [the officer's] patent instability was so far
> outside the realm of reasonableness that it rendered him ineligible
> for protection under the qualified immunity doctrine.

*Id.* at 14-15.

Here, just as in *Camilo-Robles*, it appears that the Prosecutor Defendants had discretionary authority over whether or not to rearm Seidle. *Gramiccioni*, 235 A.3d at 142 (finding that because Seidle "was a law enforcement officer accused of domestic violence on multiple occasions, the normal rules governing the return of seized weapons to an alleged perpetrator were superseded by specialized guidelines vesting prosecutors with crucial discretionary decisions"); *Mahmoud*, 2014 WL 2155370, at *4 ("The Directive clearly sets forth that the seizure or return of the weapon [from municipal law enforcement officers involved in domestic violence incidents] is within the discretion of the County Prosecutor's Office[.]"). There are, of course, some ways in which the officer's history in *Camilo-Robles* was arguably more egregious than Seidle's conduct as alleged in the TAC. Nevertheless, the TAC makes a number of disturbing allegations relating to Seidle's pre-2015 conduct, including that officials knew that Tamara alleged that Seidle had previously "abus[ed] her, and put[] a gun to her head and pull[ed] the trigger in the past." (TAC ¶ 88.) Accordingly, similar to *Camilo-Robles*, the Court finds that in light of such allegations, the Prosecutor Defendants' have not met their burden of establishing their entitlement to qualified immunity for their decision to rearm Seidle.

Furthermore, in its October 31, 2019 Opinion, the Court found it premature to address whether police officials were entitled to qualified immunity for allegedly "allow[ing] Seidle to retain his service weapon despite [his] violent history[.]" *Seidle*, 2019 WL 5685731, at *10. "The Court, accordingly, decline[d] to dismiss Plaintiffs' claims against the Individual Neptune

Defendants at this early stage of the litigation and [found] the matter best addressed at summary judgment." *Id.* at *11. The Court's October 2019 Opinion declining to address qualified immunity at the motion to dismiss stage is consistent with a number of other Section 1983 actions in this District considering whether individual officials were entitled to qualified immunity for their decisions on whether or not to rearm an officer. *See, e.g., Mahmoud v. City of Paterson*, 611 F. App'x 95 (3d Cir. 2015) (affirming a summary judgment decision that police officials were entitled to qualified immunity for decision not to rearm police officer); *Estate of Soberal v. City of Jersey City*, No. 04-2788, 2006 WL 2085397 (D.N.J. July 25, 2006) (holding at the summary judgment stage that prosecutors are entitled to qualified immunity for their decision to rearm police officer accused of domestic violence).

Based on the Court's prior opinion in this matter, and based on cases like *Camilo-Robles*, the Court finds the question of Prosecutor Defendants' qualified immunity is best addressed at the summary judgment stage. *See Newland v. Reehorst*, 328 F. App'x 788, 791 n.3 (3d Cir. 2009) ("[I]t is generally unwise to venture into a qualified immunity analysis at the pleading stage as it is necessary to develop the factual record in the vast majority of cases.").

Finally, as Plaintiffs observe, Defendants' moving brief makes no effort to argue that they are entitled to absolute immunity. (Pls.' Opp'n Br. 15.) "[T]he Supreme Court has 'emphasized that the official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question.'" *Fogle v. Sokol*, 957 F.3d 148, 159 (3d Cir. 2020) (quoting *Burns v. Reed*, 500 U.S. 478, 486 (1991)). Nevertheless, in *Gramiccioni*, the New Jersey Supreme Court held that "[t]he decisions of the MCPO defendants who considered whether Seidle could be re-armed and then remain armed were *prosecutorial functions* exercised on behalf of the State." *Gramiccioni*, 235 A.3d at 144 (emphasis added). "Prosecutors have absolute immunity from suit

15

under § 1983 when carrying out prosecutorial functions," *Hyatt*, 340 F. App'x at 837, while a prosecutor's "investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Fogle*, 957 F.3d at 160. The Third Circuit has cautioned that "the Supreme Court . . . has not blanketed the actions of a prosecutor . . . merely because they are performed by a prosecutor. Instead, courts must focus upon the functional nature of the activities rather than [the prosecutor's] status to determine whether absolute immunity is warranted." *Fogle*, 957 F.3d at 159 (second alteration in the original) (quotations omitted). Although the Court denies Defendants' Motion to Dismiss on qualified immunity grounds, the denial is without prejudice to their ability to renew these arguments and supplement them with absolute immunity arguments at the summary judgment stage.

### 3.      Count VIII – State-Created Danger

Plaintiffs also assert a state-created danger claim against the Prosecutor Defendants.[4] (*See generally* TAC ¶¶ 632-66.) Plaintiffs maintain that the affirmative acts of (1) returning Seidle's gun to him twice after taking it away in 2012 and 2014, (*id.* ¶¶ 634, 641, 646, 653), (2) allowing him to retain the use and possession of a gun at all, (*id.* ¶ 633), and (3) failing to impose appropriate discipline on him throughout his tenure as a police officer, (*id.* ¶¶ 634, 640, 645, 652), "placed Tamara in a more dangerous and vulnerable position than if Seidle had been properly disciplined and his gun permanently removed and/or if he had been terminated from the force," (*id.* ¶¶ 633- 34, 640, 646, 652). Plaintiffs further note that the Prosecutor Defendants "permitted and allowed

---

[4] Because Plaintiffs consent to dismissal of the suit "against the MCPO as an entity and all the individual defendants in their official capacities," (Pls.' Opp'n Br. 2), the Court dismisses Count VIII as to the MCPO.

Seidle to possess and use a weapon, and reinstated his weapon to him without conditions." (*Id.* ¶ 48.)

"Although as a general rule, 'the state has no affirmative obligation to protect its citizens from the violent acts of private individuals,' the 'state-created danger' theory of liability is an exception to this rule." *Hansell v. City of Atl. City.*, 152 F. Supp. 2d 589, 603 (D.N.J. 2001) (quoting *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 907 (3d Cir. 1997)), *aff'd*, 46 F. App'x 665 (3d Cir. 2002). The state-created danger doctrine recognizes that a violation of substantive due process may result when state authority is affirmatively employed in a manner that injures a citizen or renders that citizen more vulnerable to injury than he or she would have been absent state intervention. *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 281 (3d Cir. 2006); *see also Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015).

To state a meritorious Fourteenth Amendment substantive due process claim under the doctrine, the following elements must be met:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Galliano v. Borough of Seaside Heights*, No. 03-1463, 2007 WL 979850, at *13 (D.N.J. Mar. 30, 2007) (citing *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 431 (3d Cir. 2006)).

The Court previously dismissed Plaintiffs' state-created danger claims against the Neptune Township Police Department for its alleged role in "allowing Seidle to retain the use of his police-issued weapon." *See Seidle*, 2019 WL 5685731, at *14. Nevertheless, in dismissing those claims, the Court expressly noted that it "made no findings regarding the Monmouth County Defendants." *Id.*

To the extent Plaintiffs bring state-created danger claims against the Prosecutor Defendants for failure to discipline Seidle, the Court will dismiss those claims. Here, the Prosecutor Defendants' alleged failure to discipline Seidle was not an affirmative act satisfying the fourth prong of the state-created danger doctrine. Such an allegation "is merely an artful attempt to reframe an inaction—i.e., failure to discipline—as an action." *Id.* at *15 (alteration in original) (citing *Morrow v. Balaski*, 719 F.3d 160, 179 (3d Cir. 2013) (en banc) ("[M]erely restating the [d]efendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct.")).

With respect to the decision to return Seidle's service weapon, construing the facts in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have plausibly alleged state-created danger claims against the Prosecutor Defendants. As to the first and third factors, foreseeable harm and foreseeable victim, these two elements are clearly met in this matter. Plaintiffs allege that Seidle's service weapon was taken away from him in 2012 because of a domestic violence incident involving Tamara. (TAC ¶¶ 87, 464-66) (alleging that "[i]n the 2012 time[-]frame[,] Seidle was disciplined for cancelling a dispatch call from Tamara relating to domestic violence and was suspended. His firearm was taken away from him by Neptune," and Monmouth County, through the Prosecutor Defendants, "was directly involved in determining whether Seidle should have his gun and service weapon returned"). Elsewhere, Plaintiffs allege that the Prosecutor

Defendants were aware of accusations from Tamara accusing Seidle of "abusing her, and putting a gun to her head and pulling the trigger in the past[.]" (*Id.* ¶¶ 88, 142, 507.) If true, these facts may establish that the risk of harm to Tamara was not only foreseeable, but also that the Prosecutor Defendants were aware of this risk. *Cf. Galliano*, 2007 WL 979850, at *14 (finding that a police department's knowledge that an officer threatened to kill his ultimate victim demonstrated that the harm to the victim was foreseeable).

Next, Plaintiffs must demonstrate that the Prosecutor Defendants acted with a degree of culpability that shocks the conscience. *Bright*, 443 F.3d at 281. The Third Circuit has explained that "[t]he level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases. In a 'hyperpressurized environment,' an intent to cause harm is usually required." *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006). "On the other hand, in cases where deliberation is possible and officials have the time to make unhurried judgments, deliberate indifference is sufficient." *Id.* (internal quotations omitted). In the case at bar, the Court finds "that deliberate indifference on the part of Defendants is sufficient to establish the conscience-shocking level of culpability required to establish culpability." *Galliano*, 2007 WL 979850, at *15.

Here, the Court agrees that Plaintiffs have adequately alleged deliberate indifference by the Prosecutor Defendants. Plaintiffs allege that the Prosecutor Defendants' decision to rearm Seidle following the 2012 decision to disarm him spanned nearly a year. (*See* TAC ¶¶ 464, 475.) As the District Court in *Galliano* held, "the same evidence that supports a finding as to . . . the foreseeability of harm . . . supports a finding as to deliberate indifference[.]" *Galliano*, 2007 WL 979850, at *15. Thus, the same TAC allegations that would, if true, establish that the Prosecutor Defendants were aware of the risk of harm to Tamara posed by Seidle's possession of his service

19

weapon potentially support allegations that they were deliberately indifferent to those facts. *See id.* (finding that the "evidence may rise to the level of deliberate indifference based upon the numerous incidents alleged that should have alerted [defendants] of the need to take evaluative action in connection with [the officer's] continued possession of state-issued weapons, particularly the MP-5 submachine gun to which he was given unfettered access").

Finally, Plaintiffs must allege that the Prosecutor Defendants "affirmatively used [their] authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Kaucher*, 455 F.3d at 431 (citations omitted). The Prosecutor Defendants argue that Plaintiffs' state created danger claim "fails because it lacks the required element that these Defendants affirmatively created a danger." (Defs.' Opp'n Br. 17-22 (emphasis omitted) (citing, *inter alia*, *Bright*, 443 F.3d at 282 ("[i]t is misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause")).) In support of their position, the Prosecutor Defendants assert that "this Court has already considered and properly dismissed Plaintiffs' state-created danger claims against other defendants in this action in the October 2019 [d]ecision." *Id.* at 17.

As a preliminary matter, the Court notes that the Prosecutor Defendants and the Neptune Township Police Department officials are differently situated. In its previous opinion, the Court held that "the Neptune Defendants allowing Seidle to *retain* his weapon did not put Tamara in a worse situation than had they not acted at all." *Seidle*, 2019 WL 5685731, at \*15 (emphasis added). In the Motion now before the Court, however, the question is whether Plaintiffs have plausibly alleged that the Prosecutor Defendants' decision to *rearm* Seidle with his service weapon placed Tamara in a more vulnerable position than if they had not acted to rearm him. The latter allegation against the Prosecutor Defendants, who were the ultimate decision makers as to whether Seidle

would be rearmed, constitutes an affirmative act. The former allegation against Neptune Township Police Department officials is a failure to act that does not allege a state created danger claim. *Morrow*, 719 F.3d at 179 ("[M]erely restating the [d]efendants' inaction as an affirmative failure to act does not alter the passive nature of the alleged conduct.").

Construing the facts alleged in the TAC as true and in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have adequately alleged that the Prosecutor Defendants affirmatively used [their] authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. Here, again, *Galliano* is instructive.

The police officer at the center of *Galliano* had a long, troubled history. The defendants in *Galliano* had "knowledge that the officer was experiencing personal problems such as alcohol abuse and involvement in criminal mischief directed toward the ultimate victims" of his attack. *Galliano*, 2007 WL 979850, at *17. He had been involved in incidents of domestic violence. *Id.* at *3. After his neighbor was charged with sexual abuse of the officer's daughter, the officer was alleged to have told other officers that he intended to kill the neighbor. *Id.* at *5-6. Other evidence in the record suggested that the officer had made threats against the neighbor in other contexts. *Id.* at *14. Still other evidence in the record suggested that police officials had been "advised of [the officer's] deteriorating mental condition." *Id.* at *6. The police department had removed the officer's weapons on at least two occasions, including after an incident of domestic violence. *Id.* at *17. After officials returned his service weapons, the officer used a police-issued submachine gun to murder and wound several people, including people he had previously threatened. *Id.* at *2, 17. In *Galliano*, the District Court found that the officials' decision to remove and then return the officer's weapon was affirmative conduct that plausibly left the victims more vulnerable to danger. *Id.* at *17.

The Court agrees with the *Galliano* court's analysis. In light of Seidle's alleged history of domestic violence, excessive force complaints, and psychological issues, Plaintiffs' allegation that the Prosecutor Defendants placed Tamara in a worse position than if they had not acted to rearm Seidle is plausible. Accordingly, Plaintiffs are entitled to discovery on their state-created danger claim.

### B.    State Law Claims

#### 1.    Count IX – NJCRA

Plaintiffs allege state constitutional claims against all Defendants pursuant to the New Jersey Civil Rights Act, N.J. Stat. Ann. § 10:6-2 ("NJCRA"). The NJCRA "was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitution[]." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). The NJCRA provides in pertinent part,

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.

N.J. Stat. Ann. § 10:6-2(c). "This Court has repeatedly interpreted the NJCRA analogously to § 1983." *Wang v. N.J. State Police*, No. 18-11933, 2019 WL 3887126, at *8 n.5 (D.N.J. Aug. 19, 2019) (citations omitted).

Preliminarily, the Court notes that Plaintiffs failed to specify which New Jersey constitutional provision Defendants allegedly violated. *See, e.g.*, *Celestine v. Foley*, No. 10-1775, 2010 WL 5186145, at *6 (D.N.J. Dec. 14, 2010) (dismissing the plaintiff's NJCRA claims because

the "[p]laintiff failed to identify which specific New Jersey State constitutional provisions [the d]efendants allegedly violated"). Plaintiffs, however, clearly intended for their NJCRA claims to be coextensive with their § 1983 claims, and therefore the Court declines to dismiss Plaintiffs' NJCRA claims solely for that oversight. (*See* TAC ¶ 668 ("The factual allegations in the [Third Amended] Complaint supporting liability under . . . Section 1983 as set forth herein also support a cause of action under the [NJCRA] . . . .").) Accordingly, because the NJCRA is analogous to § 1983, the Court grants in part and denies in part Defendants' Motions to Dismiss the NJCRA claims in a manner consistent with Section A above.

### 2.  Count X – Negligence

To sustain a cause of action for negligence, a plaintiff must establish four elements: "(1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Townsend v. Pierre*, 110 A.3d 52, 61 (N.J. 2015) (quoting *Polzo v. Cnty. of Essex*, 960 A.2d 375, 384 (N.J. 2008)). "The most common test of negligence . . . is whether the consequences of the alleged wrongful act were reasonably to be foreseen as injurious to others coming within the range of such acts." *Di Cosala v. Kay*, 450 A.2d 508, 517 (N.J. 1982) (emphasis omitted) (citation omitted); *see also Rappaport v. Nichols*, 156 A.2d 1, 8 (N.J. 1959) ("[n]egligence is tested by whether the reasonably prudent person at the time and place should recognize and foresee an unreasonable risk or likelihood of harm or danger to others"), *superseded by statute on other grounds*; *Tose v. Greate Bay Hotel & Casino Inc.*, 819 F. Supp. 1312, 1321 (D.N.J. 1993).

Defendants argue the New Jersey Tort Claims Act (the "Act" or "TCA") immunizes them from Plaintiffs' claims that they were negligent in training, supervising, and disciplining Seidle. As a general matter, public entities are not liable for any injury caused unless the Act stipulates such liability. *See* N.J. Stat. Ann. § 59:2-1. "[The] most important command of the Act [is] . . .

that the immunities set forth in the Act prevail over any liabilities, whether found in the Act or in preexisting law, including statutes." *Tice v. Cramer*, 627 A.2d 1090, 1103 (N.J. 1993); *see also* N.J. Stat. Ann. §§ 59:2-1(b), 59:3-1(b). "[I]mmunity for public entities is the general rule and liability is the exception." *Parsons ex rel. Parsons v. Mullica Twp. Bd. of Educ.*, 142 A.3d 715, 718 (N.J. 2016).

The Act provides in relevant part,

> [n]either a public entity nor a public employee is liable for failure to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service.

N.J. Stat. Ann. § 59:5-4. Although this statute reads broadly, the New Jersey Supreme Court has held that the Act does not provide complete immunity from all tort liability arising out of acts or omissions, and police officers may be subject to liability for negligence in the performance of their ministerial (as opposed to discretionary) duties. *Lee v. Doe*, 557 A.2d 1045, 1049-50 (N.J. Super. Ct. App. Div. 1989). "A discretionary act . . . calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *S.P. v. Newark Police Dep't*, 52 A.3d 178, 190 (N.J. Super. Ct. App. Div. 2012) (alteration in original) (internal quotation marks and citation omitted). A ministerial act, on the other hand, is one that "a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his [or her] own judgment upon the propriety of the act being done." *Id.* (citation omitted).

As discussed above, in *Gramiccioni*, the New Jersey Supreme Court found that the decision by the MCPO and its employees to return Seidle's weapon was a discretionary decision. *Gramiccioni*, 235 A.3d at 142 (finding that because Seidle "was a law enforcement officer accused of domestic violence on multiple occasions, the normal rules governing the return of seized

weapons to an alleged perpetrator were superseded by specialized guidelines vesting prosecutors with crucial discretionary decisions"). This accords with this Court's previous finding that "[d]isciplinary decisions and decisions to rearm officers are generally discretionary in nature." *Seidle*, 2019 WL 5685731, at *18. Accordingly, with respect to the Prosecutor Defendants, the Court similarly finds that "the disciplinary decisions and decisions pertaining to Seidle's weapon were similarly discretionary in nature[,]" *id.*, and will dismiss the negligence claim against Defendants. *See S.P.*, 52 A.3d at 190 ("the TCA immunizes public employees for injury that results from 'the exercise of judgment or discretion vested in him'" (quoting N.J. Stat. Ann. § 59:3-2(a)); *see also* N.J. Stat. Ann. § 59:2-3(a) (immunizing public entities for discretionary decisions).

### 3.    Count XI – Wrongful Death

"Under New Jersey law, an executor or administrator may pursue an action based on 'the wrongful act, neglect, or default of another, where death resulted from injuries for which the deceased would have had a cause of action if he lived.'" *Seidle v. Neptune Twp.*, No. 17-4428, 2020 WL 4349901, at *3 (D.N.J. July 29, 2019) (quoting N.J. Stat. Ann. § 2A:15-3). "Claims of . . . wrongful death are derivative and therefore must be dismissed when the underlying claims have been dismissed." *White v. City of Vineland*, No. 16-8308, 2018 WL 4583509, at *8 (D.N.J. Sept. 24, 2018) (internal quotation marks omitted) (quoting *Abramson v. Ritz-Carlton Hotel Co. & Spa Resort*, No. 09-3264, 2011 WL 2149454, at *5 (D.N.J. May 31, 2011), *aff'd*, 480 F. App'x 158 (3d Cir. 2012)). Wrongful death claims may be derivative of claims under § 1983 or the NJCRA. *See Estate of Rosario v. Paterson Police Dep't*, No. 14-5167, 2016 WL 6540447, at *3 (D.N.J. Nov. 3, 2016) (permitting derivative wrongful death claims where § 1983 claims were not dismissed); *Hottenstein v. City of Sea Isle City*, No. 11-740, 2011 WL 2559523, at *5 n.5 (D.N.J. June 27, 2011) (dismissing wrongful death claims where NJCRA claims were dismissed). As

such, wrongful death claims shall be dismissed where the underlying claims are dismissed, but may survive where the underlying claims survive.

Accordingly, to the extent Plaintiffs' wrongful death claim against the Defendants derive from their *Monell* claims against the MCPO, Section 1983 claims brought against the Prosecutor Defendants in their official capacities, or Section 1983 claims brought under state-created danger theories, those claims are dismissed. To the extent Plaintiffs' claims are brought against the Prosecutor Defendants in their personal capacities for violations of the Fourth and Fourteenth Amendments pursuant to Section 1983, Defendants' Motion to Dismiss the wrongful death claim is denied.

### 4. Counts XIII & XIV – Intentional Infliction of Emotional Distress & *Portee* Claim

To state a claim for intentional infliction of emotional distress, a plaintiff must plead facts showing "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Taylor v. Metzger*, 706 A.2d 685, 694 (N.J. 1998) (citation omitted). "To recover for negligent infliction of emotional distress, a plaintiff must demonstrate that the defendant's negligent conduct placed the plaintiff in reasonable fear of immediate personal injury, which gave rise to emotional distress that resulted in substantial bodily injury or sickness." *Thomas v. E. Orange Bd. of Educ.*, 998 F. Supp. 2d 338, 355 (D.N.J. 2014) (citation omitted). Alternatively, to sufficiently plead a *Portee* claim, a plaintiff must demonstrate that the defendant's negligent conduct caused the death or serious injury of another individual with whom the plaintiff had a sufficient "familial relationship," that the plaintiff witnessed the death or injury, and that the plaintiff experienced "resulting severe emotional distress." *Portee v. Jaffee*, 417 A.2d 521, 528 (N.J. 1980).

Here, Plaintiffs' TAC fails to raise a plausible right to relief because it completely lacks any alleged facts that Defendants intended to cause Plaintiffs emotional distress, and for that reason alone Plaintiffs' intentional infliction of emotional distress claim fails. *See, e.g., Buckley v. Trenton Sav. Fund Soc'y*, 544 A.2d 857, 863 (N.J. 1988) ("For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress."). Moreover, because the Court dismissed Plaintiffs' negligence claims, any derivative claim, including the negligent infliction of emotional distress claim, must also be dismissed. *See Abramson*, 2011 WL 2149454, at *5. The Court, accordingly, dismisses with prejudice Counts Thirteen and Fourteen of the TAC.

/s/ Michael A. Shipp ⎯⎯⎯⎯⎯⎯
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE