NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| KIRSTEN SEIDLE, *as Administratrix of the Estate of Tamara Wilson-Seidle*, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>NEPTUNE TOWNSHIP et al.,<br><br>Defendants. | Civil Action No. 17-4428 (RK) (JBD)<br><br>**OPINION** |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court upon the Motion to Vacate, Modify, or Reverse Interlocutory Order[1] ("Motion") filed by Plaintiffs Kirsten Seidle, individually and as administratrix of decedent's estate; T.S., M.S., and S.S., minors by their guardian Kirsten Seidle; and Philip Jr., John, Christopher, Monica, and Dorothy Seidle ("Plaintiffs"). ("Mot.," ECF No. 380-6.) Plaintiffs seek reconsideration of the October 31, 2019 Memorandum Opinion and Order ("2019 Opinion") issued by the Honorable Michael A. Shipp, U.S.D.J., dismissing Plaintiffs' negligence claims against Defendants the City of Asbury Park (the "City" or "Asbury Park") and Asbury Park police officers David Kelso, Anthony Salerno, Marshawn Love, Ahmed Lawson, and Carl Christie (together, the "Asbury Park Defendant Officers," and collectively with Asbury Park, the "Asbury Park Defendants") pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6). ("2019 Op.," ECF No. 152.) Defendant Asbury Park opposed the Motion, ("Opp.," ECF No. 381), and Plaintiffs replied, ("Reply," ECF No. 382). The Court has carefully considered the parties'

[1] Plaintiffs appear to seek confusing, inconsistent relief, to the extent that their Notice of Motion includes a request to "Permit Motion to File an Amended Complaint," which is absent from the caption of their brief. (ECF No. 380; Mot. at 1); *see infra* Section III.D.

submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons below, Plaintiffs' Motion is **DENIED**.

## I. BACKGROUND

This case concerns the tragic killing in 2015 of Tamara Wilson-Seidle ("Tamara"), a mother of nine children, by her ex-husband Philip Seidle ("Philip"), a Neptune Township police officer. Philip fatally shot Tamara 12 times, including in the head and chest, following a car chase and intense police standoff.[2] Tamara's estate and survivors[3] brought suit in 2017 against Neptune Township, Asbury Park, the Monmouth County Prosecutor's Office, and employees and responding officers from each.[4] (ECF No. 1; *see* "TAC," ECF No. 110.) Following three amendments of the initial Complaint, motion practice, numerous opinions by Judge Shipp, six years of discovery, mediation, agreements between the parties, and a recent settlement resolving

---

[2] *See State v. Seidle*, No. A-1485-19, 2021 WL 3084908, at *1 (N.J. Super. Ct. App. Div. July 22, 2021) (per curiam); (Medical Report, Ex. C to Plaintiffs' Counsel's Certification ("Pls. Cert."), ECF No. 380-2, 7–11).

[3] Plaintiffs are the nine children of Tamara and Philip: Kirsten Seidle, individually and as administratrix of Tamara's estate; minors T.S., M.S., and S.S., by their guardian Kirsten; and Philip Seidle, Jr., John Seidle, Christopher Seidle, Monica Seidle, and Dorothy Seidle. ("TAC," ECF No. 110 ¶¶ 1–3.)

[4] Specifically, Plaintiffs alleged constitutional violations and torts by the following groups of Defendants:

- The "Neptune Defendants": Neptune Township, Neptune Township Police Department (together, "Neptune Township"), Former Neptune Police Chiefs James M. Hunt, Jr., Howard O'Neil, and Robert Adams, and Former Neptune Police Director Michael Bascom (together, the "Individual Neptune Defendants"), (TAC ¶¶ 4–8);
- The "Monmouth County Defendants": Monmouth County, the Monmouth County Prosecutor's Office (the "Prosecutor's Office"), Prosecutors Christopher Gramiccioni, Gregory J. Schweers, Jacquelyn F. Seely, and Richard E. Incremona (together, the "Prosecutor Defendants"), and Public Safety Telecommunicators Karen Clayton, Kristin Aras, Stephanie Migliaccio, and Kurt Gibson (together, the "Dispatcher Defendants"), (*id.* ¶¶ 12–14, 20–22);
- The "Asbury Park Defendants": Asbury Park, Former Acting Police Chief Anthony Salerno, Former Deputy Police Chief David Kelso, Sergeant Marshawn Love, and Police Officers Ahmed Lawson and Carl Christie (together, the "Asbury Park Defendant Officers"), (*id.* ¶¶ 9–11, 16–17). Plaintiffs additionally sued Asbury Park Police Officers James Crawford and Timothy Griswold, (*id.* ¶ 16), but Plaintiffs do not seek to disturb the dismissal of either officer, (Mot. at 16–26; Reply at 19).

Plaintiffs also brought one count of assault and battery against Philip, but he has not appeared in this action. (*See* TAC ¶¶ 709–21; *see also* 2019 Op. at 6 n.5.)

certain claims, only Asbury Park remains a Defendant. (*See* ECF Nos. 25, 75, 76, 107, 110, 152, 153, 185, 186, 215, 241, 242, 365.) Plaintiffs, some nine years after the commencement of this action, now seek reconsideration of Judge Shipp's 2019 dismissal of their negligence claims against Asbury Park and the Asbury Park Defendant Officers under Rule 12(b)(6). (*See* Mot.; 2019 Op.) The Court begins with a summary of the relevant factual and procedural background.

### A. Factual Background

The facts are well known, as the matter received significant coverage in local and national media. Tamara and Philip married in 1990 and had nine children together over the course of their relationship. (TAC ¶ 77.) They lived together in Neptune Township, where Philip was a police officer and then sergeant, until Tamara filed for divorce and Philip moved out of the family residence in 2012. (*Id.* ¶¶ 67, 69, 73.) Plaintiffs allege a long history of domestic violence and "horrific abuse" by Philip, both throughout the marriage and during the separation and visitation disputes that followed. (*Id.* ¶¶ 68, 71, 73, 75; *see also id.* ¶¶ 75–109.) Tamara and Philip's divorce was finalized on May 27, 2015. (*Id.* ¶ 70.)

Twenty days later, on June 16, 2015, Philip followed Tamara after she left work and proceeded to chase her by car into Asbury Park. (*Id.* ¶¶ 162–63.) As was later learned, Philip had their 7-year-old daughter T.S. in the car at the time. (*Id.* ¶ 182.) Tamara told her older daughter Kirsten that she was being chased by Philip after receiving an "extremely angry and threatening" phone call from him and that she feared for her life. (*Id.* ¶¶ 162–63.) Kirsten called 9-1-1 on her mother's behalf. (*Id.* ¶ 194.)

During the chase, Philip followed Tamara onto Sewell Avenue in Asbury Park, "rammed his vehicle into [hers]," and "forced her off the road." (*Id.* ¶ 165.) He exited his car and "began to shoot several shots into the driver's side window . . . at Tamara." (*Id.*) Defendant Lawson was

"already at the scene dealing with an unrelated motor vehicle stop," and Defendants Love and Christie, among others, arrived soon after. (*Id.* ¶¶ 166, 197; *see id.* ¶ 197 (alleging that responding officers included Asbury Park Defendants Lawson, Love, Christie, Griswold, and Crawford, "as well as other unidentified responding officers from either Asbury Park, the Prosecutor's Office, Sheriff's Department or other public entity" (cleaned up)).) Seven-year-old T.S. got out of Philip's car and ran to Defendants Lawson and Love, who drove her to safety before returning to the scene. (*Id.* ¶ 182.) An approximately 13-minute standoff between Philip and the officers ensued, during which Philip shot a second round of fire at Tamara, repeatedly pointed the gun at his own head, and eventually allowed responders to remove Tamara from her car, but only after it was too late. (*Id.* ¶¶ 165, 181, 185, 194, 198, 200, 202, 213.) Philip was eventually arrested, later pled guilty to aggravated manslaughter and endangering the welfare of a child, and was sentenced to 30 years' incarceration. (*See id.* ¶ 15); *State v. Seidle*, No. A-1485-19, 2021 WL 3084908, at *1–2 (N.J. Super. Ct. App. Div. July 22, 2021) (per curiam).

### B. PROCEDURAL BACKGROUND

At the outset, as stated, the horror involved here is undeniable and unimaginable. Given the sensitive nature of this case, in the interests of justice and as will be explained in greater detail later, the Court addresses each of Plaintiffs' arguments and claimed "new" evidence, and has declined to summarily dispense with Plaintiffs' Motion based on, *inter alia*, its untimeliness. The Court likewise has not truncated its analysis based on any given independently sufficient basis to deny Plaintiffs' Motion, such as the absence of new evidence or the absence of a showing that such evidence was previously unavailable. In addition, the Court has considered the effect of the purported new evidence on Judge Shipp's decision, and ultimately concludes that it does not

support the rare and extraordinary remedy of reconsideration. Notwithstanding, Plaintiffs' *Monell* claim against Asbury Park remains,[5] as does the standard appellate process.

Plaintiffs filed their initial Complaint on June 16, 2017, (ECF No. 1), followed by their First Amended Complaint on September 29, 2017, ("FAC," ECF No. 25; *see* ECF No. 21). Upon motions to dismiss by all appearing Defendants, (ECF Nos. 26, 28, 30, 33, 46), Judge Shipp dismissed the FAC without prejudice for "fail[ing] to meet the pleading requirements of Federal Rule of Civil Procedure 8(a)," (ECF No. 76 at 4; *see* ECF No. 74). He explained that "[t]he Court had difficulty discerning which claims were brought against which entities or individuals and the factual basis for each claim" because Plaintiffs had engaged in "group pleading" and had not set forth their factual allegations or claims "in a systematic and appropriate way." (ECF No. 76 at 4–5.) Plaintiffs filed their Second Amended Complaint on May 21, 2018, ("SAC," ECF No. 75), and Defendants again moved to dismiss, (ECF Nos. 87, 89, 90, 91, 92). Judge Shipp granted the motions and dismissed the SAC without prejudice, finding that it "suffer[ed] from the same flaws as the [FAC]" and that "the Court again ha[d] difficulty discerning precisely which legal theories Plaintiffs are alleging, against which Defendants, and the facts attendant to those claims." (ECF No. 107 at 2–3.) He "grant[ed] Plaintiffs one final opportunity to cure the deficiencies" via a Third Amended Complaint. (*Id.* at 3.)

On January 25, 2019, Plaintiffs filed their TAC—the fourth complaint in this case—which remains the operative pleading. (TAC.) On October 31, 2019, Judge Shipp issued a 36-page Opinion granting in part and denying in part the motions to dismiss filed by, *inter alia*, the Asbury

[5] The Court emphasizes that the analysis and conclusions herein relate only to Plaintiffs' negligence claims, which are legally and factually distinct from Plaintiffs' surviving *Monell* claim concerning Asbury Park's alleged failure to enforce and enact appropriate policies. (*See* 2019 Op. at 13–14.) This Opinion neither considers nor expresses any view regarding Plaintiffs' *Monell* claim or its relationship, if any, to the arguments and evidence presented in Plaintiffs' Motion.

Park Defendants. (*See* 2019 Op.; ECF Nos. 117, 118, 119.) As relevant here, Judge Shipp dismissed with prejudice Plaintiffs' negligence claims. (2019 Op. at 31–36.) He concluded that Plaintiffs failed to plead a duty of care owed by Chief Salerno and Deputy Chief Kelso; that the New Jersey Tort Claims Act (the "Act" or "TCA") immunized the Asbury Park Defendants from liability because their alleged conduct was discretionary; and that Plaintiffs could not premise a negligence claim on an alleged "duty to use lethal force." (*Id.* at 31–35.) Judge Shipp in turn dismissed Plaintiffs' derivative negligent infliction of emotional distress claims.[6] (*Id.* at 35–36.) Although not the subject of Plaintiffs' instant Motion, Judge Shipp also dismissed Plaintiffs' Fourth Amendment claim against the Asbury Park Defendant Officers based on qualified immunity but allowed Plaintiff's *Monell* claim against the City to proceed to discovery. (*Id.* at 7–14, 21–23); *see generally Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

Plaintiffs and Defendants Asbury Park, Salerno, and Kelso cross-moved for reconsideration of the 2019 Opinion. ("Pls. First Recon. Mot.," ECF No. 157; ECF No. 171.) On July 29, 2020, Judge Shipp granted in part and denied in part Plaintiffs' motion and denied Asbury Park's motion. ("Recon. Op.," ECF No. 185.) In particular, Judge Shipp declined to reconsider the dismissal of Plaintiffs' negligence claims against Defendants Salerno and Kelso, finding that Plaintiffs' arguments "amount[ed] to no more than disagreement with the Court's previous decision." (*Id.* at 4.) He also denied Defendants' request for reconsideration of his decision to allow Plaintiffs' *Monell* claim to proceed against the City despite dismissing Plaintiffs' federal

[6] In addition to their claim of negligence (Count 10), Plaintiffs alleged two derivative claims: negligent infliction of emotional distress (Count 13) and a "*Portee* claim" of negligent infliction of emotional distress on behalf of T.S. (Count 14). (TAC ¶¶ 722–38; *see* 2019 Op. at 6 n.6 (explaining that, in *Portee v. Jaffee*, 417 A.2d 521 (N.J. 1980), the New Jersey Supreme Court "create[d] a negligent infliction of emotional distress cause of action" for an individual who witnesses the death of a close family member and satisfies certain elements).) After dismissing Count 10 for the reasons explained *supra*, Judge Shipp dismissed Counts 13 and 14 as derivative. (2019 Op. at 31–36.)

constitutional claims against the Asbury Park Defendant Officers. (*Id.* at 6–7.) Accordingly, Plaintiffs' negligence claims against the Asbury Park Defendants remained dismissed, and the case proceeded to discovery with Asbury Park as the only remaining Asbury Park Defendant. (*See id.*) The Neptune Defendants and certain Monmouth County Defendants also remained in the case.[7] (*See* 2019 Op.; ECF No. 242.)

Approximately six years of fact and expert discovery followed. (*See* ECF Nos. 155, 169, 335, 351.) The matter was reassigned from Judge Shipp to the Honorable Georgette Castner, U.S.D.J., in April of 2022, and ultimately, in May of 2023, to the undersigned. (*See* ECF Nos. 270, 294.) After the close of fact discovery in October of 2024, the remaining parties attended mediation before the Honorable Jose L. Linares, U.S.D.J. (ret.), in March of 2025, and all remaining claims except those against Asbury Park were resolved.[8] (ECF Nos. 335, 339.) A settlement was reached between Plaintiffs and the Neptune Defendants and Prosecutor's Office for a payment of $4 million to Plaintiffs for wrongful death damages and attorney's fees and costs. (ECF No. 365 at 3.) Expert discovery proceeded as to Asbury Park and was completed on September 30, 2025. (ECF No. 351.)

---

[7] In the 2019 Opinion, as modified and vacated in part on reconsideration, Judge Shipp dismissed with prejudice some claims against the Neptune Defendants (including Plaintiffs' negligence claims) and allowed others to proceed (such as Plaintiffs' *Monell* claim against Neptune Township and their Fourth Amendment claim against the Individual Neptune Defendants). (*See* 2019 Op.; Recon. Op.) In 2020, Plaintiffs voluntarily dismissed their claims against Monmouth County and the Dispatcher Defendants. (ECF Nos. 212, 215.) In 2021, with the parties' consent, Judge Shipp dismissed without prejudice Plaintiffs' claims against the Prosecutor's Office and against the Prosecutor Defendants in their official capacities. (ECF No. 241 at 2; ECF No. 242 at 6–7.) He further granted in part the Monmouth County Defendants' motion to dismiss, dismissed with prejudice Plaintiffs' negligence claims against all Monmouth County Defendants, and allowed certain claims to proceed, such as Plaintiffs' Fourth Amendment claim against the Prosecutor Defendants. (ECF Nos. 241, 242; *see* ECF No. 204.)

[8] Also in March of 2025, Plaintiffs advised the Court that they intended to move for reconsideration regarding certain aspects of Judge Shipp's 2019 Opinion. (ECF No. 339.)

On May 5, 2026, Plaintiffs filed the instant Motion. (Mot.) They assert that discovery has revealed new evidence warranting reconsideration of Judge Shipp's 2019 dismissal of their negligence claims against the Asbury Park Defendants. (*See id.*) Asbury Park opposed, and Plaintiffs replied. (Opp.; Reply.) It is unclear whether the Asbury Park Defendant Officers are aware of the Motion, and they have not filed a response. Plaintiffs' Counsel concedes that the Motion papers were not served on the individual officers but contends that such service was unnecessary.[9] (Reply at 18.) Because Plaintiffs' Motion is denied for the reasons below, the Court need not resolve the issue.

## II. LEGAL STANDARD

In the District of New Jersey, "[t]he proper procedural mechanism for reconsideration of [an] interlocutory order is Local Civil Rule 7.1(i)." *Warner v. Township of S. Harrison*, 885 F. Supp. 2d 725, 747–48 (D.N.J. 2012). Under the Local Rule, motions for reconsideration must be served and filed within 14 days of the entry of the subject order. L. Civ. R. 7.1(i). Here, Plaintiffs de facto seek reconsideration of two decisions issued six and seven years ago. (*See* 2019 Op.; Recon. Op.)

It is well established that reconsideration is "'an extraordinary remedy' that is to be granted 'very sparingly.'" *Heartland Payment Sys., LLC v. Carr*, No. 18-9764, 2021 WL 9667965, at *1 (D.N.J. Aug. 8, 2021) (quoting *NL Indus. Inc. v. Com. Union Ins. Co.*, 935 F. Supp. 513, 516

[9] Plaintiffs' Counsel certified that the Motion papers were "served upon counsel of record." (ECF No. 380-1.) In its Opposition, Asbury Park pointed out that "[P]laintiffs haven't served anyone but Asbury Park with this motion" and explained that Counsel for the City has not represented any Asbury Park Defendant Officers since their dismissal pre-discovery. (Opp. at 9 n.2, 42.) Plaintiffs' Counsel asserts in Reply that "[t]here was no need to serve each individual defendant with this motion" because "Asbury Park will be vicariously liable for the actions of the Asbury Park officers and officials" and "[t]he individuals certainly don't need individual representation on the negligence claims unless they wish to, as they will be indemnified by the City." (Reply at 18.) Plaintiffs' Counsel further asserts that "Asbury Park would of necessity be counsel of record" for the Asbury Park Defendant Officers, (*id.*), despite the fact that Counsel for the City "never represented [Defendant] Love," (Opp. at 9 n.2).

(D.N.J. 1996)). Thus, a motion for reconsideration must be denied where a party "simply asks the court to analyze the same facts and cases it had already considered in reaching its original decision," expresses "mere disagreement with a decision of the district court," or presents evidence or arguments that could have been raised prior. *Bonds v. N.J. Judiciary Admin.*, No. 19-18983, 2026 WL 1948816, at *3 (D.N.J. July 6, 2026) (first quoting *Tehan v. Disability Mgmt. Servs., Inc.*, 111 F. Supp. 2d 542, 549 (D.N.J. 2000); then quoting *Morris v. Siemens Components, Inc.*, 938 F. Supp. 277, 278 (D.N.J. 1996); then citing *Bowers v. NCAA*, 130 F.Supp.2d 610, 613 (D.N.J. 2001)). Reconsideration is "an extremely limited procedural vehicle" that does not provide "a second bite at the apple." *Heartland*, 2021 WL 9667965, at *5; *see United States v. Jones*, 158 F.R.D. 309, 314 (D.N.J. 1994) ("The purpose of the [reconsideration] rule . . . is . . . to prevent parties from filing a second motion, with the hindsight provided by the court's analysis, covering issues that should have been raised in the first set of motions."). "A difference of opinion with a court's decision should be addressed through the appellate process." *Garcia v. Bartkowski*, No. 11-3689, 2017 WL 3671289, at *2 (D.N.J. Aug. 23, 2017); *see also Kanter v. Barella*, No. 04-5542, 2005 WL 3088336, at *1 (D.N.J. Nov. 16, 2005) ("A motion for reconsideration is improper when it is used solely to ask the court to rethink what it has already thought through—rightly or wrongly."), *aff'd*, 489 F.3d 170 (3d Cir. 2007).

Reconsideration may be sought "only in three situations." *Rodrigues v. Wells Fargo Bank, N.A.*, No. 16-3845, 2017 WL 2345559, at *1 (D.N.J. May 30, 2017). The party seeking reconsideration bears the burden of showing: (1) an intervening change in controlling law, (2) new evidence that was not available at the time of the prior decision, or (3) the need to correct a clear error of law or prevent manifest injustice. *Garcia*, 2017 WL 3671289, at *2 (citing *Max's Seafood Cafe v. Quinteros*, 176 F. 3d 669, 677 (3d Cir. 1999)). When reconsideration is sought based on

new evidence, the movant "bears the burden of demonstrating that the evidence was unavailable or unknown at the time of the original [decision]." *Id.* at *1; *see Interfaith Cmty. Org. Inc. v. PPG Indus., Inc.*, 702 F. Supp. 2d 295, 317 (D.N.J. 2010). "A court will grant a motion for reconsideration only where a previous decision has overlooked a factual or legal issue that may alter the disposition of the matter." *Heartland*, 2021 WL 9667965, at *1.

## III. DISCUSSION

In 2019, Judge Shipp issued a thorough, rather lengthy decision dismissing Plaintiffs' negligence claims against supervisory officials Defendants Salerno and Kelso; responding officers Defendants Love, Lawson, and Christie; and the City of Asbury Park. (2019 Op. at 31–36.) In 2020, upon a timely motion for partial reconsideration filed by Plaintiffs, Judge Shipp declined to reconsider his dismissal of Plaintiffs' negligence claims against Defendants Salerno and Kelso. (Recon. Op. at 4; *see also id.* at 5–7 (granting in part Plaintiffs' motion for reconsideration on other grounds and denying Defendants' cross-motion for reconsideration).) Now before the Court is Plaintiffs' second motion for reconsideration, filed in May of 2025, again concerning their dismissed negligence claims against the Asbury Park Defendants. (*See* Mot.)

According to Plaintiffs, "discovery has revealed new facts establishing negligence not known to plaintiffs at the time of the filing" of their TAC—namely, the Asbury Park Police Department's Active Shooter Policy (the "Active Shooter Policy" or "Policy"),[10] which Plaintiffs assert was "an applicable policy which should have been implemented at the scene of the shooting." (*Id.* at 13, 27.) Based on this "new evidence," Plaintiffs ask the Court to "reconsider

[10] The Policy is attached to Plaintiffs' Motion and Counsel Certification as Exhibit H. (*See* "Pls. Cert.," ECF No. 380-2; *see also* ECF Nos. 380-3 to 380-5 (Exhibits A through CC).) The Policy does not contain internal pagination, so the Court will cite the Bates numbering therein, with the initial "0s" omitted. ("Policy," ECF No. 380-3 at AP324–AP334.)

and reinstate" their dismissed negligence claims against the Asbury Park Defendants. (*Id.* at 27.) However, because this evidence is not new and would not alter Judge Shipp's 2019 decision, reconsideration is improper.

### A. UNTIMELINESS

The Court begins—but does not end—with the untimeliness of Plaintiffs' Motion. Plaintiffs agree on the relevant legal standard for reconsideration, set forth *supra*, and appear to agree that Local Rule 7.1(i) governs, but they disagree that its timing requirement precludes their Motion. (*Id.* at 1, 10, 12; Reply at 2, 4.) They point to general principles of inherent judicial power and discretion, the overall distinction between final and non-final orders, and Federal Rules of Civil Procedure 15(b) ("Amendments During and After Trial") and 54(b) ("Judgment on Multiple Claims or Involving Multiple Parties") to contend that Judge Shipp's decision may be revised "any time" before the entry of a judgment. (Mot. at 9–11.)

The Court notes, for starters, that Plaintiffs previously timely moved for reconsideration pursuant to Local Rule 7.1(i) when they asked, for the first time, for reconsideration of Judge Shipp's 2019 Opinion. (*See* Pls. First Recon. Mot.) In contrast, their instant Motion was filed six-and-a-half years after that 2019 Opinion, and almost six years after the 2020 reconsideration decision thereafter (which Plaintiffs now reargue in relevant part, as explained *infra*). (*See* 2019 Op. (issued October 31, 2019), Recon. Op. (issued July 29, 2020); Mot. (filed May 5, 2026).) It is beyond dispute that Plaintiffs' Motion is untimely under Local Rule 7.1(i).

"Untimeliness alone is sufficient grounds to deny" reconsideration. *Takata v. Riot Blockchain, Inc.*, No. 18-2293, 2019 WL 2710273, at *1 (D.N.J. June 26, 2019) (cleaned up). Courts within this District "routinely" deny motions for reconsideration that are untimely under Local Rule 7.1(i), and the Third Circuit has upheld those denials. *Schlafly v. Eagle F.*, No. 17-

2522, 2020 WL 2790519, at *6 (D.N.J. May 30, 2020) (collecting cases). Plaintiffs' assertion that "[t]here is no restriction on the time within which to file the Motion plaintiff[s] seek[]," (Mot. at 7), is thus inaccurate—Local Rule 7.1(i) imposes such a restriction, and it is well established that Local Rule 7.1(i) governs motions for reconsideration of non-final orders filed in this District. *See, e.g.*, *Zitter v. Petruccelli*, No. 15-6488, 2017 WL 1837850, at *2 & n.2 (D.N.J. May 8, 2017) (collecting cases).

True, Federal Rule of Civil Procedure 54(b) provides that an order "that adjudicates fewer than all the claims . . . [or] parties . . . may be revised at any time before the entry of a judgment." Fed. R. Civ. P. 54(b); (*see* Mot. at 7). However, Rule 54(b) does not create a vehicle for reconsideration and, in any event, "[t]he Court is doubtful that Rule 54(b) acts as an atemporal mechanism for reconsideration of interlocutory discovery orders, especially considering the existence of Local Civil Rule 7.1(i)" as well as the absence of a corresponding federal mechanism for seeking reconsideration of interlocutory orders. *Bonds*, 2026 WL 1948816, at *5 n.5 (collecting cases); *see Weston v. Subaru of Am., Inc.*, No. 20-5876, 2022 WL 18024222, at *7 (D.N.J. Dec. 31, 2022) ("While not expressly authorized by the Federal Rules of Civil Procedure, motions for reconsideration are provided for and governed by Local Civil Rule 7.1(i).").

Moreover, although the Court has discretion to excuse some untimely filings, the movant must still justify both their untimeliness and the Court's reconsideration, and Plaintiffs do neither. *See, e.g.*, *Garrison v. Porch*, No. 04-1114, 2008 WL 1744730, at *2 (D.N.J. Apr. 11, 2008); *J.A. v. Monroe Twp. Bd. of Educ.*, No. 20-9498, 2025 WL 3238267, at *3 n.7 (D.N.J. Nov. 20, 2025); *Takata*, 2019 WL 2710273, at *1 n.1; *see also Bonds*, 2026 WL 1948816, at *5 n.5 ("[M]any of the jurisdictions that view Rule 54(b) as a basis for reconsideration of interlocutory discovery orders commit the decision for reconsideration 'to the discretion of the district court,' as 'justice

requires,' or apply a legal standard that mirrors the three-pronged standard that governs reconsideration in this jurisdiction." (collecting cases)).

Notwithstanding the Court's finding of Plaintiffs' untimeliness, the Court will proceed to address the substantive arguments presented in their Motion.

### B. ALLEGED NEGLIGENT SUPERVISION AND TRAINING

The Court now addresses Plaintiffs' negligence claims against Defendants Salerno and Kelso, Asbury Park's respective Acting Police Chief and Deputy Police Chief at the time Plaintiffs filed the TAC.[11] (TAC ¶¶ 10–11.) In 2019, Judge Shipp dismissed with prejudice Plaintiffs' negligence claims against Defendants Salerno and Kelso, finding that, despite twice dismissing Plaintiffs' claims for impermissible group pleading and twice granting Plaintiffs the opportunity to amend to correct the deficiency, Plaintiffs failed to adequately allege any duty of care owed by the two Defendants in the TAC.[12] (2019 Op. at 32 ("Preliminarily, the Court notes that it is unclear which specific duties Plaintiffs allege against which specific Defendants because Plaintiffs, again, resort to group pleading."); *id.* at 32 n.14 ("The flaw in Plaintiffs' group pleading method is further underscored by their failure to name any duty as it pertains to Deputy Chief David Kelso and former Police Chief Anthony Salerno. Because Plaintiffs fail to explicitly plead any duty

[11] Plaintiffs refer to Defendants as "Chief Salerno" and "Deputy Chief Kelso" throughout their TAC, and Judge Shipp in turn does the same in his 2019 Opinion. (*See* TAC ¶¶ 10–11; 2019 Op. at 6, 32 n.14.) The parties likewise use the same titles in their instant briefing. (*See* Mot.; Opp.; Reply.) For the sake of completeness, the Court notes that, per the TAC, Defendants Salerno and Kelso were Police Directors on June 16, 2015 (then became Acting Police Chief and Deputy Police Chief by the time the lawsuit was brought two years later). (TAC ¶¶ 10–11.)

[12] As Judge Shipp summarized, "[t]he Court . . . repeatedly emphasized before Plaintiffs filed their [TAC] that claims would be dismissed where they fail to state specific allegations attributable to specific defendants." (Recon. Op. at 4.) He previously dismissed without prejudice Plaintiffs' FAC "because the 'Court had difficulty discerning which claims were brought against which entities or individuals and the factual basis for each claim'" and dismissed without prejudice the SAC "because it 'mainly group pleads Defendants without applying specific facts to specific actors.'" (*Id.* (first quoting ECF No. 76 at 4–5; then quoting ECF No. 107 at 2–3).)

pertaining to those defendants, the Court dismisses with prejudice Plaintiffs' negligence-based claims against Kelso and Salerno.").)

Plaintiffs moved for reconsideration of that decision, arguing that the TAC sufficiently pled that Salerno and Kelso "fail[ed] to train and supervise responding officers on active shooter policies and/or enact, promulgate and enforce such policies." (Pls. First Recon. Mot. at 13 (citing TAC ¶¶ 682–83); *see id.* (asserting that "[t]hese failures [to train and supervise] were noted multiple times throughout the TAC").) Judge Shipp, having previously considered Plaintiffs' allegations and having found them deficient under Rule 12(b)(6), concluded that "Plaintiffs' argument . . . amount[ed] to no more than disagreement with the Court's previous decision." (Recon. Op. at 4); *see Jones v. Sanko Steamship Co.*, No. 10-6787, 2016 WL 819618, at *3 (D.N.J. Mar. 2, 2016) ("[R]econsideration does not provide 'an opportunity for a second bite at the apple,' nor a vehicle 'to relitigate old matters.' Indeed, mere disagreement with the court's decision—particularly its reasoning and distillation of the applicable law and facts—should be aired through the appellate process." (citations omitted)). So too here.

In the instant Motion, Plaintiffs maintain that they adequately alleged Defendants Salerno and Kelso's duty to train and supervise, including with respect to "an active shooter/rapid response/hostage event," in their TAC. (Mot. at 3; *see id.* at 6 (asserting that Judge Shipp, in his 2019 Opinion, "determined that the negligence count impermissibly resorted to 'group pleadings' and that plaintiff[s] fail[ed] to name any duty as it pertains to . . . Kelso and . . . Salerno" despite the TAC "exhaustively and repeatedly review[ing] the liability of each individual defendant, including Salerno and Kelso in the various counts" (omissions in original)); Reply at 7–9.) In summarizing their TAC allegations, Plaintiffs assert that they "pled that there was no training or supervision," that "[n]ot one of the officers had received active shooter or rapid response training,"

and that "the supervisory officers failed to establish, consider and enact any policies or protocol for the handling of an active shooter/rapid response/hostage event." (Mot. at 3 (citing TAC ¶¶ 211, 214, 217, 219, 382, 391).) Plaintiffs thus contend that "the pleadings were and remain sufficient" such that "there is little necessity for an amended complaint" were reconsideration granted. (Reply at 1, 7; *see id.* at 1–2 ("The 143 page [TAC] finely details the individual liability of the Asbury Park Police Chief and Deputy Chief for the failure to train and supervise so that the Court's statement about 'group pleading' in the negligence count also needs to be revisited as clearly erroneous and not in the interests of justice.").) As explained, Judge Shipp considered those TAC allegations and found them insufficient in his 2019 Opinion, and he considered Plaintiffs' arguments on reconsideration that his dismissal should be revisited because, according to Plaintiffs, the TAC adequately alleged the supervisory officials' duty to train and supervise. (2019 Op. at 32 & n.14; Recon. Op. at 4; *see also* ECF No. 126 at 48–49 (Plaintiffs making similar arguments in their opposition to the Asbury Park Defendants' underlying motion to dismiss).)

Six years later, Plaintiffs re-raise the same arguments for reconsideration, this time under the guise of "new evidence." (*See* Mot. at 17–18, 26.) For the reasons explained *infra*, the evidence Plaintiffs present in support of their Motion is not new—but even if it were, it would not alter Judge Shipp's previous decision. As Judge Shipp's decisions and Plaintiffs' prior motions make clear, Plaintiffs could have pled Defendants Salerno and Kelso's duty to train and supervise in support of their negligence claims when they filed the TAC. (*See* Recon. Op. at 4 ("The Court takes this opportunity to note . . . that it repeatedly emphasized before Plaintiffs filed their Third Amended Complaint that claims would be dismissed where they fail to state specific allegations attributable to specific defendants."); 2019 Op. at 32 & n.14.) Within their negligence count (Count

10), they pled the duties owed by other Defendants,[13] including that the Neptune Defendants "had a duty to hire, train, supervise, and discipline" Philip.[14] (2019 Op. at 33 (citing TAC ¶ 683); *see* Recon. Op. at 4.) Similarly, in support of their Fourth Amendment claims, Plaintiffs alleged failures to train and/or supervise by Defendants Salerno, Kelso, and Love. (2019 Op. at 21 (analyzing Plaintiffs' Fourth Amendment claims and describing their allegations that "Salerno and Kelso 'failed to assure [their] subordinates received appropriate and critical training concerning the handling of an active shooter/rapid responder/hostage situation'"; that "Salerno and Kelso 'failed to enact, promulgate[,] and enforce any policies or practices for the handling of an active shooter/rapid responder/hostage situation'"; and that "Sergeant Love failed to train and supervise his subordinates" (alterations in original) (quoting TAC ¶¶ 382–83, 391–92, 412)).)

---

[13] Judge Shipp explained that Plaintiffs "did not specifically plead any duty for Salerno and Kelso, unlike their pleadings as to Neptune officials." (Recon. Op. at 4.) Within Count 10, Plaintiffs alleged duties owed by each Individual Neptune Defendant, as well as by Asbury Park Defendants Lawson, Love, Christie, Griswold, and Crawford—*inter alia*, that "Neptune and its officials had a duty to use reasonable care in the hiring, training, supervision and retention of Seidle"; "[t]he Neptune officials Chief O'Neil, Chief Adams, Chief Hunt and Director Bascom had a duty to act reasonably in connection with the hiring, training and supervision of Seidle and to use reasonable care in the discipline of Seidle"; and "[t]he Asbury Park police defendants Lawson, Love, Christie, Griswold and Crawford all had a duty to act reasonably in their performance and actions once the duty was undertaken to provide police protection"—but nowhere addressed Defendants Salerno or Kelso or their duties. (TAC ¶ 683 (cleaned up).)

In denying reconsideration in relevant part, Judge Shipp summarized his multiple prior directives regarding Plaintiffs' impermissible group pleading, *see supra* note 12, rejected Plaintiffs' contention that they "adequately pleaded a duty of care for [Defendants Salerno and Kelso]," and advised that, "[o]n their [TAC], it is not enough for Plaintiffs to omit specific allegations against Salerno and Kelso on the chance that the Court may find sufficient factual allegations within the previous 682 paragraphs." (Recon. Op. at 4 (citing 2019 Op. at 32).)

[14] Judge Shipp nonetheless found the Neptune Defendants immune from Plaintiffs' negligence claims under the TCA based on the discretionary nature of their conduct and the "'broad immunity protection' for claims arising from alleged failures to enforce the law." (2019 Op. at 34 (citing N.J. Stat. Ann. § 59:3–5, :5-4).) Judge Shipp likewise found the Asbury Park Defendants immune for the discretionary conduct underlying Plaintiffs' negligence claims, as discussed in detail below. (*Id.* at 33.) Because Plaintiffs fail to justify reconsideration of that conclusion, *see infra*, it remains fatal to Plaintiffs' negligence claims.

Judge Shipp dismissed Plaintiffs' negligence claims against Defendants Salerno and Kelso because of Plaintiffs' continued pleading deficiency.[15] (*See* 2019 Op. at 32 & n.14 (describing Plaintiffs' continued use of group pleading and concluding that, "[b]ecause Plaintiffs fail to explicitly plead any duty pertaining to [Defendants Kelso and Salerno], the Court dismisses with prejudice Plaintiffs' negligence-based claims against [them]"); Recon. Op. at 3 ("The Court dismissed Plaintiffs' negligence-based claims against Kelso and Salerno because Plaintiffs failed to plead Salerno and Kelso had any duty of care.").) This reasoning is unaffected by purported, claimed "new" facts. *See English v. Fed. Nat'l Mortg. Ass'n*, No. 13-2028, 2020 WL 11027479, at *2 (D.N.J. Aug. 28, 2020) (denying reconsideration of with-prejudice dismissal of complaint where "the Court previously dismissed Plaintiff's original, and First, Second, and Third Amended Complaints for failure to state a claim under rule 12(b)(6), after finding that, even accepting Plaintiff's allegations as true, she had not stated a claim to relief" and reasoning that "even a finding that [Plaintiffs presented] 'new evidence' would not change the Court's repeated conclusion that Plaintiff[s] ha[d] not stated a claim to relief and that dismissal of th[ese] [claims] is required"). Plaintiffs' disagreement with the 2019 dismissal of their negligence claims against

[15] Judge Shipp also considered Plaintiffs' argument in their first motion for reconsideration that reconsideration was warranted on the basis of clear error of law or manifest injustice. (*See* Pls. First Recon. Mot. at 5–6; Recon. Op. at 2–4.) As he explained, "[a] court commits clear error of law only if the record cannot support the findings that led to the ruling" and "a party must do more than allege that portions of a ruling were erroneous in order to obtain reconsideration of that ruling." (Recon. Op. at 2 (first quoting *Rich v. State*, 294 F. Supp. 3d 266, 272 (D.N.J. 2018); then quoting *ABS Brokerage Servs., LLC v. Penson Fin. Servs., Inc.*, No. 09-4590, 2010 WL 3257992, at *6 (D.N.J. 2010)); *see id.* ("A moving party's '[m]ere disagreement with the Court's decision' is insufficient to show a clear error of law." (alteration in original) (quoting *ABS Brokerage Servs.*, 2010 WL 3257992, at *6)).) Similarly, "[m]anifest injustice pertains to situations where a court overlooks some dispositive factual or legal matter that was presented to it." *Heartland*, 2021 WL 9667965, at *2; *see Pittman v. Zickefoose*, No. 10-5057 RMB, 2011 WL 4729021, at *2 n.2 (D.N.J. Oct. 5, 2011) ("[T]he term 'manifest injustice' could be defined as 'an error in the trial court that is direct, obvious, and observable.' Most cases, therefore, use the term 'manifest injustice' to describe the result of a plain error." (cleaned up)).

Defendants Salerno and Kelso, and with the 2020 decision to not reconsider that dismissal, does not support reconsideration.[16]

Plaintiffs similarly seek reconsideration of Judge Shipp's dismissal of their negligent-training-and-supervision claims against Asbury Park. (Mot. at 18–19.) As explained, Asbury Park is the only remaining Defendant in this case, against whom Plaintiffs' *Monell* claim is presently pending. (*See* 2019 Op. at 13–14.) Judge Shipp previously concluded that dismissal of these claims was appropriate given his dismissal of all negligence claims against the individual Asbury Park Defendants. (*Id.* at 35.) Plaintiffs do not challenge that reasoning. They assert that, "[s]ince the evidence in discovery overwhelmingly supports the claims for negligent supervision and training against both the public entity [i.e., Asbury Park] and its Acting Chief and Deputy Chief of police [i.e., Defendants Salerno and Kelso], plaintiff[s] should be permitted to amend the complaint and/or to reinstate that dismissed claim." (Mot. at 19. *Compare also id.* at 16, *with* ECF No. 126 at 44 (Plaintiffs' opposition to Asbury Park Defendants' motion to dismiss).) Because the Court declines to reconsider the dismissal of Plaintiffs' negligence claims against Defendants Salerno and Kelso, it likewise declines to reconsider the dismissal of those claims against Asbury Park.

[16] The Court further notes that New Jersey law appears to recognize negligent training and supervision claims only against "the employer entity" and "not . . . the individual supervisor." *A.C. v. Dwight-Englewood Sch.*, No. 21-6376, 2022 WL 1184799, at *3 (D.N.J. Apr. 21, 2022) (quoting *Duran v. Warner*, No. 07-5994, 2013 WL 4483518, at *8 (D.N.J. Aug. 20, 2013); citing *G.A.-H. v. K.G.G.*, 210 A.3d 907, 916 (N.J. 2019)); *accord Mills v. Pivot Occupational Health*, No. 21-846, 2022 WL 610781, at *4 (D. Del. Feb. 15, 2022) ("Although 'Delaware law recognizes claims of negligent hiring and supervision of employees, . . . liability is imposed on the employer where the employer is negligent, not on supervisors.'" (omission in original)). Defendant Asbury Park raises this issue in its Opposition, but Plaintiffs do not address it in Reply. (Opp. at 40; Reply at 17–18 (addressing only Defendant's argument about knowledge element).)

### C. PURPORTED "NEW" EVIDENCE

The Court next addresses Plaintiffs' arguments for reconsideration based on the alleged "new" evidence uncovered during discovery—the Active Shooter Policy.[17] Plaintiffs contend that this Policy warrants reconsideration of Judge Shipp's 2019 Opinion because it shows that (1) Defendants' conduct was ministerial, rather than discretionary, so they are not entitled to TCA immunity, and (2) "the use of lethal force is required, if necessary, in an active shooter situation," so Judge Shipp's conclusion regarding such force should be revisited. (Mot. at 5–6.) The Court takes these arguments in turn.

1. Discretionary Conduct

As Plaintiffs recognize, in the 2019 Opinion, "[t]he Court found the conduct of the Asbury Park Defendants[] to be discretionary" as opposed to ministerial, thus rendering these Defendants immune from liability under the TCA. (*Id.* at 6 (citing 2019 Op. at 33–34).) The TCA, as Judge Shipp explained, generally immunizes public entities and public employees, including police officers, from tort liability. (2019 Op. at 31 ("[T]he immunities set forth in the Act prevail over

[17] At the outset, the Court notes that the parties dispute whether the Active Shooter Policy applied to the Asbury Park Defendants' conduct on June 16, 2015. (*Compare* Pls. Cert. ¶¶ 9, 22–25, 40–60 (asserting that the Active Shooter Policy applied based on the expert report and deposition testimony of Plaintiffs' expert and the deposition testimony of various Defendants such as responding officers and prosecutors), *with* Opp. at 4 ("[A]ctive shooters are those seeking to indiscriminately kill *en masse*. The sheer fact that a suspect is armed and shoots one person doesn't transform him into an active shooter. If that were the case, then every shooting would be considered an active shooter event." (citing Policy at AP326; Dep. of Asbury Park Captain, ECF No. 381-1, Tr. 154:6–15)); Pls. Cert. ¶ 20 (explaining that Asbury Park developed its Active Shooter Policy in response to New Jersey Attorney General's directive that police departments "implement procedures enhancing school safety and safety including active shooter response"); Policy at AP333–AP334 (setting forth recommendations for school officials in connection with the Policy); *and* Pls. Cert. ¶ 14 n.3 ("It is unclear whether use of the word 'facility' was used to describe schools or other locations but the effective meaning is to save the victims."). *See also* Monmouth County Prosecutor's Office Internal Review Report of Law Enforcement Response to the Killing of Tamara Seidle on June 16, 2015 ("Monmouth County Investigation Report"), Ex. A to Pls. Cert., 16 ("Existing law enforcement policies at either the State or County level do not anticipate or encompass the situation which unfolded on June 16, 2015.").)

any liabilities, whether found in the Act or in preexisting law, including statutes. Immunity for public entities is the general rule and liability is the exception." (cleaned up) (first quoting *Tice v. Cramer*, 627 A.2d 1090, 1103 (N.J. 1993); then quoting *Parsons ex rel. Parsons v. Mullica Twp. Bd. of Educ.*, 142 A.3d 715, 718 (N.J. 2016)))); *see Ogborne v. Mercer Cemetery Corp.*, 963 A.2d 828, 835 (N.J. 2009) ("The Legislature [in enacting the TCA] provided broad immunity protection for public entities because 'the area within which the government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done.'"). As relevant here, the Act provides immunity for police officers' "discretionary" conduct but not for negligently performed "ministerial" acts. (*See* 2019 Op. at 32 ("[T]he Act does not provide complete immunity from all tort liability arising out of acts or omissions, and police officers may be subject to liability for negligence in the performance of their ministerial (as opposed to discretionary) duties." (citing *Lee v. Doe*, 557 A.2d 1045, 1049–50 (N.J. Super. Ct. App. Div. 1989))).)

An act is discretionary, and thus protected by TCA immunity, if it "calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." (*Id.* (quoting *S.P. v. Newark Police Dep't*, 52 A.3d 178, 190 (N.J. Super. Ct. App. Div. 2012))); *see Coyne v. State of New Jersey*, 867 A.2d 1159, 1164 (N.J. 2005) (explaining that public employees "exercise . . . discretion" within the meaning of the TCA when they make "actual, high-level policymaking decisions involving the balance of competing considerations"). Conversely, when "a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done," his conduct is ministerial, and he may be held liable when he acts negligently. (2019

Op. at 32 (alteration omitted) (quoting *Newark Police Dep't*, 52 A.3d at 190).) "In essence, where 'the circumstances [are] thought to be such that reasonable policemen in the position of the defendants could have differed about whether or how to act,' the specific decision at issue may be considered discretionary for the purposes of determining TCA immunity." *Gonzalez by Gonzalez v. City of Jersey City*, 255 A.3d 1175, 1187 (N.J. 2021) (alteration in original).

Judge Shipp concluded that the TCA immunized the Asbury Park Defendants. Reviewing their alleged conduct, he found that "the Asbury Park Defendants' response to the events that unfolded during the standoff, such as the Asbury Park Defendants' taking improper tactical cover and parking cars, speaking to Seidle 'without first waiting for command,' yelling 'shots fired,' and 'creating panic,'"[18] constituted discretionary acts subject to immunity under § 59:5-4 of the TCA.[19] (2019 Op. at 33); *see* N.J. Stat. Ann. § 59:5-4 (providing immunity for "failure to provide sufficient police protection service"); (*see also* 2019 Op. at 29 ("Finally, regarding Officer Lawson's yelling 'shots fired' instead of 'active shooter,' the Court finds Plaintiffs failed to allege any facts that

---

[18] Judge Shipp summarized the relevant allegations as follows:

> Plaintiffs argue that Officer Lawson . . . acted in a "grossly deficient manner," including "running in the opposite direction of the shooting, taking improper cover and tactical positions, and relaying the wrong and in fact harmful information of 'shots fired' to dispatch," which added "confusion and chaos" to the scene. Regarding Officers Christie, Griswold, and Crawford, Plaintiffs allege these individuals also "took wrong positions" such that they blocked the view of Seidle and, therefore, there was no "straight line of fire." Plaintiffs also allege that Officers Christie. Griswold, and Crawford improperly parked cars, which did not "effectively close off pedestrian and civilian movement in the immediate area of the shooting," and "spoke to Seidle without waiting for command or coordinating the response first before attempting any intervention."

(2019 Op. at 28 (cleaned up) (citing TAC ¶¶ 613, 617, 621, 625).) He analyzed these allegations at length with respect to Plaintiffs' Fourth and Fourteenth Amendment claims under § 1983. (*Id.* at 21–23, 28–29.)

[19] In its Opposition, Defendant Asbury Park notes that "the individually-named Asbury Park officers could also assert immunity under N.J.S.A. § 59:3-3, which mirrors, at least as to the 'clearly established law' prong, the analysis of qualified immunity under § 1983." (Opp. at 17 n.5; *see* 2019 Op. at 21–23 (finding the Asbury Park defendant officers entitled to qualified immunity and dismissing with prejudice Plaintiffs' Fourth Amendment claim under 42 U.S.C. § 1983).) Defendant further states that, "[s]ince plaintiffs are not seeking to challenge that portion of Judge Shipp's decision granting qualified immunity on the § 1983 claim, that analysis would likely be dispositive of any amended negligence claim." (Opp. at 17 n.5.)

would support their assertion that there is a meaningful difference between those two phrases.”)). Plaintiffs assert that Asbury Park’s Active Shooter Policy, obtained through discovery, applied to officers’ conduct during the standoff, thus making their conduct ministerial rather than discretionary. (*E.g.*, Mot. at 6 (“The Court found the conduct of the Asbury Park Defendants’ to be discretionary. . . . Now that the proofs are in, there is an actual policy which was not followed. Accordingly, the conduct involved was ministerial and the Order/Opinion should be vacated on that issue.” (citations omitted)).) Although not the basis for their Motion, Plaintiffs also reference statewide and nationwide analogues. (*See id.* at 13, 15 n.7, 27; Pls. Cert. ¶ 20.)

However, what Plaintiffs present in their Motion is not new. Plaintiffs allege throughout their TAC that the Asbury Park Defendant Officers acted in contravention of active shooter policy and procedure. (*See, e.g.*, TAC ¶¶ 172 (alleging that Defendant Lawson acted “[i]n a gross disregard of police procedure and policy . . . as expected in any situation where there is an active shooting”), 194 (alleging that Defendant Love “failed to follow any accepted guidelines on how to handle an active shooter/rapid response situation”), 199 (alleging that Defendants Christie, Griswold, and Crawford violated “all active shooter guidelines, both state, national and local”), 215 (alleging “various actions tak[en] by the responding officers which did not comport with policy and procedure”).) They allege actions taken by the Asbury Park responding officers and that such conduct deviated from what was required “in an active shooter situation.” (*Id.* ¶ 173; *see id.* ¶¶ 167 (alleging that Defendant Lawson acted “[i]n a gross disregard of police procedure and policy” by “yell[ing] ‘shots fired’ to dispatch instead of indicating that there was an active shooter and rapid responder situation evolving”), 171 (alleging that Defendant Lawson acted “[i]n a gross disregard of police procedure and policy” by “failing to take available cover with a direct line of

fire to Seidle"),[20] 172 (alleging that Defendant Lawson acted "[i]n a gross disregard of police procedure and policy" by "fail[ing] to take Seidle down by the use of lethal force as mandated under the use of force guidelines and as expected in any situation where there is an active shooting"), 173 (alleging that Defendant Lawson did not act "as required in an active shooter situation"), 189–90 (alleging that Defendant Love "failed to take command of operations as required" and acted "in gross disregard of police procedure and policy"), 197 (alleging that Asbury Park responding officers acted contrary to what was "required under mandated use of force policy and local and nationwide police standards for the handling of the situation"), 198 (alleging that Defendants Christie, Griswold, and Crawford "fail[ed] to take tactical positions in the direct line of fire to Seidle, as each of them were required to [do]"), 428–29 (alleging that Defendant Christie "failed to follow mandated, required protocol in the situation before him" and that, "[i]n an active shooter situation, certain equipment such as bulletproof vests and shields are required and Christie did not show up in accordance with proper protocol and police standards"), 436–37 (same as to Griswold), 444–45 (same as to Crawford); *see also id.* ¶¶ 41–42, 166, 168–69, 175, 177–78, 181, 206, 212, 217, 219, 366–69, 406, 417.)

Plaintiffs' summary of their TAC allegations is instructive: they assert that the TAC "set forth a litany of violations of policy by the Asbury Park officers at or who came to the scene, including running in the opposite direction from the shooting, failing to dispatch or communicate active shooter, failing to coordinate, command and control the situation as required, failing to isolate and contain Seidle, failing to take tactical positions, failing to extricate and rescue the dying Tamara and failing in their ministerial duties to follow policy." (Mot. at 3 (citing TAC ¶¶ 166–71,

[20] In many filings, Philip is referred to as "Seidle" rather than by first name. The Court has not altered these direct quotations but notes that the use of "Seidle" in such instances refers to Philip Seidle.

182–84, 186, 189, 190, 194, 197, 201, 202, 212, 403, 404, 406, 407).) In short, Plaintiffs maintain that their TAC already alleged what they argue their "new" evidence now "establishes"—i.e., that the Asbury Park Defendant Officers violated relevant police policy through their conduct. (*Id.* at 13.)

Likewise, Plaintiffs' instant arguments for reconsideration—that the Policy shows the Asbury Park Defendants' conduct was ministerial and thus defeats TCA immunity—were raised in their opposition to Defendants' underlying motion to dismiss. (*Compare id.* at 23–26, *with* ECF No. 126 at 45–47 (Plaintiffs opposition to Asbury Park Defendants' motion to dismiss) (disagreeing with Defendants' argument that "there is no ministerial duty to shoot Seidle, to designate the event as an active shooter, and to handle the event in the matter factually pled" and arguing that "[v]iolation of actual policies and Standard Operating Procedures are ministerial in nature" and "[t]he ministerial duties are those mandated by policy, which remain to be explored during discovery").) In their second motion for reconsideration, Plaintiffs continue to describe, dispute, and relitigate what the Asbury Park Defendants argued in the underlying motion to dismiss.

Judge Shipp in turn considered the above allegations (and Plaintiffs' arguments in the underlying briefing) in reaching his prior decision. Indeed, he denied dismissal of Plaintiffs' *Monell* claim against the City based on Plaintiffs' allegations that Asbury Park failed to enforce "necessary policies related to active shooter situations," and their *Monell* claim remains pending today. (2019 Op. at 13 (citing TAC ¶¶ 166–78).) He reached a different conclusion with respect to Plaintiffs' negligence claims against the Asbury Park Defendants. (*Id.* at 31–36.) Plaintiffs may well disagree with that decision, and they may raise that disagreement through the appellate process, but not on reconsideration. *See Heartland*, 2021 WL 9667965, at *5 ("Where a party

merely has a difference of opinion with the court's decision, the issue should be raised through the normal appellate process; reconsideration is not the appropriate vehicle."). It is well established that "new" evidence for purposes of reconsideration cannot be cumulative of evidence already presented and considered. *See Bonds*, 2026 WL 1948816, at *6 n.7 ("Each step of the litigation should build upon the last and, in the absence of newly discovered, non-cumulative evidence, the parties should not be permitted to reargue previous rulings made in the case." (quoting *Oritani Sav. & Loan Ass'n v. Fid. & Deposit Co. of Md.*, 744 F. Supp. 1311, 1314 (D.N.J. 1990))). Reconsideration also "may not be used to rehash arguments which have already been briefed by the parties and considered and decided by the Court." *Jester v. State Dep't of Safety*, No. 14-1124, 2016 WL 4497055, *1 (D. Del. Aug. 26, 2016); *see Roggio v. FBI*, No. 08-4991, 2025 WL 1511141, at *4 (D.N.J. May 28, 2025) ("Because of the court's interest in the finality of judgments, motions for reconsideration 'should be granted sparingly and may not be used to rehash arguments which have already been briefed by the parties and considered and decided by the Court.' Said differently, a motion for reconsideration . . . should not be 'grounded on a request that a court rethink a decision already made.'").

Nor is evidence "new" merely because a party "obtains or submits [it] to the court after an adverse ruling. Rather, new evidence in this context [of reconsideration] means evidence that a party *could not* earlier submit to the court because that evidence was not previously available." *Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 252 (3d Cir. 2010) (emphasis added); *see English*, 2020 WL 11027479, at *2 ("[E]vidence is not considered to be previously unavailable just because Plaintiff is now accessing it."). "Absent unusual circumstances, a court should reject new evidence that was not presented when the contested decision was made. A party seeking to introduce new evidence on reconsideration bears the burden of demonstrating that the

evidence was unavailable or unknown at the time of the original [decision].” *Garcia*, 2017 WL 3671289, at *1 (citations omitted). Plaintiffs do not satisfy this burden. They assert, without elaboration, that “discovery has revealed” the Policy, (Mot. at 13; *see id.* at 19, 27), but they neither argue the Policy was previously unavailable nor explain why it “could not have been discovered earlier through the exercise of due diligence,” *English*, 2020 WL 11027479, at *2; *see Stokes v. Internal Affs. Section*, No. 19-20414, 2020 WL 2537575, at *2 (D.N.J. May 19, 2020) (“Evidence that could have been discovered earlier through the exercise of due diligence does not constitute newly discovered evidence for reconsideration purposes.”).

Per Plaintiffs’ own description, the Policy was “effective 2007” and in effect as of June 16, 2015, and it “copied virtually word for word” the New Jersey Attorney General’s “model policy” also issued in 2007.[21] (Mot. at 20; Pls. Cert. ¶ 20; *see also* Opp. at 37 (asserting that Plaintiffs could have obtained the Policy via the Open Public Records Act). *But see* Reply at 16 n.2 (disagreeing that an OPRA request would have yielded the Policy).) What is more, even assuming, *arguendo*, that Plaintiffs could not have obtained the Active Shooter Policy before their TAC was filed and then partially dismissed in 2019—and even putting aside that their TAC nonetheless repeatedly alleges violations of “active shooter policies” and further assuming that Local Rule 7.1(i)’s 14-day time limit does not itself foreclose Plaintiffs’ 2025 Motion—Plaintiffs appear to have been in possession of the Policy no later than September 1, 2021, three-and-a-half years before they first raised the prospect of their Motion to the Court and almost five years before they

[21] According to Plaintiffs, in 2007, the New Jersey Office of the Attorney General (“NJOAG”) issued an active shooter directive—which the Court notes is publicly available online—instructing “all law enforcement agencies [to] implement procedures enhancing school safety and safety including active shooter response.” (Pls. Cert. ¶ 20.) Also in 2007, the NJOAG “created a model policy,” which Asbury Park “copied virtually word for word” in its Active Shooter Policy the same year. (*Id.*)

filed it.[22] (ECF No. 256 at 2–3 (parties' discovery dispute letter setting forth Plaintiffs' position and discovery request regarding the Active Shooter Policy); ECF No. 339.)

Furthermore, Plaintiffs' "new" evidence fails to alter Judge Shipp's 2019 decision that TCA immunity warranted dismissal of Plaintiffs' negligence claims against the Asbury Park Defendants under Rule 12(b)(6). *See Interfaith Cmty. Org.*, 702 F. Supp. 2d at 317 ("To permit reconsideration when new evidence is available, the moving party must present new evidence that would alter the disposition of the case."); *Garcia*, 2017 WL 3671289, at *1 ("A court will grant a motion for reconsideration only where a previous decision has overlooked a factual or legal issue that may alter the disposition of the matter."). The existence of an allegedly applicable policy or law does not make officers' conduct ministerial rather than discretionary. *See, e.g.*, *Newark Police Dep't*, 52 A.3d at 190–91 (concluding that statutory arrest mandate for certain domestic violence situations did not impose ministerial duty preventing TCA immunity for officers who failed to effect arrest because "ensuing decisions of a responding officer" entailed discretion, including whether and how the statute and its mandate applied in a given situation); *Thompson v. State of New Jersey*, No. A-1973-13T3, 2015 WL 5511948, at *6 & n.5 (N.J. Super. Ct. App. Div. Sept. 17, 2015) (per curiam) (rejecting plaintiff's argument that provisions in Police Training Manual imposed ministerial duties on police officers in responding to and investigating shots fired and

[22] Plaintiffs do not dispute this timeline but state in their Reply that they "had to wait until discovery was completed to bring this matter back before the Court." (Reply at 2.) Their other filings echo that position. (*E.g.*, ECF No. 343 ("Plaintiff requests that expert discovery be completed prior to motions seeking to vacate or reconsider the initial dismissal motions . . . .").) This statement by Plaintiffs offers further support for the Court's discussion below, *see infra* note 27, that Plaintiffs appear to ultimately seek to place their expert's opinion, rather than the Policy, before the Court as a basis for reconsideration. Furthermore, to the extent Plaintiffs seek leave to amend their TAC, *see infra* Section III.D, the Court would find that this constitutes undue delay. *See, e.g.*, *Santoro v. Tower Health*, No. 24-3173, 2026 WL 2543842, at *6 (3d Cir. Aug. 28, 2026) (affirming with-prejudice dismissal of second amended complaint and denial of motion for reconsideration and for leave to amend where, *inter alia*, plaintiffs were given multiple opportunities to amend and "rel[ied] on facts that could have been pled much earlier," showing undue delay).

explaining that the manual "merely identifies performance objectives to be completed by police trainees, and is not a formal code of conduct or performance manual" and that plaintiff "proffer[ed] no legal precedent supporting [her] assertion" about duty owed by responding and investigating officers). The instant Policy illustrates why.

The Active Shooter Policy expressly recognizes that "active shooter incidents . . . are sufficiently unique in that their effective handling cannot be totally reduced to standardized and generic procedures." (Policy at AP328.) The Policy accordingly sets out seven "tenets," i.e., "response guidelines," that "represent a means of intervention available to officers" and "are not meant to limit conventional police tactics appropriate to a crisis situation." (*Id.*; *see also id.* at AP329 ("The traditional uniform responses of contain, isolate, evacuate and wait for a tactical response team and Crisis Negotiators *may not be* adequate or appropriate in an active shooter incident. The incident commander will need to *consider* the following [tactics]." (emphasis added)), AP325 ("It is the policy of the Asbury Park PD to *empower* initial responding officers with the authority and responsibility to take immediate action, consistent with their training and experience, to contain and, if necessary, to neutralize active shooters." (emphasis added)).) One of these tenets is "situational analysis," whereby officers "must . . . deci[de] . . . whether the situation is an active shooter incident, whether an opportunity exists for immediate intervention leaning to accomplishment of one of the goals listed above, and how responding resources should be deployed at the scene." (*Id.* at AP328–AP329.) This "situational analysis" appears to "require[] a significant thoughtful analysis and exercise of personal deliberations regarding a variety of factors

such that discretionary immunity should attach under the TCA." *Newark Police Dep't*, 52 A.3d at 190; *see id.* at 190–91.[23]

Plaintiffs suggest that the Policy warrants reconsideration because of a footnote in the 2019 Opinion. (*See* Mot. at 6.) Therein, Judge Shipp noted that, to the extent Plaintiffs alleged that Asbury Park failed to not only *enforce* but also *enact* a proper policy, "Officer Lawson's yelling 'shots fired' instead of 'active shooter' could not have been a ministerial act" performed pursuant to policy.[24] (2019 Op. at 33 n.15.) Plaintiffs recognize that this observation by the Court was not dispositive. (*See* Mot. at 13 n.5 (stating that, in their TAC, "Plaintiff[s] pled that . . . Asbury Park failed to 'enact, promulgate and enforce [such policies]'" and that "[t]his pleading" was "*a* basis to dismiss the negligence claims, as there could be no ministerial failures absent a policy setting

---

[23] The Court notes that Plaintiffs' Motion does not bridge the gap between the conduct alleged in the TAC and the "mandated ministerial obligations" they reference in their Motion. (Mot. at 26.) They cite the Policy as a whole but nowhere offer pincites, specific provisions, or direct quotations in support of their arguments. (*See id.* at 20, 26.) It is only in their accompanying Counsels' Certification that they begin to offer such specificity, primarily based on other evidence in the record such as depositions and their expert's report. (*See* Pls. Cert. ¶¶ 61–79); *cf. Smith v. Haverfield Int'l Inc.*, No. 22-3207, 2023 WL 6164368, at *3 (D.N.J. Jan. 18, 2023) ("[A]rgument . . . is more appropriately set forth in a legal brief and not an attorney certification.").

Although Plaintiffs attach over 3,000 pages of evidence to their Motion, their Motion addresses none of it. (*See* Mot.; ECF Nos. 380-3 to 380-5.) They then argue in Reply that "[t]his is not simply about the policy provided in discovery. It is about the full breadth of discovery required to address the policy and obligations of the Asbury Park officers including depositions, application of the policy, the views of the Asbury Park superior official Salerno and expert review"—despite expressly identifying the Active Shooter Policy as the "new evidence" on which their Motion relies (and despite citing none of this evidence in their Motion). (Reply at 16 n.2; *see, e.g.*, Mot. at 6, 13, 27.)

[24] In full, this footnote said:

> Plaintiffs argue that Asbury Park lacks a proper procedure pertaining to active shooter situations. (*See* TAC ¶ 41 (alleging that Asbury Park knew and was deliberately indifferent to its lack of procedures pertaining to active shooter situations).) As such, Officer Lawson's yelling "shots fired" instead of "active shooter" could not have been a ministerial act performed pursuant to "the mandate of legal authority, without regard to or the exercise of his own judgment," because, as Plaintiffs themselves aver, there is no policy established regarding such circumstances. *Newark Police Dep't*, 52 A.3d at 191.

(2019 Op. at 33 n.15.)

forth specific obligations" (emphasis added)).) Indeed, Judge Shipp considered and accepted as true Plaintiffs' alternative allegations of both the non-existence and non-enforcement of a policy in reaching his decision. (*See, e.g.*, 2019 Op. at 13 (concluding that Plaintiffs adequately alleged their *Monell* claim against the City based on Plaintiffs' allegations that Asbury Park "failed to enforce or enact necessary policies related to active shooter situations").) He found the Asbury Park Defendants' conduct discretionary regardless and independent of what he additionally noted via footnote. (*Id.* at 33.) The Policy thus does not alter Judge Shipp's previous conclusion. *See Jones*, 2016 WL 819618, at *3 ("In order to prevail on a motion for reconsideration, . . . the moving party must set forth the 'dispositive factual matters or controlling decisions of law' it believes the Court overlooked when rendering its initial decision." (quoting *Mitchell v. Twp. of Willingboro Mun. Gov't*, 913 F. Supp. 2d 62, 78 (D.N.J. 2012))).

2. Use of Force

For similar reasons, reconsideration is not warranted based on "use of force" provisions within the Policy. In addition to finding the Asbury Park Defendants immune under the TCA due to the discretionary nature of their conduct, Judge Shipp previously concluded that Plaintiffs could not premise their negligence claims against any Defendant on an alleged duty to use lethal force. (2019 Op. at 34 ("To the extent Plaintiffs allege that any Defendants had a duty to use lethal force, the Court finds no such legal duty exists. . . . For the reasons previously discussed, the Court finds imposing a duty to use lethal force is contrary to public policy, and would interfere with '[t]he deep-rooted nature of law-enforcement discretion.'" (second alteration in original) (quoting *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 761 (2005))).) Plaintiffs argue that "the Court did not have the benefit of discovery establishing that the use of lethal force is required, if necessary, in

an active shooter situation and that all national policies on active shooter set forth this mandate." (Mot. at 5.)

However, Plaintiffs alleged as much in their TAC, which was filed well before discovery commenced. They alleged, for example, that the Asbury Park responding officers failed to use lethal force "as mandated," including as required under "local and nationwide police standards." (TAC ¶¶ 172, 197.) Judge Shipp therefore already considered and accepted those allegations as true pursuant to Rule 12(b)(6), determined that dismissal was appropriate, and concluded that Plaintiffs' negligence claims could not proceed to the extent they were premised on a duty to use lethal force.[25] (*See, e.g.*, *id.* ¶¶ 172 (alleging that Defendant Lawson acted "[i]n a gross disregard of police procedure and policy" by "fail[ing] to take Seidle down by the use of lethal force *as mandated* under the use of force guidelines and as expected in any situation where there is an active shooting" (emphasis added)), 173 (alleging that Defendant Lawson had "sufficient time . . . to use deadly force against Seidle, *as required* in an active shooter situation" and that "[t]he use of deadly force would have either prevented any of the first round of shots or some of them" (emphasis added)), 429 (alleging that Defendant Christie failed "to neutralize the threat of harm to Tamara by shooting Seidle once he began the second round of shots *as required* under the AG guidelines for the use of deadly force" (emphasis added)), 439 (same as to Defendant Griswold), 445 (same as to Defendant Crawford); *see also id.* ¶¶ 41 (alleging "the need to neutralize by death or otherwise the shooter upon contact" as part of "the handling of an active

[25] Plaintiffs assert in a footnote that they "[are] not claiming and never ha[ve] claimed that there is a 'duty' to use lethal force." (Mot. at 15 n.7.) This representation is contradicted by their assertions throughout their TAC and briefing. (*See, e.g.*, Reply at 14 ("The Court's finding that there was 'no duty' to shoot Seidle flies in the face of every recognized authority on the subject and every policy both local and national.").) Furthermore, Judge Shipp's previous decision noted that Plaintiffs' negligence claims could not proceed "[t]o the extent" they depended on such a duty. (2019 Op. at 34.) If Plaintiffs agree that there is no such duty, there is no basis to reconsider that conclusion.

shooter/rapid responder/hostage taking situation"), 175 ("The [New Jersey] Attorney General guidelines state that an officer may use deadly force when there is a reasonable belief that such action is immediately necessary to protect the officer or another person from imminent danger of death or serious bodily harm."), 176 ("The Police Training Commission guidelines, which are used to train all new police recruits, lists as a 'Performance Objective' for active shootings in a school that the priority of law enforcement is to 'Stop shooter- as soon as possible,' which means to neutralize the threat immediately by shooting the suspect."), 197 (alleging that Asbury Park responding officers acted contrary to what was "required under mandated use of force policy and local and nationwide police standards for the handling of the situation"), 199 (same), 403 (alleging that "the responding officers were permitted by the AG guidelines to use deadly force").) In other words, Plaintiffs purport to offer evidence that simply bears out what they allege throughout their TAC.

Plaintiffs agree that the TAC contained such allegations. They contend the TAC already "pled that the use of lethal force was necessary to take down the shooter" and "pled that protocol states that neutralizing the threat is a primary and appropriate response to an active shooter." (Mot. at 3 (citing TAC ¶¶ 172–76); Reply at 14.) They expressly disagree with the conclusion Judge Shipp reached based on what was already before him. (*See* Reply at 14 ("The Court's finding that there was 'no duty' to shoot Seidle flies in the face of every recognized authority on the subject and every policy both local and national. . . . At the time the Court made its original findings, none of the discovery on this issue had taken place. Plaintiff pled it, and pled that protocol states that neutralizing the threat is a primary and appropriate response to an active shooter. Plaintiff did plead that policy requires a responder to shoot an active shooter.")); *Warner*, 885 F. Supp. 2d at 748 ("A party seeking reconsideration must show more than a disagreement with the Court's decision, and

recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden."). For the reasons explained hereinabove, reconsideration is not warranted based on alleged "proofs" of allegations already considered and accepted as true in the original decision. (Mot. at 13.) Evidence is not "new" when it is repetitive or cumulative of what was already considered by the Court, and it does not support reconsideration when it would not have altered the basis for the Court's prior decision. Reconsideration is permitted "only when 'dispositive factual matters or controlling decisions of law' were presented to the court but were overlooked." *Interfaith Cmty. Org.*, 215 F. Supp. 2d at 507; *see Bowers*, 130 F.Supp.2d at 612 ("The word 'overlooked' is the operative term in the Rule. Mere disagreement with a decision of the District Court should normally be raised through the appellate process and is inappropriate on a motion for reargument." (citation omitted)).

Moreover, the Active Shooter Policy does not contain a mandate to use lethal force, so it does not alter the previous outcome. Most obviously, the Policy does not change Judge Shipp's conclusion that no such duty exists so as to support a negligence claim. It also does not alter his conclusion that the Asbury Park Defendants' conduct was discretionary. *See Thompson*, 2015 WL 5511948, at *5–6 (citing N.J. Stat. Ann. §§ 59:2-3, :3-2, :5-4; *Wuethrich v. Delia*, 382 A.2d 929, 930 (N.J. Super. Ct. App. Div. 1978) (per curiam)); *see also id.* at *5 ("When both liability and immunity exist, immunity prevails." (quoting *Dickson ex rel. Duberson v. Township of Hamilton*, 946 A.2d 617, 621 (N.J. Super. Ct. App. Div. 2008))). The Policy expressly confers discretion with respect to the use of force, as even Plaintiffs acknowledge. (Policy at AP325–AP326 ("It is the *goal* of the Asbury Park PD to intervene in active shooter situations to neutralize the threat by preventing access to potential victims and to rescue injured persons and potential victims. . . . This *may* include arrest, containment, or use of deadly force." (emphasis added)), AP328 ("Under New

Jersey law, a law enforcement officer *can* use deadly force as long as the officer reasonably believes that the force employed creates no substantial risk of injury to innocent persons." (emphasis added)); Mot. at 15 n.7 ("[T]he *decision* to use lethal or deadly force is *permitted* under the Attorney Generals Use of Force policy and Asbury Park's use of force and active shooter policies." (emphasis added)); Pls. Cert. ¶ 27 ("The use of deadly force is explicitly *authorized* to be used *as necessary* in the [Active Shooter Policy]." (emphasis added)).)[26] This comports with Judge Shipp's conclusion, as well as with public policy and common sense, that "no such legal duty [to use lethal force] exists." (2019 Op. at 34; *see id.* at 22 ("[Plaintiffs'] position promotes the notion that police officers should shoot first and ask questions later and pushes the Court to support a policy under which lethal force is not merely condoned, but affirmatively required. The Court is loath to endorse such a position . . . .").)

To the extent Plaintiffs recognize the absence of a mandate to use lethal force yet nonetheless seek reconsideration, they appear ultimately concerned not with the Policy but with the opinions of their expert and issues of admissibility.[27] Plaintiffs assert they "seek[] to offer

---

[26] The Prosecutor's Office apparently examined "whether deadly force should have been utilized against Philip Seidle" as part of its investigation into the law enforcement response on June 16, 2015, per the report Plaintiffs submitted in support of their Motion. (Monmouth County Investigation Report at 15.) The Prosecutor's Office concluded that, "[b]ased on a thorough review of the evidence from this incident, *the decision not to utilize* deadly force against Philip Seidle was reasonable" and "[t]he responding officers' ability to use force against Seidle was limited because of two (2) overarching and fundamental principles in use of force *assessments*." (*Id.* (emphasis added).)

First, "[o]fficers are prohibited by State law and policy from using lethal force against a person, or shooting a person, who could be injurious only to themselves," and, second, "[e]ven during the brief period when Seidle was discharging his gun and not threatening suicide, responding officers had no ability or opportunity to shoot Seidle without creating a substantial risk to innocent civilians in this densely populated neighborhood." (*Id.* at 15–16.) This aligns with the Policy's statement that "a law enforcement officer can use deadly force as long as the officer reasonably believes that the force employed creates no substantial risk of injury to innocent persons." (Policy at AP328.)

[27] Plaintiffs' Counsel's Certification suggests that their request for reconsideration is largely if not ultimately founded not on the Policy but on their expert's opinions regarding the duties and failures of the

expert testimony on policies which were not adhered to or understood, including the ability to use deadly force," and that "[t]o prohibit plaintiff from establishing what is a national and local standard is contrary to the rules of evidence." (Mot. at 5; *see id.* at 27 ("Discovery reveals that the use of deadly force can and should be used in an appropriate situation. For the expert not to be able to include this critical piece of the policy at trial would amount to a distortion and inaccurate presentation of policy, which would clearly not be in the interests of justice."); Reply at 15 ("[The Court's prior decision] makes it virtually impossible to present this case on the merits – that law enforcement had various tools and protocols at their disposal to stop Seidle and save Tamara, including the use of deadly force.").) The Court does not consider the previous decisions, at the pleadings stage, to be evidentiary rulings. Nor do such concerns provide a basis for reconsideration.[28]

Finally, Judge Shipp dismissed Plaintiffs' negligence-based claims in Counts 13 and 14, *see supra* note 6, as derivative of Plaintiffs' dismissed negligence claims in Count 10. (2019 Op. at 36 ("[B]ecause the Court dismissed Plaintiffs' negligence claims, any derivative claim, including the negligent infliction of emotional distress claim, must also be dismissed.").) Plaintiffs make no separate argument as to their derivative negligence claims and seek reinstatement thereof based on their other arguments. (*See* Mot. at 26 (asserting that, "in the event the negligence claims

---

Asbury Park Defendants. (*See* Pls. Cert. ¶¶ 61–79.) Such opinions also do not affect the previous decision. *See Jerkins ex rel. Jerkins v. Anderson*, 922 A.2d 1279, 1284 (N.J. 2007) ("Whether a duty of care exists is a question of law that must be decided by the court."); *Coleman v. Martinez*, 254 A.3d 632, 648–49 (N.J. 2021) ("[W]hether a defendant owes a legal duty to another and the scope of that duty are generally questions of law for the court to decide."); *Est. of Campagna v. Pleasant Point Props., LLC*, 234 A.3d 348, 359 (N.J. Super. Ct. App. Div. 2020) ("We are not bound by the opinion of plaintiffs' expert that the recognition of such a duty is legally required because it is reflective of industry practices and customs. An expert's opinion on a question of law is neither appropriate nor probative. It is the exclusive province of the court to decide questions of law . . . " (cleaned up)).

[28] Again, the Court reiterates that this Opinion relates only to Plaintiffs' dismissed negligence claims against the Asbury Park Defendants and should not be read as expressing any view about Plaintiffs' *Monell* claim against the City, which remains pending.

are reinstated," Plaintiffs' emotional distress and *Portee* claim "must also be reinstated").) Absent any reason to disturb the dismissal of Plaintiffs' negligence claims, for the reasons explained hereinabove, reconsideration is improper as to Plaintiffs' derivative negligence claims.

### D. AMENDMENT OF THE TAC

As stated, *see supra* note 1, Plaintiffs' Motion is titled "Brief in Support of Motion to Vacate, Modify or Reverse Interlocutory Order," and, as evidenced by the foregoing, Plaintiffs' substantive focus in their Motion is reconsideration. However, their Notice of Motion includes an alternative or additional request: "Motion to Vacate, Modify or Reverse Interlocutory Order *or Permit Motion to File an Amended Complaint*." (ECF No. 380 (emphasis added).) The Court will briefly address Plaintiffs' imprecise, offhanded, and contradictory request regarding amendment of the TAC.

Plaintiffs' Motion contains three passing and perfunctory assertions, without any developed argumentation, that they should be permitted to amend the TAC. (Mot. at 27 (stating that the Court should "permit the [TAC] to either be amended to permit the negligence claims to proceed or reconsider and reinstate those claims"); *see id.* at 19, 26.) However, they elsewhere recognize that, in order to seek such amendment, they would need to file a proper Rule 15(a) motion with a proposed amended complaint attached. (*See, e.g.*, Reply at 1 ("[A] motion for an amended complaint . . . would then require the proposed amended pleading . . . .").) Plaintiffs further advise that they simply seek to "leave[] open the remedy of amendment" but maintain that "there is little necessity for an amended complaint" because "the pleadings were and remain sufficient." (*Id.* at 1, 7.)

In Plaintiffs' Reply, they appear to seek slightly different relief. Rather than presently asking to amend the TAC, they seem to ask to file a *future* motion to make that request. (*Id.* at 19

(asking the Court to "reconsider and reinstate" negligence claims against Asbury Park Defendants "or permit plaintiff[s] to file a motion with a proposed amended pleading to amend the complaint"); *see id.* at 1.) Put another way, Plaintiffs make a passing request for *leave to move* for leave to amend, rather than presently requesting leave to amend.[29]

It is thus ultimately unclear whether Plaintiffs seek any additional or alternative relief other than reconsideration. Any request they make is cursory and undeveloped. It is "well-settled" that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed" forfeited. *Gladysiewski v. Allegheny Energy Serv. Corp.*, 282 F. App'x 979, 981 (3d Cir. 2008); *see Higgins v. Bayada Home Health Care Inc.*, 62 F.4th 755, 763 (3d Cir. 2023) ("A passing reference to an issue . . . will not suffice to bring that issue before this court.").

Albeit confusing and undeveloped, to the extent Plaintiffs request to amend the TAC, thus constituting the fifth complaint in this action, such a request is denied. Plaintiffs fail to attach "a copy of the proposed amended pleading" as required under Local Rule 15.1(a); fail to analyze the necessary Rule 15(a) factors, many of which present a further barrier to amendment; and fail to justify reconsideration for overlapping reasons. L. Civ. R. 15.1(a); Fed. R. Civ. P. 15(a)(2); *see Mullin v. Balicki*, 875 F.3d 140, 149–50 (3d Cir. 2017) (explaining that district courts' discretion

[29] Plaintiffs appear to recognize that Rule 15(a) is not the proper vehicle for reinstating claims that were dismissed with prejudice, and amendment would be futile, as a matter of law, without reconsideration and reinstatement of those claims. *See, e.g.*, *McAdory v. M.N.S. & Assocs.*, No. 17-777, 2018 WL 1256482, at *1 (D. Or. Mar. 11, 2018) ("Given that the dismissal . . . was with prejudice, Plaintiff's current motion [for leave to amend] is more appropriately considered a motion for reconsideration . . . . I construe the motion as a motion for reconsideration and I deny it."); *cf. Niedermeier v. Off. of Baucus*, 153 F. Supp. 2d 23, 27 (D.D.C. 2001) (denying Rule 59(e) motion to vacate with-prejudice dismissal and explaining that, before a district court can consider a motion for leave to amend a dismissed complaint, "the Court must first rule upon" the motion for reconsideration); *Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357, 367–68 (3d Cir. 2013) ("When a party seeks leave to amend a complaint after judgment has been entered, it must also move to set aside the judgment pursuant to Federal Rule of Civil Procedure 59(e) or 60(b), because the complaint cannot be amended while the judgment stands.").

to grant or deny leave to amend depends on the factors of "undue delay, bad faith or dilatory motive on the part of the movant; repeated failure to cure deficiencies by amendments previously allowed; prejudice to the opposing party; and futility" and that courts may further consider "additional equities, such as judicial economy/burden on the court and the prejudice denying leave to amend would cause to the plaintiff"); *supra* note 22; *see also Cureton v. NCAA*, 252 F.3d 267 (3d Cir. 2001) (explaining that the merits of a motion for reconsideration under Rule 59(e) and a motion for leave to amend under Rule 15(a) "turn on the same factors").

**CONCLUSION**

For the reasons set forth above, the Court **DENIES** Plaintiffs' Motion for Reconsideration (ECF No. 380-6). An appropriate Order accompanies this Opinion.

ROBERT KIRSCH
UNITED STATES DISTRICT JUDGE

Dated: September 28, 2026